UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BOSTON CAB DISPATCH, INC, | ) | |
| and | ) | |
| EJT MANAGEMENT, INC, | ) | |
| Plaintiffs, | ) | C.A. No. 13-cv-10769-NMG |
| v. | ) | |
| UBER TECHNOLOGIES, INC., | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

## I.     INTRODUCTION

Uber's Memorandum in Support of Defendant's Motion to Dismiss ("Defendant's Memorandum") relies on a simple premise in asking the Court to dismiss the non-RICO claims (Counts I-VI): according to Uber, the Plaintiffs "assume a particular interpretation of Boston's taxicab regulations [Rule 403] that the designated regulators have neither tested nor adopted." Uber asserts that these counts stand or fall on proving "a litany of alleged Rule 403 violations," and that "these alleged municipal violations form the basis of Plaintiffs' Lanham Act claims as well as the derivative Chapter 93A and common law claims." (Defendant's Memorandum, p. 5.)

In assuming that the plaintiffs only contend in Counts I-VI that Uber's operations run afoul of the Taxi Rules, Uber has overlooked three laws that prohibit its operation in Boston, consisting of two Massachusetts statutes and the Boston City Code, an ordinance

1

passed by the City Council and wholly unrelated to the Hackney Division's Rule 403. Uber's fundamental misunderstanding of Massachusetts law torpedoes the argument on which the Motion to Dismiss Counts I-VI is founded.

In 1930, the Massachusetts legislature granted the Police Commissioner of Boston authority to adopt the regulations that exist today as the "Taxi Rules," formally entitled Rule 403, Hackney Carriage Rules and Flat Rate Handbook (Exhibit C to Defendants' Memorandum)(referred to as "Taxi Rules," "Rule 403," and "Hackney Rules"). In that Hoover-era statute, Chapter 392 Of The Acts Of 1930 (set forth in full in Appendix I to the Taxi Rules, Defendants' Memorandum Exhibit C, p. 53), the Massachusetts legislature established, as a matter of state law, the definition of "Hackney Carriage," and the requirement that every Hackney Carriage in the City of Boston must have a Hackney License.

Section 2 of Chapter 392 of the Acts of 1930 defines a "Hackney Carriage" as any "vehicle used or designed to be used for the conveyance of persons for hire from place to place within the city of Boston," other than trolleys and other unrelated forms of public transportation. Section 3 states, as a matter of state law—not a mere Hackney Division regulation—that:

> [N]o person shall drive or have charge of a hackney carriage, nor shall any person, firm or corporation set up and use a hackney carriage, unless licensed thereto by the Police Commissioner of the City of Boston; nor shall any person having the care or ordering of such a vehicle in said city suffer or allow any other person other than a driver so licensed to drive such a vehicle.

Having established this definition and licensing requirement, the legislature then delegated to the Police Commissioner of Boston "exclusive authority to make rules and orders for the regulation of hackney carriages . . . as defined in section two." But the

statute does not grant the Commissioner authority to alter the definition of Hackney Carriage or alter the licensing requirement enacted by the legislature. These are state law, and the rulemaking authority delegated by the statute does not extend to amending the statute itself.

Thirty-three years later, the Massachusetts legislature returned to the subject of Boston taxis, and enacted Chapter 386 of the Acts of 1963 (also set out in Appendix I of Exhibit C to the Defendants' Memorandum), which states in relevant part:

> In the city of Boston, no person driving or having charge of a taxicab[1] shall solicit the carriage of a passenger or passengers for hire unless said person is licensed as a hackney carriage driver and said taxicab is licensed as a hackney carriage, by the police commissioner of said city.

Independent of the Police Commissioner's authority under Chapter 392 Of The Acts Of 1930 to adopt regulations for Hackney Carriages, the Boston City Council adopted City of Boston Municipal Code, Section 16-15.5, which states in relevant part:

> 16-15.5 Vehicles for Hire.
> a. In the City of Boston, no person, firm, or corporation driving or having charge of a taxicab or other private vehicle shall offer the vehicle for hire for the purpose of transporting, soliciting and/or picking up a passenger or passengers unless said person is licensed as a hackney driver and said vehicle is licensed as a hackney carriage by the Police Commissioner of said City.

The two statutes and Boston City Code provision set out above refute Uber's claim that this lawsuit depends on interpretation of the Taxi Rules. The Taxi Rules themselves do not prohibit operation of a "taxi" or a "conveyance for hire" or a "hackney carriage" without a license. Unlicensed cabs are only outlawed by the two state statutes

---

[1] Lest there be any question about the definition of the term "Taxicab," Rule 403 § 1.I. incorporates the definition of Hackney Carriage from Statutes 1930, ch. 392, and adds a final sentence:

> b. Hackney Carriage: A vehicle used or designed to be used for the conveyance of persons for hire from place to place within the city of Boston . . . Also known as a taxicab or taxi.

and the Boston City Code quoted above.

It is curious that Uber overlooked the two state statutes and the Boston Code that each independently outlaw Uber's Black Cars, SUVs and UberX vehicles, as these laws are appendices to the Taxi Rules attached as Exhibit C to Uber's Motion to Dismiss. It is even more difficult to understand Uber's attempt in its Motion to Dismiss to ignore its most recent innovation in Boston. Uber's Memorandum acknowledges that it currently "partners" in Boston with Black Cars and SUVs, but elects not to deal with the elephant in the room—UberX.

When the Complaint was filed on March 11, 2013, UberX had been announced in Boston, and Uber was recruiting drivers. (Complaint, ¶¶ 55-58.) As stated in the Complaint, UberX is designed to supplant regulated taxis entirely by converting every licensed driver with a post-2006 Prius, Camry, Altima, Taurus or Fusion into an Uber-partnered gypsy cab. (*Id.*) In the intervening seven weeks, UberX Boston has ramped up. Its Twitter account features Instagram photos of the drivers it has recruited, and in the highest-traffic areas of Boston, UberX vehicles are almost as numerous as Uber Black Cars, SUVs and taxis.

Yet Uber's Memorandum nowhere addresses UberX. Without question UberX's new fleet of blue-collar limos, like its more familiar Black Cars and SUVs, are "conveyance[s] of persons for hire" (Statutes 1930, ch. 392, §2) and "private vehicle[s]. . .for hire for. . .picking up a passenger" (Boston Municipal Code, Section 16-15.5). These vehicles cannot, under the redundant requirements of state law and the Boston City Code, operate unless they have obtained a license from the Police Commissioner of Boston. Presumably Uber refuses to acknowledge its boldest innovation because it cannot deny

that UberX is designed to replace licensed taxis as "conveyances for hire," avoid any oversight by the Hackney Division, and permit Uber to monopolize on-demand transportation services in Boston with Uber Black Cars and SUVs for the wealthy and UberX cars for the rest.

Uber compounds its failure to acknowledge state laws, Boston's City Code, and UberX's existence by failing to recognize that the Complaint distinguishes clearly between Uber's three different operations—Black Cars/SUVs, Uber-affiliated Taxis and UberX. As explained below, these cumulative oversights lead Uber to argue mistakenly that the plaintiffs' claims under M.G.L. c. 93A (Counts III-IV), common law unfair competition (Count V) and Intentional Interference (Count VI) rely on interpretation of the Taxi Rules. The plaintiffs will first address Uber's grounds for dismissing state law claims (Counts III-VI), and then will take up Uber's arguments concerning RICO claims (Counts VII-IX) and Lanham Act claims (Counts I-II).

## II.  **ARGUMENT**

### A.  **Uber Has Stated No Grounds for Dismissing Count III, Alleging Unfair and Deceptive Acts and Practices in Violation of M.G.L. c. 93A.**

Uber's misunderstanding of Massachusetts law and mischaracterization of the plaintiffs' claims is nowhere more evident than in Uber's argument for dismissing Count III. In that count, the plaintiffs allege that Uber made four "false representations that constitute unfair and deceptive acts and practices in commerce:"

a) Falsely claiming an affiliation with medallion owners and radio associations;
b) Falsely claiming that it only collects a $ 1 fee and pays the full 20% "gratutity" to taxi drivers;
c) Falsely claiming that its taxi service is lawful under Boston Taxi Rules;
d) Falsely claiming that its Black Cars, SUVs and UberX vehicles do not need to be licensed and regulated as taxis in Boston.

Complaint, ¶ 66.

Although Uber insists that these claims rely on alleged violations of Rule 403, only (c) implicates the Taxi Rules. A review of the remaining three specific claims shows that none of them turn on an interpretation of the Taxi Rules. The plaintiffs' allegations concerning (b) (the phony gratuity) are:

> 37. Uber claims that its fee is a mere $1 per taxi trip, and that drivers receive the full 20% "gratuity:"
>> With Uber TAXI we'll automatically add **20% gratuity for the driver**, and you'll see it reflected on your receipt. We charge your credit card directly, so there's no need to hand any payment to the driver.
>> (https://www.uber.com/cities/boston#)(emphasis added).

> 38. Uber's claim that it receives only $1 and drivers receive the 20% gratuity is an outright lie. The truth is that drivers only get half of the 20% charge and the rest goes to Uber. Uber' s lie is clever marketing, designed to trick customers into believing that they are paying the standard taxi fare, paying a standard 20% tip to the driver, and giving Uber only $1 for its services.

The Taxi Rules are not implicated in this claim: it turns on nothing more than Uber's fraudulent representations about the fees it charges and the gratuities it pays.

Turning next to Claim (d) of Count III—that Uber falsely represents that its Black Cars, SUVs and UberX vehicles can lawfully operate in Boston without hackney licenses—that allegation will be resolved based on the Court's reading of the two state statutes and Boston City Code provisions quoted above. No interpretation of Rule 403 is required.

The final alleged misrepresentation in Count III, claim (a), relies on the following assertions:

> 50. Uber falsely leads customers to believe that the owners and operators of Boston Cab taxis have approved these charges [Uber fares that violate the Taxi Rules], and falsely suggests that Uber and the radio associations, including Boston Cab, are "partners" in the Uber transportation system. Having invested

> nothing to acquire and equip vehicles, purchase licenses, create and equip radio associations, pay carrying costs for insurance, inspection and regulatory compliance, Uber has unilaterally established a new system for linking customers to cabs and tricked the customers into believing that cab owners and radio associations, including Boston Cab, have granted Uber legal authority to sell taxi services in Boston and collect fares.

Complaint, ¶ 50.

As with (b) and (d), this claim turns on whether Uber unfairly and deceptively led consumers to believe that Uber had partnered with the plaintiffs in adding the plaintiffs' taxis to the Uber Taxi transportation system. No interpretation or application of the Taxi Rules controls the outcome of this ch. 93A claim.

Uber offers a final argument against Count III that simply misunderstands the claim. Uber mistakenly asserts that in Count III the plaintiffs are claiming that a violation of the Taxi Rules is a violation of ch. 93A. Uber then says dismissal is required because the Taxi Rules "do not confer a private right of action." (Defendant's Memorandum, p. 13-14.) But, as discussed above, Count III does not claim Uber engaged in unfair and deceptive acts and practices by violating Rule 403; it states that Uber violated ch. 93A by deceptively suggesting it had partnered with the plaintiffs; by lying about the gratuities and fees it charges; and by deceptively claiming that its Black Cars, SUVs and UberX vehicles do not need taxi licenses. These misrepresentations, not violations of the Taxi Rules, are the basis for Count III. And misrepresentations are the clearest ground for liability under ch. 93A:

> This court has underscored the broad impact of c. 93A as creating "new substantive rights" and providing relief which is "in addition to, and not an alternative to, traditional tort ... remedies." *Linthicum v. Archambault,* 379 Mass. 381, 383, 398 N.E.2d 482 (1979), and cases cited. Consequently, while it is clear that common law actions for fraud and deceit are within the contemplation of an "unfair act" under the statute, it is equally well established that the definition of the term under c. 93A goes far beyond the scope of these common law actions.

*Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 778, 489 N.E.2d 185, 197 (1986).

### B. Uber Has Stated No Grounds for Dismissing Counts IV and V, Alleging Unfair Competition in Violation of M.G.L. c. 93A and at Common Law.

Uber makes no distinction between Counts III and IV in its Memorandum, apparently not recognizing that ch. 93A, § 11 identifies two forms of unlawful business-to-business behavior—one for unfair or deceptive acts and practices, and a different one for unfair competition. The allegations supporting the ch. 93A unfair competition claim in Count IV are:

> 69. By unlawfully operating its taxi, Black Car, SUV and UberX transportation services without incurring the expense of compliance with Massachusetts and Boston laws, as alleged above, Uber unfairly competes with plaintiffs, in violation of M.G.L. c. 93A, § 11.

> 70. By diverting revenues for credit card processing that the plaintiffs are contractually obligated to pay to CMT, Uber unfairly competes with the plaintiffs.

Focusing first on ¶ 69, the allegations concerning the "expense of compliance" with state and local law refer to the unfair competitive advantage Uber's Black Cars, SUVs and UberX cars obtain by ducking two distinct costs. First, Uber's taxi surrogates evade the costs associated with obtaining taxi licenses. Second, Uber gains an unlawful competitive advantage when its Black Cars and SUVs purchase insurance under the state CAR program at rates substantially lower than they would have to pay as licensed taxis. (Complaint, ¶¶ 46-48.)

Paragraph 70 of the Complaint refers to a different form of unfair competition that occurs in Uber-affiliated taxis. When Uber diverts the entire fare (plus 20%, plus $1) of a Boston taxi passenger into its computerized collection system, it deprives one of the three

Hackney Division-authorized credit card processing companies of revenue and puts the plaintiffs in violation of their agreements with their credit card processing company, CMT. (Complaint, ¶¶ 51-54.) This claim thus turns on violation of a contact between the plaintiffs and CMT, not a violation of the Taxi Rules.

None of the allegations in Count IV rely on an interpretation of the Taxi Rules, and Uber makes no other argument for dismissal of Count IV. Its Motion to Dismiss Count IV must be denied.

Count V states Massachusetts' common-law unfair competition claim, which relies on the same allegations at Count IV. Uber has stated no grounds for dismissal other than those addressed above, and its motion to dismiss Count V must be denied.

**C.      Uber Does Not Bother To State Grounds for Its Motion to Dismiss Count VI, Intentional Interference With Contractual Relationships.**

Uber's argument for dismissal of Count VI follows a familiar theme—that the plaintiffs have simply "repackage[d] the allegations of municipal ordinance and regulation violations" and that "Just as Plaintiffs' other claims based on alleged violations of these ordinances and regulations fail, so too does this claim." (Defendant's Memorandum, p. 14.)  Uber's attempt to steer the Court away from any interpretation of the Taxi Rules in Lanham Act cases is, as the plaintiffs explain below, pp. 19-20, a nonstarter: Uber has violated a variety of clear and unambiguous provisions of the Hackney Rules. But even if this Court chose not to interpret Rule 403 in resolving federal Lanham Act claims, Count VI is a state-law tort claim. The prudential Lanham Act doctrine discussed by the D.C. Circuit—even if it provided guidance for the Lanham Act counts—is inapplicable to a Massachusetts tortious interference claim.

The Complaint meets pleading standards in alleging that Uber interferes in the contract between the plaintiffs and Boston taxi drivers. Uber induces drivers of cabs leased from EJT and other Boston medallion owners to violate their lease agreements. (Complaint, ¶¶ 42, 51-54, 77-78.) The Shift Lease Agreement signed by all Boston Taxi drivers includes the following provision:

Hackney Carriage Rules

Lessee shall abide by, conform to, and comply with any and all rules and regulations of the Boston Police Commissioner or his designee applied to Licensed Hackney Carriages during the term of this agreement, whether previously or subsequently promulgated, and Lessee shall indemnify Lessor from any and all costs and expenses caused by Lessee's violation of said rules and regulations. In the event the Police Commissioner at any time adopts any rules or regulations, which preclude the Lessor and Lessee from engaging in the taxicab business as contemplated, this Agreement shall automatically terminate without further obligation or liability to either party.

(Shift Lease Agreement, IOC-9-12, Exhibit A to this Memorandum.)[2]

Uber compels "partnered" Boston taxi drivers to commit multiple shift lease violations, *e.g.*, charging illegal fares, using cell phones illegally*,* and refusing illegally to accept payment in cash, vouchers, discount coupons or the credit card machine installed in each Boston taxi. (¶ 42) Focusing specifically on credit card payment violations, the Shift Lease requires all drivers to comply with the following provisions relevant to credit card payment:

Credit Card Payments: No Hackney Carriage Driver shall refuse to accept a credit card as payment for a fare. . . .

---

[2] It is appropriate for the Court to consider the Shift Lease Agreement in connection with a Motion to Dismiss, just as it is appropriate to consider the three exhibits submitted by the defendants. "[W]hen a complaint's factual allegations are expressly linked to-and admittedly dependent upon-a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008), *quoting Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12, 16-17 (1st Cir.1998). This document is referenced in Defendant's Memorandum Exhibit 2, p. 2, but not included in the exhibit.

(Rule 403, § 5.II.bb, Defendant's Exh. C p. 36.)

Boston cabbies violate this provision every time they carry an Uber passenger: Uber refuses to allow its customers to pay any way other than its smartphone app. (Complaint ¶¶ 33, 42, 51-53.)

This review of Count VI of the Complaint demonstrates that the plaintiffs have provided facts in support of each element of the Massachusetts tort of interference with contractual relations. Uber incorrectly cites *Blackstone v. Cashman*, 448 Mass. 255, 860 N.E.2d 7 (2007) for the elements of a tortious interference claim in Massachusetts.[3] The actual elements of a tortious interference claim in Massachusetts are:

> To make out a case of intentional interference with a contract, a plaintiff must prove that "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive **or** means; and (4) the plaintiff was harmed by the defendant's actions." *G.S. Enterprises, Inc. v. Falmouth Marine, Inc.,* 410 Mass. 262, 272, 571 N.E.2d 1363 (1991).

*Melo-Tone Vending, Inc. v. Sherry, Inc.*, 39 Mass. App. Ct. 315, 318, 656 N.E.2d 312, 314 (1995)(emphasis added).

In addition, Massachusetts also allows recovery for interference that prevents the plaintiff "from performing the contract or causing his performance to be more expensive *or burdensome*," *Shafir v. Steele*, 431 Mass. 365, 369, 727 N.E.2d 1140, 1144 (2000)(*quoting from* Restatement (Second) of Torts § 766A)(emphasis added).

Evaluating the sufficiency of the complaint in light of these elements, the plaintiffs have alleged that they have a contract with taxi drivers who lease cabs and who

---

[3] As the Appeals Court noted, *Blackstone* involved a specific subset of tortious interference claims--those against a corporate official for interfering in his own employee's employment contract. In that form of corporate employment case, the elements and burdens of proof are different from those in business-to-business tortious interference cases. *Blackstone,* 448 Mass. at 260-69, 860 N.E.2d 7 at 13-19.

also sign up with Uber (Element 1), and that Uber knowingly induced a violation of that contract (Element 2):

> [Uber] induces its taxi drivers ("partners") to illegally substitute Uber's computerized dispatching and credit card billing system for the seven legal dispatching systems and three legal billing systems in Boston--knowing full well that in so doing, the taxi drivers who sign up with Uber are violating the Taxi Rules of the City of Boston and their contracts with taxi owners.

Complaint, ¶ 14.

Element 3, improper motive or means, is alleged in a variety of ways. Inducing-- more accurately, compelling—cabbies to violate the taxi rules is unquestionably an improper means. *See, e.g., United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 816, 551 N.E.2d 20, 23 (1990). And the plaintiffs have certainly made it plain that Uber's vision—to bypass the public safety protections of the Taxi Rules and divert all income in the Boston Taxi industry through its coffers—is an improper motive. (*See, e.g.,* Complaint ¶ 58.)

Finally, the Complaint alleges sufficient harm to meet pleading standards. As stated in *Shafir*, *supra*, intentional interference that makes performance of a contract "more expensive *or burdensome*" gives rise to a claim. The plaintiffs' claim that Uber prevents them from performing their obligations to CMT, their credit card processing company, Complaint ¶¶ 51-53, sufficiently alleges that Uber's misappropriation of credit card processing fees due to CMT makes the plaintiffs' performance of their contract more burdensome. Uber's Motion to Dismiss Count VI must be denied.

### D. Uber Ignores the Plaintiffs' Fraud Claims In Claiming Failure to Plead Predicate Acts for the RICO Claims, Counts VII-IX.

Uber's abbreviated RICO arguments misstate or ignore the plaintiffs' allegations. Uber first questions whether the Complaint adequately pleads predicate wire fraud acts,

leading off with the curious assertion that "Plaintiffs' claim that 'fraudulent representations have been transmitted to Boston users of the Uber taxi transportation system thousands of times over a period in excess of five months' **contains no support**." (Defendant's Memorandum, p. 16)(emphasis added).

In fact, the quoted paragraph reads:

80. By using the internet to transmit fraudulent misrepresentations to Boston consumers about fares in Uber taxis and false claims of an association between Uber and Boston Cab Dispatch, Uber violates the federal Wire Fraud statute, 18 U.S.C. §1343. These fraudulent representations have been transmitted to Boston users of the Uber taxi transportation system thousands of times over a period in excess of five months.

Earlier allegations concerning Uber's wire fraud state:

38. Uber's claim that it receives only $1 and drivers receive the 20% gratuity is an outright lie. The truth is that drivers only get half of the 20% charge and the rest goes to Uber. Uber' s lie is clever marketing, designed to trick customers into believing that they are paying the standard taxi fare, paying a standard 20% tip to the driver, and giving Uber only $1 for its services.

49. Each time Uber assigns a Boston cab in response to an electronic hail, Uber fraudulently leads its customers to believe that it is legally authorized to do so, and that Uber is legally authorized to charge a fee and a 20% "gratuity" over and above the maximum lawful fare set by the Taxi Rules.

50. Uber falsely leads customers to believe that the owners and operators of Boston Cab taxis have approved these charges, and falsely suggests that Uber and the radio associations, including Boston Cab, are "partners" in the Uber transportation system.

Apparently forgetting that the case is at the pleading stage, Uber argues for dismissal by pointing out that Uber's web site disclaims any partnership with the plaintiffs. (Defendant's Memorandum, p. 17.) At trial Uber can offer evidence to rebut the plaintiffs' claims, but in this Rule 12(b)(6) motion the Complaint—including the plaintiffs' assertion that Uber has used the internet for months to falsely claim a partnership with the plaintiffs—is taken as true. The allegations of false pretenses

concerning a partnership meet the pleading standard.

Even more curious is Uber's claim that the Complaint contradicts itself by alleging that Uber charges illegal taxi fares and also alleging that Uber deceives customers about the cabbies' share. (Defendant's Memorandum, p. 17.) Uber does both, but that is not the issue. For purposes of this Motion to Dismiss, the Complaint alleges that Uber has engaged for months in wire fraud through thousands of internet communications to customers that contain "outright lies" about payments to cab drivers and misrepresentations concerning a partnership with the plaintiffs. These allegations meet the pleading standard for wire fraud.

Uber's next argument against the RICO counts is that the Complaint doesn't allege "specific intent by Uber to defraud. Plaintiffs' claims, taken at face value, attempt to show omissions in disclosure." (Defendant's Memorandum, p. 17.) On its face the Complaint accuses Uber of an "outright lie" that is "designed to trick customers" about fares and asserts that Uber "falsely leads customers" and "fraudulently leads customers" to believe Uber and the plaintiffs are operating in association with each other. (Complaint, ¶¶ 38, 49-50, set out above.) It is difficult to credit the defendant's argument that these allegations only accuse Uber of "failure to disclose information, without more." (*Id.*) The pleading standard for specific intent has been met.

Turning from its attack on predicate acts to the substance of the three RICO claims, Uber makes a single argument: that none of the three counts "allege[s] a harm independent from the alleged wire fraud activity underlying the action." (Defendant's Memorandum, p. 18.) Uber proceeds to state (correctly) that in Count VII, alleging violation of RICO's "use or invest" alternative, 18 U.S.C. § 1962(a), the plaintiffs claim

Uber uses the fraudulent representations set out in the Complaint to earn income. Uber also correctly states that under § 1962(a) "the plaintiff must allege an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves." (*Id.*)

Count VII's detailed allegations (Complaint, ¶¶ 79-85) meet these standards. In analyzing all the RICO counts, it is important to keep in mind a distinction that Uber's argument ignores: the wire fraud alleged in Counts VII-IX is Uber's false claims about how much of the fare and "gratuity" Uber TAXI drivers receive, and its false claims that it has partnered with the plaintiffs in the operation of Uber-affiliated Boston taxis. Count VII alleges that Uber uses these fraudulent representations to convince customers to summon Uber-affiliated Boston taxis, and that Uber profits from these fares. The plaintiffs allege that they reasonably believe (and Uber doesn't deny) that Uber then uses at least some of this income ("proceeds of racketeering activity") to expand its non-taxi fleet of Black Cars, SUVs and UberX vehicles in Boston. These "taxi substitutes" compete directly against the plaintiffs' cabs, causing economic injury to the plaintiffs. Applying the language of § 1962(a), it is "unlawful for any person [Uber] who has received any income derived. . .from a pattern of racketeering activity [the multiple instances of fraudulent internet representations to customers concerning fares and affiliation]. . .to use or invest. . .any part of such income" in the "operation of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

Uber does not argue that it is not engaged in interstate commerce.

Uber does argue, as noted above, that the plaintiffs must show an injury from the

investment of racketeering income, and that the injury must be distinct from any injury caused to the plaintiffs by the predicate acts of wire fraud. The predicate acts of lying to customers about fares and affiliation do not, standing alone, cause the plaintiffs appreciable harm, and there is no requirement under any subsection of § 1962 that the plaintiffs themselves be the recipient, rely on, or be harmed by the fraudulent representations that make up the predicate acts. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008); *Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc.*, 712 F.3d 21 (1st Cir. 2013); *Aetna, Inc. v. Pfizer, Inc.,* 712 F.3d 51 (1st Cir. 2013). The plaintiffs suffer a distinct economic injury when Uber subsequently <u>uses</u> its Boston taxi income to blanket the Boston market with unlicensed gypsy cabs, ranging from Lincoln Town Cars to Toyota Priuses, thereby reducing demand for licensed Boston taxis and causing economic harm to the plaintiffs. These allegations match the elements of § 1962(a), and the Motion to Dismiss Count VII must be denied.

The Defendants' additional arguments against Counts VIII and IX are brief and cryptic, but appear to rely on the assertion that "Plaintiffs fail to allege a harm independent from the alleged wire fraud activity underlying the action." (Defendants' Memorandum, p. 18.) As the discussion of Count VII showed, the plaintiffs allege that they suffered distinct harm in the form of competition from Uber's unlicensed Black Cars, SUVs and UberX vehicles, which are funded by and are part of an integrated business plan developed by Uber to substitute its affiliated vehicles for the plaintiffs' licensed taxis, causing economic injury to the plaintiffs. The plaintiffs have adequately alleged the elements of RICO claims under 18 U.S.C. § 1962(b) and § 1962(c) in Counts

VIII and IX, and the defendant's motion to dismiss should be denied.

**E.**      **Uber Ignores the Complaint and Cites Inapposite First Circuit Precedent In Its Motion to Dismiss Count II.**

Count II makes the following claim:

63. By fabricating a nonexistent "partnership" with Boston taxi owners and misrepresenting its legal authority to operate a dispatch service, as alleged above, Uber has used false descriptions and representations of fact to cause confusion and mistake in consumers, who are likely to believe that Uber is affiliated with, connected with, associated with, sponsored by, and approved by Boston medallion owners, including plaintiff EJT Management, Inc. and lawful Radio Associations, including plaintiff Boston Cab Dispatch, Inc., in violation of 15 U.S.C. § 1125(a)(l)(A).

The statute reads:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
**(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. 1125(a)(1)(A).

Uber derails its argument on Count II at the outset by relying on First Circuit precedents on "infringement/false designation," a distinct form of Lanham Act claim which the plaintiffs are not making. (Defendant's Memorandum, p. 11.) Uber next argues that the plaintiffs have not alleged that Uber's false claims of a partnership with the plaintiffs have been made in interstate commerce, overlooking ¶¶ 80-81 of the Complaint, which state that these "false claims of an association" have been transmitted over the internet thousands of times. Uber goes on to assert that the Complaint does not "cite . . . evidence that any customers are likely to suffer confusion," (Defendant's

Memorandum, p. 12), overlooking ¶ 63 of the Complaint, quoted above, which states that Uber's claim of partnership with the plaintiffs is likely to cause confusion.

Uber argues finally that "the plaintiff must assert some type of competitive injury to state a claim for false advertising under the [Lanham] Act (Defendant's Memorandum, p. 10), and that "Logically, it is impossible to see how Plaintiffs would suffer competitive injury." (Defendant's Memorandum, pp. 10, 13.) The injury comes in the form of business diverted from EJT, which leases cabs and has experienced a drop in demand for its cabs as a result of Uber's false claim that it is affiliated with the plaintiffs as some form of "partner." When an Uber customer opens Uber's app, that customer sees all the Uber-affiliated vehicles—Black Cars, SUVs, licensed Boston taxis and UberX cars—in his or her vicinity. By presenting itself as the premier site for multiple forms of private transportation, and moving aggressively to dominate the Boston market, Uber tries to convince customers that they should use Uber as a one-stop shopping site for the taxis and the taxi-surrogates Uber offers. By misappropriating the good will and legitimacy the plaintiffs possess as the largest fleet of Boston-licensed cabs, and claiming that they are "partners" in Uber's transportation system, Uber raises the stature of its service and breadth of its offerings. This unlawful elevation of Uber's standing in the private transportation marketplace draws more customers.

As stated above, once Uber customers open the app, they can see all the Boston-licensed taxis, Uber-affiliated Black Cars, Uber-affiliated SUVs and UberX cars in their immediate vicinity. The customer's decision to pick a licensed taxi or a Black Car or an SUV or an UberX car is usually made in a matter of seconds, and is typically based on how many cars in each category are nearby and how much the customer is willing to

spend for convenience.

By falsely portraying taxis, including the plaintiffs' 500 cabs, as one choice among several Uber-affiliated forms of transportation that appear on a smartphone screen, Uber diverts fares that would go to licensed Boston taxis if Uber did not falsely claim taxis were part of its affiliated businesses. This diversion of business has already caused a decrease in the demand for the plaintiffs' cabs, a diminution in the number of cabs leased, and a loss of revenue. The plaintiffs have alleged the economic harm required to meet current pleading standards.

### F.    Uber Misreads D.C. Circuit Caselaw In Seeking To Dismiss Count I.

Count I alleges:

> 60. By representing to consumers in its commercial advertising and promotion that Uber-assigned taxis are operating lawfully in Boston, as stated above, Uber falsely describes facts and falsely represents facts, thereby misrepresenting the nature, characteristics and qualities of its services, in violation of 15 U.S.C. § 1125(a)(l)(B).

Uber argues that this claim relies on the plaintiffs' partisan (and untested) interpretation of ambiguous provisions of the Taxi Rules. The defendant cites a D.C. Circuit case, *Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484 (D.C. Cir. 1996), for the proposition that a federal court should not, in a Lanham Act case, "usurp the agency's responsibility for interpreting and enforcing potentially ambiguous regulations." (Defendant's Memorandum, p. 9.)

Uber is correct that Count I depends on showing that Uber-affiliated taxis are violating the Taxi Rules. But it mistakenly claims that *Dial a Car* says that federal courts should shy away from applying local regulations. In *Dial a Car*, the District Court was asked to find that Virginia and Maryland taxi companies were violating a "reciprocal

agreement" with the District of Columbia, under which the D.C. Taxicab Commission allowed Arlington County, Virginia and Montgomery County, Maryland taxis to operate in D.C. only if they were transporting passengers to or from those Maryland and Virginia counties. The defendant taxi companies allegedly were attempting to end-run this agreement by designating conventional taxicabs as unregulated corporate-account limousines when they operated in D.C. 82 F.3d at 488-489.

The District Court found that it was not clear whether the Reciprocal Agreement applied to the defendants' activity, and concluded it could not find the defendants were misrepresenting their right to operate as limousines in D.C. *Id.* The District Court's reluctance is understandable: it could not find the defendants' "representations that they are permitted to provide the taxi service at issue qualifie[d] as a false or misleading statement of fact for Lanham Act purposes" unless the application of the reciprocal agreement was "clear and unambiguous." *Id.*

*Dial a Car* relied on the ambiguity of D.C.'s taxi regulations, and for that reason provides no guidance in this case. Uber's taxi operations clearly and unambiguously violate multiple provisions of the Taxi Rules. To pick two examples:

- Rule 403 requires Boston taxis to accept payment in cash, vouchers, coupons and credit card payments through the terminal in the cab. Uber-affiliated taxis cannot accept any of these when transporting Uber customers. (Complaint, ¶ 33.)

- Rule 403 imposes maximum fares. Uber adds 20% to these fares, plus an additional $1 fee. (Complaint, ¶¶ 34-38.)

Both examples allege indisputable violations of unambiguous regulations, and no

precedent stands in the way of applying unambiguous regulations to decide the Lanham Act claim in Count I. The Motion to Dismiss must be denied.

**III.**     <u>**CONCLUSION**</u>

For the reasons stated above, the Court should deny Uber's Motion to Dismiss.

**IV.**     <u>**REQUEST FOR ORAL ARGUMENT**</u>

The plaintiffs request oral argument on this motion.

Respectfully Submitted,

Plaintiffs,
BOSTON CAB DISPATCH, INC. and
EJT MANAGEMENT, INC.,
By its attorneys,

*/s/ Samuel Perkins*
Samuel Perkins, BBO# 542396
Richard E. Brody, BBO# 058260
Michael Stefanilo, BBO# 684500
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100
(617) 880-7171
sperkins@bhpklaw.com
rbrody@bhpklaw.com
mstefanilo@bhpklaw.com

Dated: May 8, 2013

# CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.

*/s/ Samuel Perkins*
Samuel Perkins, BBO #542396

Dated: May 8, 2013