UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BOSTON CAB DISPATCH, INC.,
AND EJT MANAGEMENT, INC.,
    Plaintiffs,


    v.                                    CIVIL ACTION NO.
                                          13-10769-NMG

UBER TECHNOLOGIES, INC.,
    Defendant.

**REPORT AND RECOMMENDATION RE:**
**DEFENDANT'S MOTION TO DISMISS**
**(DOCKET ENTRY # 5)**

**February 28, 2014**

**BOWLER, U.S.M.J.**

    Pending before this court is a motion to dismiss filed by
defendant Uber Technologies, Inc. ("Uber").  (Docket Entry # 5).
Plaintiffs Boston Cab Dispatch, Inc. ("Boston Cab") and EJT
Management, Inc. ("EJT") (collectively "plaintiffs") oppose the
motion.  The complaint alleges that Uber unfairly competes and
unlawfully functions as a taxicab service in violation of Boston
taxicab rules, two Massachusetts statutes and an ordinance of the
City of Boston.  After conducting a hearing, this court took the
motion (Docket Entry # 5) under advisement.

    The complaint raises the following causes of action:  (1)
violation of section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. §
1125(a)(1)(B) ("section 43(a)(1)(B)") (Count I); (2) violation of
section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)
("section 43(a)(1)(A)") (Count II); (3) violation of

Massachusetts General Laws chapter 93A ("chapter 93A"), section 11, based on Uber's unfair and deceptive acts and practices (Count III); (4) violation of chapter 93A, section 11, based on Uber's unfair competition (Count IV); (5) unfair competition under Massachusetts common law (Count V); (6) interference with contractual relationships (Count VI); (7) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a) (Count VII); (8) violation of RICO, 18 U.S.C. § 1962(b) (Count VIII); and (9) violation of RICO, 18 U.S.C. § 1962(c). (Docket Entry # 1-1).

STANDARD OF REVIEW

The motion seeks dismissal under Fed.R.Civ.P. 12(b)(1) ("Rule 12(b)(1)") and Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)"). (Docket Entry # 5). Neither the supporting memorandum nor the reply brief cite Rule 12(b)(1) or discuss a dismissal for lack of subject matter jurisdiction. All of the captions to each section in the supporting brief seek dismissal for failure to state a claim, i.e., Rule 12(b)(6). (Docket Entry # 6). Likewise, the supporting brief sets out the standard of review only for a Rule 12(b)(6) motion. At best, the chapter 93A argument relies and quotes a case, Katz v. Pershing, LLC, 806 F.Supp.2d 452 (D.Mass. 2011), aff'd, 672 F.3d 64 (1st Cir. 2012), which includes a Rule 12(b)(1) constitutional standing challenge as well as a Rule

2

12(b)(6) statutory standing challenge to a chapter 93A claim.[1]
The court in Katz dismissed the entire action on the basis of
lack of constitutional standing under Rule 12(b)(1) and also
dismissed the chapter 93A count under Rule 12(b)(6) because Katz
lacked statutory standing.  Id. at 458 & 461.  Uber seeks to
dismiss the chapter 93A claim due to a lack of a private right of
action in a Boston taxicab rule and enabling statutes, i.e., a
Rule 12(b)(6) challenge.  Disconnected from any facts and legal
argument, the Rule 12(b)(1) "argument" is waived.  See O'Connell
v. Marrero-Recio, 724 F.3d 117, 124 (1st Cir. 2013); Higgins v.
New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir.
1999); see also U.S. v. Caparotta, 676 F.3d 213, 218 (1st Cir.
2012).

In conducting a Rule 12(b)(6) analysis, a court "accept[s]
as true all well pleaded facts in the complaint and draw[s] all
reasonable inferences in favor of the plaintiffs."  Gargano v.
Liberty International Underwriters, Inc., 572 F.3d 45, 48 (1st
Cir. 2009).  "To survive a motion to dismiss, the complaint must
allege 'a plausible entitlement to relief.'"  Fitzgerald v.
Harris, 549 F.3d 46, 52 (1st Cir. 2008).  While "detailed factual
allegations" are not required, "a plaintiff's obligation to
provide the 'grounds' of his 'entitlement for relief' requires
more than labels and conclusions, and a formulaic recitation of

---

[1]  See footnote 37.

the elements of a cause of action will not do." <u>Bell Atlantic v.</u>
<u>Twombly</u>, 550 U.S. 554, 555 (2007); <u>Maldonado v. Fontanes</u>, 563
F.3d 263, 266 (1st Cir. 2009); <u>Thomas v. Rhode Island</u>, 542 F.3d
944, 948 (1st Cir. 2008).  Additionally, "a well-pleaded
complaint may succeed even if . . . actual proof of those facts
is improbable."  <u>Bell Atlantic v. Twombly</u>, 550 U.S. at 556.

In evaluating a Rule 12(b)(6) motion, a court may consider
inter alia "'documents central to the plaintiffs' claim,'" and
"'documents sufficiently referred to in the complaint.'"  <u>Curran</u>
<u>v. Cousins</u>, 509 F.3d 36, 44 (1st Cir. 2007); <u>see</u> <u>also</u> <u>Trans-Spec</u>
<u>Truck Service, Inc. v. Caterpillar Inc.</u>, 524 F.3d 315, 321 (1st
Cir. 2008); <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993).
The complaint refers to and quotes Boston Police Department Rule
403 Hackney Carriage Rules and Flat Rate Handbook ("Rule 403").
It also refers to and quotes a portion of the terms and
conditions that Uber requires each "customer to execute" when
registering as a user of Uber.  (Docket Entry # 1-1, ¶ 28).  In
addition, the complaint refers to taxicab leases between EJT and
taxicab drivers.  (Docket Entry # 1-1, ¶¶ 3 & 77).  Uber attaches
Rule 403, the terms and conditions and the sign up screen for the
terms and conditions as exhibits to the motion.  (Docket Entry ##
6-1, 6-2 & 6-3).  Plaintiffs attach a copy of a form lease to
their memorandum.  (Docket Entry # 14-1).  These documents, all
central to the claims and sufficiently referred to in the

complaint, are therefore part of the Rule 12(b)(6) record.

Uber also moves to dismiss the RICO counts for failure to satisfy the heightened pleading standard of Fed.R.Civ.P. 9(b) ("Rule 9(b)").  Rule 9(b) dictates that, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed.R.Civ.P. 9(b).

FACTUAL BACKGROUND[2]

Boston Cab is an approved taxicab dispatch service referred to as a "radio association" under Rule 403.  (Docket Entry # 1-1, ¶ 2).  Boston Cab's members consist of owners of Boston licenses, defined as "medallions" under Rule 403, who operate taxicabs, defined as "hackney carriages" under Rule 403.  Boston Cab provides dispatch services to taxicab drivers.  Uber connects and introduces individuals seeking transportation for hire with drivers who sign up with Uber and operate Uber affiliated vehicles.

I.   Boston Taxicab Regulations and Oversight[3]

By statute, the Massachusetts "Legislature empowered the

---

[2]  Citations to the record are provided only for direct quotations.  The majority of the facts are taken directly from the complaint.

[3]  Because a proper understanding of the facts entails an understanding of the statutory and regulatory framework, it is summarized here as well as addressed in the discussion section.

[Police] Commissioner [of the City of Boston] to regulate the taxi business in Boston and to fix rates of fare." Town Taxi Inc. v. Police Commissioner of Boston, 387 N.E.2d 129, 131 (Mass. 1979) (citing Mass. Gen. L. ch. 392, §§ 1, 3 (1930), as amended by Mass. Gen. L. ch. 280 (1934), and Mass. Gen. L. ch. 386 (1963)).[4]  Chapter 392 "authorizes the [Police Commissioner of the City of Boston] to regulate the taxi business in Boston in part by issuing hackney licenses, or medallions, authorizing the holder to operate a cab within the city." Boston Neighborhood Taxi Association v. Department of Public Utilities, 575 N.E.2d 52, 53-54 (Mass. 1991); Town Taxi Inc. v. Police Commissioner of Boston, 387 N.E.2d at 134; see Lynch v. Police commissioner of Boston, 681 N.E.2d 307, 308 & 310 (Mass.App.Ct. 1997) (describing chapter 392 as "the enabling act" with respect to granting annual licenses to "suitable persons" to operate taxicabs in Boston). In exercising the duties under the statute, the Police Commissioner of the City of Boston ("the Commissioner") issues licenses known as "taxicab 'medallions'" that "entitle[] the holder[s] thereof to operate a taxicab within the city." Town Taxi Inc. v. Police Commissioner of Boston, 387 N.E.2d at 131;

---

[4]  The cited statutes, Massachusetts General Laws chapter 392 (1930) ("chapter 392") and Massachusetts General Laws chapter 386 (1963) ("chapter 386"), are set out in Appendix I to Rule 403, which Uber filed as an exhibit to the motion. (Docket Entry # 6-3).  Neither Uber nor plaintiffs maintain that the statutes, as set out in the appendix, are not current for present purposes or do not apply to the case at bar.

see Teixeira v. Cab Three, Inc., 1994 WL 413034, at *1
(Mass.App.Div. July 29, 1994) ("the common term 'medallion'"
refers "to what is officially a 'hackney carriage license' issued
by the Police Commissioner of the City of Boston pursuant to
Chapter 386 of the Acts of 1963").

Chapter 392, section one, endows the Commissioner with
"exclusive authority to make rules and orders for the regulation
for hackney carriages and hackney stands" in the City of Boston
"with penalties for the violation thereof not exceeding twenty
dollars . . .."  (Docket Entry # 6-3).  Section two defines a
"hackney carriage" as a "vehicle used or designed to be used for
the conveyance of persons for hire from place to place within the
city of Boston."  (Docket Entry # 6-3).  Section three provides
that:

> no person shall drive *or have charge of a hackney carriage*,
> nor shall any person, firm or corporation set up and use a
> hackney carriage, unless licensed thereto by the Police
> Commissioner of the City of Boston; nor shall any person
> having the care or ordering of such a vehicle in said city
> suffer or allow any other person other than a driver so
> licensed to drive such a vehicle.

(Docket Entry # 6-3) (emphasis added).

Chapter 386, enacted in 1963, likewise proscribes any person
who drives or *has charge* of a taxicab from soliciting the
carriage of any passenger for hire unless the driver "is licensed
as a hackney carriage driver and" the vehicle "is licensed as a
hackney carriage" by the Commissioner.  Chapter 386 limits "the

right of persons not holding a Boston medallion to solicit passengers within the city." Town Taxi Inc. v. Police Commissioner of Boston, 387 N.E.2d at 131. The statute set a maximum fine per violation of the statute of $50.00.

The Boston City Council adopted an ordinance with similar provisions. It prohibits any person or firm from "having charge of a taxicab or other private vehicle" from offering the vehicle for hire for transportation unless the driver "is licensed as a hackney carriage driver" and the "vehicle is licensed as a hackney carriage by" the Commissioner. (Docket Entry # 6-3). The ordinance, section 16-15.05 of the City of Boston Municipal Code ("ordinance 16-15.05"), reads as follows:

16-15.05 Vehicle for Hire Ordinance.

In the City of Boston, no person, firm, or corporation driving or having charge of a taxicab or other private vehicle shall offer the vehicle for hire for the purpose of transporting, soliciting and/or picking up a passenger or passengers unless said person is licensed as a hackney driver and said vehicle is licensed as a hackney carriage by the Police Commissioner.

(Docket Entry # 6-3).[5] "Anyone found in violation" of ordinance 16-15.05 "shall be punished by fine of not more than five hundred ($500.00) dollars for each violation." (Docket Entry # 6-3).

---

[5] "Local regulations," such as ordinances, "are presumed valid, unless they exceed the authority conferred by the enabling statute or the Home Rule Amendment (art. 89 of the Amendments to the Massachusetts Constitution)." Springfield Preservation Trust, Inc. v. Springfield Library and Museums Association, Inc., 852 N.E.2d 83, 92 (Mass. 2006) (examining validity of ordinance).

Where, as here, a statute grants authority to an
administrative officer, such as the Commissioner, that grant
includes "not only those powers expressly conferred by statute,
but also those reasonably necessary to carry out its mission."
Boston Neighborhood Taxi Association v. Department of Public
Utilities, 575 N.E.2d 52, 56 (Mass. 1991).  Thus, absent a
"statutory limitation," the Commissioner has the "authority to
employ all ordinary means reasonably necessary for the full
exercise of the power and for the faithful performance of the
duty."  Town Taxi Inc. v. Police Commissioner of Boston, 387
N.E.2d 129, 135 (Mass. 1979).

Here, section three of chapter 392 authorizes the
Commissioner to issue licenses to all hackney carriage drivers.
The statute also proscribes anyone from being in charge of a
hackney carriage, i.e., a vehicle for hire, and allowing any
person other than a licensed hackney carriage driver to operate
the vehicle.  Hence, the statute expressly grants the authority
to license hackney carriage drivers to the Commissioner.  See
generally Lynch v. Police Commissioner of Boston, 681 N.E.2d 307,
308-309 (Mass.App.Ct. 1997) (parties agreed "that no one but the
commissioner has the authority to issue licenses to particular
individuals to engage in the taxi business in the city of Boston"
and, as plaintiff "recognizes, 'the Commissioner has discretion
to determine who is a qualified person to hold a taxi

medallion'") (internal ellipses omitted).  The statutory grant of
authority in chapter 392 therefore necessarily implies the
authority to license dispatch services and it includes the
reasonably necessary authority to determine what entity or person
qualifies as an approved radio association.[6]  See id.

   Citing chapters 392 and 386, the Commissioner issued Rule
403.  (Docket Entry # 6-3, App. I).  The rule, effective August
29, 2008, states that it "is intended to be a comprehensive and
definitive listing of all regulations affecting the Hackney
Carriage industry in the City of Boston."  (Docket Entry # 6-3).
The rule regulates new applicants for a hackney carriage driver's
license or medallion (Docket Entry # 6-3, § 2), existing
medallion owners seeking to renew or transfer their hackney
carriage driver's licenses (Docket Entry # 6-3, §§ 2 & 4), the
conduct of existing medallion owners or licensed hackney carriage
drivers (Docket Entry # 6-3, §§ 4 & 5), the requirements to
register and maintain a vehicle as a hackney carriage (Docket

---

[6]   At all times, however, the Commissioner must operate within
the limits imposed by the enabling statue.  See Town Taxi Inc. v.
Police Commissioner of Boston, 387 N.E.2d at 132-133 ("[u]nless,
however, the Commissioner exceeded the authority "'from time to
time (to) fix maximum and minimum rates' delegated to him . . . ,
there can be no objection that he has usurped legislative
power"); Cambridge Taxi Co. v. City Manager of Cambridge, 76
N.E.2d 135, 136 (Mass.1947) ("[t]here is nothing in the statute .
. . limiting the power of the city or town to the fixing of
maximum rates" of taxicab fares" thereby allowing city "to enact
the ordinance fixing the single rate" for all taxicab operators).
He must also exercise his authority and discretion "to effectuate
the purposes of the statute."  Lynch v. Police Commissioner of
Boston, 681 N.E.2d at 310.

Entry # 6-3, § 3) and the standards applicable to *approved* radio associations (Docket Entry # 6-3, § 7).

Rule 403 defines a "hackney carriage" in the same manner as section two of chapter 392. It requires any person seeking a hackney driver's license, i.e., a medallion, to complete an application and satisfy certain requirements. Under the rule, the applicant must be at least 21 years old, not have any convictions for operating a motor vehicle under the influence of drugs or alcohol ("OUI") in the past five years, have no outstanding driving infractions, "not have been adjudicated a[n] Habitual Traffic Offender,"[7] not have more than four at fault accidents in the last three years, not have any drug convictions in the last five years and not be required to register as a sexually dangerous person ("SDP"). (Docket Entry ## 1-1 & 6-3). The applicant must also have a valid Massachusetts driver's license. If the applicant satisfies all these requirements and is deemed suitable, the Commissioner or the Inspector of Carriages will issue the applicant a hackney carriage license.[8]

---

[7] See Mass. Gen. L. ch. 90, § 22F.

[8] The Commissioner designated an enforcement unit known as the Hackney Carriage Unit to enforce the regulations. The unit is "[a]lso known as the Office of the Inspector of Carriages." (Docket Entry # 6-3).
    An applicant may appeal a denial of a medallion to the Director of Licensing. The Director of Licensing then makes a recommendation on the appeal to the Commissioner. Subject to complying with the time limits in Rule 403, an aggrieved applicant may seek relief in a court of competent jurisdiction.

The City of Boston issues a set number of medallions presently capped at 1,825.

Rule 403 requires all medallion owners to maintain a properly equipped and functioning hackney carriage. As stated in the rule, a hackney carriage, "also known as a taxicab," must have a protective partition between the driver and the passengers, a taximeter that calculates the fare and the distance traveled, an approved credit card machine and a "two-way communication" system with "an approved dispatch service or radio association." (Docket Entry # 6-3, §§ 1(I)(b), 3(III)(c) & 4(II)(q)). Under Rule 403, the Commissioner sets maximum allowable meter rates as well as flat rates from Boston to certain suburbs. Vehicles are subject to inspection by the Hackney Carriage Unit.

Under Rule 403, all licensed hackney drivers or medallion owners must be members of "an approved dispatch service or radio association." (Docket Entry # 6-3). Radio associations, such as Boston Cab, provide services "solely and exclusively for City of Boston Licensed Hackney Carriages." (Docket Entry # 6-3). Each approved radio association maintains specific colors and markings approved by the Inspector of Carriages. Medallion owners must paint their hackney carriages in the colors and markings of the radio association to which they belong.[9]

---

[9] The relevant provisions of Rule 403 require radio association members to display the "Radio Association's color scheme as

Medallion owners pay a weekly membership fee to their radio association and must provide a discount to elderly riders.

In order to comply with Rule 403, each radio association, including Boston Cab, must install thousands of dollars of integrated equipment including "dispatching assignment equipment." (Docket Entry # 1-1, ¶ 51). Uber does not incur these costs.

Rule 403 prohibits all hackney carriage drivers from operating a hackney carriage while under the influence of alcohol or illegal drugs. The rule additionally proscribes the use of cellular telephones "for any purpose, including text messaging." (Docket Entry # 6-3). Drivers are "required to accept multiple forms of payment, including cash, credit cards, vouchers" and coupons from qualified elderly and handicapped passengers. (Docket Entry # 1-1, ¶ 33).

The rule creates an administrative means for individuals to report violations of a vehicle against the medallion owner by filing a "Hackney Complaint" with the Inspector of Carriages. (Docket Entry # 6-3). A police officer who observes a vehicle operating as a hackney carriage in violation of the rule may cite

---

approved by the Inspector of Carriages" on their hackney carriage. (Docket Entry # 6-3). The rule similarly requires that, "All taxis must be painted in approved Radio Association markings and colors" except for certain grand fathered vehicles in a 1998 agreement. (Docket Entry # 6-3). Rule 403 further states that, "All radio association colors, markings, designs, decal or logos must be approved by the Inspector of Carriages, as required by the Hackney Rules." (Docket Entry # 6-3).

the vehicle for a "Hackney Violation."  Decisions by the
Inspector of Carriages regarding vehicle violations are final.
For other kinds of reported violations and complaints against a
medallion owner or driver, Rule 403 has an appeal process
culminating with a final appeal to an appeal board which makes a
recommendation to the Commissioner.  Subject to certain time
periods, "Any person aggrieved" by the Commissioner's final
decision may seek relief "in any court of competent
jurisdiction."  (Docket Entry # 6-3, § 8(IV)(d)(iv)(7)).

Rule 403 additionally contains an administrative process to
resolve complaints against an existing medallion owner, a manager
such as EJT, or a lessee.  If the Inspector of Carriages sustains
a complaint against the medallion owner, manager or lessee, he or
the Commissioner may discipline the person, including suspending
or revoking any medallion under his control.  The rule does not
set out an appeal process beyond the Commissioner's decision.

As to approved radio associations, also referred to as
dispatch services, section 7(I)(d) of Rule 403 mandates certain
minimum services.  Each association must provide 24 hour dispatch
capability, two way radio service, discount reimbursements for
the elderly and record keeping for all dispatch services
including the time and location of each dispatched taxicab.
Radio associations provide "services solely and exclusively for
City of Boston Licensed Hackney Carriages."  (Docket Entry # 6-3,

§ 7). Penalties for not complying with these standards "shall be cause for immediate removal of the Radio Association from the list of approved Radio Associations." (Docket Entry # 6-3, § 7). Under Rule 403, an approved radio association can appeal its removal from the list of approved associations to the Commissioner. The rule does not contain an appeal process beyond the Commissioner's decision. Presently, there are seven approved radio associations in Boston.

## II. Uber

Uber operates "by signing up" vehicles whose drivers provide transportation to paying customers. (Docket Entry # 1-1, ¶¶ 13 & 16). In order to obtain transportation, these paying customers must download and install a copy of Uber's "free smart phone application" ("the Uber app") onto their "single mobile device or computer." (Docket Entry # 6-1) (Docket Entry # 1-1, ¶ 13). These customers agree to Uber's terms and conditions by using the service "and downloading, installing or using" the Uber app. (Docket Entry # 6-1) (Docket Entry # 1-1, ¶ 13). Uber itself does not own the vehicles used to transport these customers and it does not own a radio association or medallions or employ drivers.[10]

---

[10] Uber therefore argues that it is not using any Boston Cab "logo on a Partner's vehicle under the Lanham Act." (Docket Entry # 6). Similarly, because it does not own the vehicles, medallions or radio associations, it does not "'have charge of a hackney carriage'" within the meaning of chapter 392, chapter 386 or ordinance 16-15.05, according to Uber. (Docket Entry # 19).

Uber affiliated vehicles fall into three categories
consisting of "Uber Black Cars, Uber SUVs and Uber Taxis."
(Docket Entry # 1-1, ¶ 12).  Uber also plans to introduce a
fourth category of Uber affiliated vehicles known as "UberX" to
the Boston market.  (Docket Entry # 1-1, ¶¶ 12 & 55-57).  Uber
determines the fares or rates charged for each category of
vehicle for each paying customer.  For Uber Black Cars and Uber
SUVs, "Uber's metering device" determines fares and charges "a
flat rate plus additional charges per-mile or per-minute,
depending on the car's speed."[11]  (Docket Entry # 1-1, ¶¶ 20 &
35).  When demand for Uber's services "becomes 'intense,'" Uber
might also "use 'surge' pricing.'"  (Docket Entry # 1-1, ¶ 41).
For example, it increased prices by "625% early on New Year's Day
2012."  (Docket Entry # 1-1, ¶ 41).

The fare for Uber Taxis is calculated by Uber's computer
system and begins "with the Taximeter or Flat rate" applicable to
Boston hackney drivers.  Uber then adds a $1.00 "'fee' and a 20%
'gratuity.'"  (Docket Entry # 1-1, ¶¶ 14 & 36).  The final charge
therefore exceeds the maximum rate applicable to taxicabs under

--------------------------------

[11]  The complaint also describes the method as calculated by
"[t]he Uber GPS system."  (Docket Entry # 1-1, ¶ 47).  The global
positioning system ("GPS") "calculates fares with a 'rate meter,'
and fares are 'charged based upon miles traveled."  (Docket Entry
# 1-1, ¶ 47) (brackets omitted).  Approved radio associations use
a GPS system that allows them as well as "the Boston police to
track every taxi all the time."  (Docket Entry # 1-1, ¶ 51).

Rule 403.  On its website, Uber represents that, "'With Uber TAXI we'll automatically add 20% gratuity for the driver, and you'll see it reflected on your receipt.'"  (Docket Entry # 1-1, ¶¶ 20 & 37).  Uber actually gives only half of the 20% gratuity to the driver.  (Docket Entry # 1-1, ¶ 38).

All payments for Uber affiliated vehicles, including Uber Taxis, "are charged automatically to the customer's preauthorized credit card."  (Docket Entry # 1-1, ¶ 33).  Uber affiliated "drivers cannot accept cash, coupons or vouchers."  (Docket Entry # 1-1, ¶ 33).  A customer pays for the transportation service "through the customer's smart phone" with a charge to the preauthorized credit card registered with Uber.  (Docket Entry # 1-1, ¶ 42).

Uber Taxis are comprised of "Boston taxi cab drivers" who are subject to Rule 403 and belong to a radio association.  These taxi drivers partner with Uber and, while working a shift and subject to dispatch by their radio association, are available for hire through Uber.  When connected to a paying customer by Uber's computer system, these taxicab drivers use "Uber's computerized dispatching system," which does not comply with section 7(I)(d) of Rule 403, and Uber's "credit card billing system."  (Docket Entry # 1-1, ¶¶ 12, 14, 36 & 42).

When an individual with an Uber app wants to summon an Uber affiliated vehicle, the customer opens the Uber app.  Once

opened, the app "displays a map of the user's location or
designated pickup point, displays the available black cars, SUVs
and taxis in the neighborhood," and informs the customer about
the wait time for each category of vehicle.  (Docket Entry # 1-1,
¶ 13).  The three categories of vehicles vary in price range and
passenger capacity.  The customer then chooses the category of
vehicle and Uber's "computer system then selects an Uber-
affiliated car, displays the driver's name and photograph on the
user's smart phone, and sends a text message to the user with the
driver's projected arrival time and cell phone number."  (Docket
Entry # 1-1, ¶ 13).  This "spur-of-the moment assignment" summons
an Uber affiliated vehicle "just as quickly as a taxi."  (Docket
Entry # 1-1, ¶¶ 20 & 43).

    In contrast to Boston hackney carriages, Uber affiliated
Black Cars and SUVs are not periodically inspected to ensure that
the vehicle complies with the requirements for hackney carriages
in Rule 403.  The vehicles do not have partitions, a taximeter or
the colors of an approved radio association.  Contrary to the
requirements imposed on hackney carriages, Uber Black Cars and
SUVs are not enrolled in a radio association with a GPS that
allows "the Boston police to track every taxi" and they lack "a
panic button that automatically sends a signal to the dispatcher"
in the event of an emergency.  (Docket Entry # 1-1, ¶¶ 41(C) &
51) (Docket Entry # 6-3).  Uber inspects its affiliated "vehicles

and checks registration and insurance information when the
[vehicle] owner first signs up" but it does not have a regular
program to reinspect the vehicles' "condition, licensing or
insurance." (Docket Entry # 1-1, ¶ 23).

Drivers of Uber Black Cars and Uber SUVs are not subject to
criminal background checks and SDP registration checks required
for drivers of hackney carriages in Boston. Drivers of Uber
Black Cars and Uber SUVs are required to "have a conventional
driver's license and insurance." (Docket Entry # 1-1, ¶ 25).
Insurance premiums for drivers of Uber Black Cars and Uber SUVs
are at times lower than insurance premiums applicable to
taxicabs.

Drivers of Uber affiliated vehicles are subject to a five
star rating system. All drivers of Uber affiliated vehicles
begin with a five star rating and drop below this rating if a
customer posts a negative review. Uber continues to use drivers
with a rating below five stars.

Whereas Rule 403 prohibits a hackney carriage driver from
using a cellular telephone, Uber requires all drivers of Uber
affiliated vehicles to have a cellular telephone. Drivers of
Uber affiliated vehicles must respond to an assignment generated
by the Uber computer system "within a few seconds or lose the
job" and they must use their cellular telephone to call the
customer when their vehicle "is close to the pickup point."

(Docket Entry # 1-1, ¶ 42).

By downloading and installing the Uber app, all users of Uber agree to abide by the company's terms and conditions. Although Uber's actions depict it as providing transportation services to paying customers, the terms and conditions state that, "The company does not provide transportation services, and the company is not a transportation carrier." (Docket Entry # 6-1) (capitalization omitted). The sign up screen also notes that, "Uber is a request tool not a transportation carrier." (Docket Entry # 6-2).

Elsewhere, the terms and conditions state that:

> "The company may introduce you to third party transportation providers for the purposes of providing transportation. We will not assess the suitability, legality, or ability of any third party transportation providers and you expressly waive and release the company from any and all liability, claims, or damages . . . The company will not be a party to disputes, negotiations of disputes, between you and such third party providers . . . The quality of the transportation services scheduled through the use of the service of application is entirely the responsibility of the third party provider who ultimately provides such transportation services to you . . .."

(Docket Entry # 1-1, ¶ 28) (quoting terms and conditions with capitalization omitted).

III. <u>Boston Cab and EJT</u>

EJT contracts with medallion owners "to manage all aspects of the ownership, licensing and leasing" of the taxicabs that bear their medallions. (Docket Entry # 1-1, ¶¶ 3 & 77). In conjunction thereto, it enters into leases with medallion owners

to lease taxis bearing their medallion.  (Docket Entry # 1-1, ¶¶ 3 & 77).

Rule 403 dictates that managers such as EJT and medallion owners use the lease agreements or shift rental agreements ("lease agreements") issued by the Inspector of Carriages or the Commissioner.  The form lease agreement between a lessor, such as EJT, and a lessee, such as a taxicab driver, requires the lessee to comply with the hackney carriage rules and the regulations of the Commissioner, i.e., Rule 403.

Boston Cab, an approved radio association, is the licensee of the trademarks and trade dress associated with its taxicab operations.  Members of the Boston Cab radio association must paint their taxicabs with the "'Boston Cab' logos and color schemes approved by the City of Boston."  (Docket Entry # 1-1, ¶ 4).

Radio associations, including Boston Cab, enter into "agreements with one of three credit card processing companies certified by the Inspector of Carriages."  (Docket Entry # 1-1, ¶ 52).  Boston Cab has "an exclusive" contract with Creative Mobile Technologies, LLC ("CMT").  (Docket Entry # 1-1, ¶ 53).  Under the contract, CMT purchases and installs "dispatching and fee processing equipment in exchange for the right to collect credit card processing fees."  (Docket Entry # 1-1, ¶¶ 52-53).  When a driver of an Uber Taxi who belongs to Boston Cab receives and

accepts an Uber assignment, Uber charges the fare to the customer's Uber registered credit card. Uber thereby bypasses the credit card system installed by CMT in the taxicabs of medallion owners who belong to Boston Cab and deprives CMT of the credit card processing fees Boston Cab is required to give CMT under the contract.

DISCUSSION

I. <u>Lanham Act Claims</u>

Uber's arguments to dismiss counts I and II are twofold. First, Uber maintains that both counts do not state a claim for relief based on a failure to satisfy various elements of each claim. Second, it submits that a 1996 decision by the United States Court of Appeals for the District of Columbia ("the D.C. Circuit"), <u>Dial A Car, Inc. v. Transportation, Inc.</u>, 82 F.3d 484 (D.C.Cir. 1996) ("<u>Dial A Car</u>"), forecloses relief on both counts.

A. <u>Section 43(a)(1)(B) (Count I)</u>

Uber moves to dismiss Count I on the basis that plaintiffs fail to identify a false advertisement or promotion and fail to identify any consumer deception. Plaintiffs do not address these arguments or identify the advertisements or promotion in their opposition nor did they raise the issue during the motion hearing. Uber also contends that plaintiffs fail to show any resulting competitive injury. Plaintiff addresses this argument in a limited manner.

Accordingly, this court turns to the complaint to identify the advertisement or promotion that plaintiffs challenge. Count I, captioned "Misrepresentation of Services" in violation of 15 U.S.C. § 1125(a)(1)(B) (Docket Entry # 1-1) (capitalization omitted), alleges that:

> By representing to consumers in its commercial advertising and promotion that Uber-*assigned* taxis *are operating lawfully* in Boston, as stated above, Uber falsely describes facts and falsely represents facts, thereby misrepresenting the nature, characteristics and qualities of its services, in violation of 15 U.S.C. § 1125(a)(1)(B).

(Docket Entry # 1-1, ¶ 60) (emphasis added). Count I therefore focuses on Uber assigned taxis. It is based on a purportedly false advertisement or promotion that "Uber-assigned taxis are operating lawfully." (Docket Entry # 1-1, ¶ 60).

The complaint articulates the manner in which Uber Taxis do not comply with Rule 403. Although the complaint additionally cites to chapters 392 and 386, these statutes simply require that all persons driving a hackney carriage have a license as a hackney carriage driver granted by the Commissioner. Chapter 386 requires that taxicabs be "licensed as a hackney carriage"[12] by the Commissioner and that any person who has charge of a hackney carriage not allow anyone other than a licensed hackney carriage driver to operate the vehicle. Ordinance 16-15.05 proscribes similar license requirements. Uber assigned taxis however are

---

[12] Rule 403 explains that a decal is "affixed to locations on the taxi indicating the vehicle is an official Boston Licensed hackney carriage." (Docket Entry # 6-3, § 3).

all driven by licensed hackney drivers.  The complaint fails to
state or allege that such taxis are not driven by licensed
hackney drivers or that the vehicle is not licensed as a hackney
carriage.  The false advertising or promotion therefore reduces
to false advertising or promotion that "Uber-assigned taxis are
operating lawfully" in compliance with Rule 403.  (Docket Entry #
1-1, ¶ 60).

Paragraph 42 in the complaint denotes a number of situations
in which Uber assigned taxis are not complying with Rule 403.
(Docket Entry # 1-1, ¶ 42).[13]  First, Uber assigned taxi drivers
charge fees in excess of "the maximum fare provisions of Rule

---

[13]  Paragraph 42 sets out "Uber's illegal transportation system"
with respect to Uber Taxis.  (Docket Entry # 1-1, ¶ 42).  The
bulk of the complaint targets the conduct of Uber Black Cars and
Uber SUVs.  The only allegation specific to Count I is the false
representation that Uber Taxis are operating lawfully.  (Docket
Entry # 1-1, ¶ 60).  To the extent the complaint sets out other
false or misleading statements in Uber's commercial advertising
or promotion, it was incumbent upon plaintiffs to identify them
in response to Uber's argument.  Plaintiffs only identify Uber's
single option credit card payment system and the gratuity and
$1.00 fee (Docket Entry # 1-1, ¶¶ 33 & 34-38) (Docket Entry # 14,
p. 20) also noted in paragraph 42.  Thus, insofar as the
complaint identifies additional false or misleading statements in
Uber's commercial advertisements or promotions beyond those in
paragraphs 33, 34 to 38 and 42, the issue is waived as a basis
for liability under section 43(a)(1)(B).  See O'Connell v.
Marrero-Recio, 724 F.3d at 124 (district court "had no reason to
factor into its analysis of O'Connell's retaliation claim the
allegations concerning her participation in the NPP's primary
elections" because O'Connell's brief did not premise the claim on
this allegation); Higgins v. New Balance Athletic Shoe, Inc., 194
F.3d at 260 ("district court is free to disregard arguments that
are not adequately developed"); see also U.S. v. Caparotta, 676
F.3d at 218 ("argument consist[ing] of just two sentences and two
cursory citations in his brief . . . is therefore waived").

403." (Docket Entry # 1-1, ¶¶ 34-38 & 42(A)). Under Rule 403, a
hackney carriage driver "may only charge the amount indicated by
the meter" and the Commissioner "shall establish . . . the rate
for hire of a taxi." (Docket Entry # 6-3, § 5, ¶ II(e)) (Docket
Entry # 6-3, § 10, ¶ II(b)). An appendix to Rule 403 lists the
current maximum allowable rates. (Docket Entry # 6-3, § 10, ¶
II(b) & App. IV). Uber however adds a 20% gratuity and a $1.00
fee to the maximum allowable fares. (Docket Entry # 1-1, ¶¶ 34-
37).

Second, Uber assigned taxi drivers receive text messages on
their cellular telephones with assignments and Uber's computer
system requires drivers to accept and respond to the assignment
"within a few seconds or lose the job." (Docket Entry # 1-1, ¶
42(B)). Rule 403 states that, "A Hackney Carriage Driver may not
use a cellular telephone for any purpose, including text
messaging." (Docket Entry # 6-3, § 5, ¶ II(n)).

Third, "Uber's assignment system permits a driver to
discriminate for any . . . unlawful reasons" such as disability,
age, gender and race. (Docket Entry # 1-1, ¶ 42(C)). Rule 403
states that, "A Hackney Carriage Driver may not refuse any
passenger on the basis of race, sex, religion, disability, sexual
orientation [or] national origin." (Docket Entry # 6-3, § 5, ¶
II(p)).

Fourth, Uber assigned taxis provide only one option for

payment which consists of charging the customer's credit card
registered with Uber. (Docket Entry # 1-1, ¶¶ 33 & 42(D)). Rule
403 requires all hackney carriage drivers to accept qualified
coupons from the elderly, handicapped "and cancer crusade taxicab
passengers."[14]  (Docket Entry # 6-3, § 9, ¶ II(b)).

A false advertising or promotion claim under the Lanham Act
requires the plaintiff to allege that:

> (1) the defendant made a false or misleading description of
> fact or representation of fact in a commercial advertisement
> about his own or another's product; (2) the
> misrepresentation is material, in that it is likely to
> influence the purchasing decision; (3) the misrepresentation
> actually deceives or has the tendency to deceive a
> substantial segment of its audience; (4) the defendant
> placed the false or misleading statement in interstate
> commerce; and (5) the plaintiff has been or is likely to be
> injured as a result of the misrepresentation, either by
> direct diversion of sales or by a lessening of goodwill
> associated with its products.

Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Ave.,
284 F.3d 302, 310-311 (1st Cir. 2002). Uber seeks dismissal for
failure to allege facts to support the first, third and fifth
requirements.

With respect to the first requirement, Uber argues that
plaintiffs fail to show "a specifically-offending advertisement
or promotion." (Docket Entry # 6). According to Uber, the
complaint does not establish that Uber "made any false or

---

[14]    The rule also prevents a driver from refusing "to accept a
credit card as payment." (Docket Entry # 6-3, § 5, ¶ II(bb)).
The complaint adds that Boston taxicab drivers must also accept
cash. (Docket Entry # 1-1, ¶¶ 33 & 59).

deceptive advertisements." (Docket Entry # 6). Except for
identifying Uber's required credit card payment system and the
gratuity and $1.00 fee, plaintiffs do not address the argument.
(Docket Entry # 14, p. 20).

A false advertising claim under the Lanham Act "prohibits
misrepresentations only in 'commercial advertising or
promotion.'" Podiatrist Association Inc. v. La Cruz Azul De
Puerto Rico, Inc., 332 F.3d 6, 19 (1st Cir. 2003) (quoting section
43(a)(1)(B)) (emphasis added). "[I]dentifying a false or
misleading statement that was made in" Uber's "'commercial
advertising or promotion' is a pleading requirement." Id. at 20
(citing 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair
Competition § 27:24 (2003)); see also Avon Products, Inc. v. S.C.
Johnson & Son, Inc., 984 F.Supp. 768, 796 (S.D.N.Y. 1997) ("the
law does not impute representations of government approval or
supporting test data in the absence of explicit claims"). For
example, in the context of an implied falsehood regarding Federal
Drug Administration approval based on a package insert, the
Fourth Circuit in Mylan Laboratories, Inc. v. Matkari, 7 F.3d
1130 (4th Cir. 1993), explained that:

> Mylan's claims that the defendants' falsely represented that
> their drugs had been "properly approved by the FDA" must
> fail. First, in its complaint, Mylan nowhere points to any
> statement or representation in the defendants' advertising
> which declared "proper FDA approval." Moreover, that fatal
> deficiency cannot be cured by contentions that the very act
> of placing a drug on the market, with standard package
> inserts often used for FDA-approved drugs, somehow implies

(falsely) that the drug had been "properly approved by the FDA." Such a theory is, quite simply, too great a stretch under the Lanham Act.

Id. at 1139.

An advertisement may be literally false or impliedly false. See Cashmere & Camel Hair Mfrs. Institute v. Saks Fifth Ave., 284 F.3d at 311. Liability under section 43(a)(1)(B) necessitates a showing "either that the defendant's advertisement is literally false or implicitly false—that is, the advertisement is true or ambiguous yet misleading." Id.; see Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2nd Cir. 2007) ("[t]wo different theories of recovery are available to a plaintiff who brings a false advertising action," one that an advertisement "is literally false" and the other that the advertisement is an "'implied falsehood'" that is "likely to mislead consumers"). Literal falsity devolves into "two factual questions." Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 34 (1st Cir. 2000). First, the "factfinder must determine the claim conveyed by the advertisement." Id. Second, "the factfinder must then evaluate whether that claim is false." Id. On a motion to dismiss, the issue is simply whether a rational factfinder could conclude that the advertisement or promotion is claiming that Uber assigned Taxis are operating lawfully either explicitly or by necessary implication. See id. at 35. A showing of consumer deception is not required where the

advertisement or promotion is literally false.  Cashmere & Camel
Hair Mfrs. Institute v. Saks Fifth Ave., 284 F.3d at 311 & 314-
315.

     The complaint does not identify a representation in which
Uber states explicitly or conveys by necessary implication that
"Uber assigned taxis are operating lawfully," as alleged in Count
I.  (Docket Entry # 1-1, ¶ 60); see id. ("[a]lthough factfinders
usually base literal falsity determinations upon the explicit
claims made by an advertisement, they may also consider any
claims the advertisement conveys by 'necessary implication'").
Likewise, the complaint does not point to a statement by Uber
that Uber assigned taxis are "operating lawfully" by charging
legal fares, using cellular telephones, not accepting coupons or
accepting only the credit card registered with Uber as payment.
Rather, the falsity, if any, is implicit because the Uber
assigned taxis are violating Rule 403 due to the illegal
gratuity, the illegal cellular telephone use, the failure to
accept coupons and/or the ability to accept payment only in the
form of the customer's Uber registered credit card.[15]  See, e.g.,
Ameritox, Ltd. v. Millennium Laboratories, Inc., 889 F.Supp.2d
1304, 1315 (M.D.Fla. 2012) ("[b]ecause Ameritox has not alleged
that these representations explicitly address legality, Ameritox

---

[15]  As discussed below, the gratuity representation also raises a
literally false claim that Uber Taxi drivers approve the gratuity
and that the drivers receive a 20% gratuity.

must allege that these representations are false by implication"). Where a plaintiff presents an implied falsity claim, the plaintiff bears the underlying burden to show "that a substantial portion of the audience for that advertisement was actually misled," Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d at 33, unless the defendant "intentionally deceived the consuming public." Cashmere & Camel Hair Mfrs. Institute v. Saks Fifth Ave., 284 F.3d at 311 n.4.[16]

Except for the gratuity representation, the other three aforementioned "advertisements or promotions" all implicate Uber's assignment system or an Uber assigned taxi or taxi driver. In order "[t]o constitute advertising or promotion, commercial speech must at a bare minimum target a class or category of purchasers or potential purchasers, not merely particular individuals."[17] Podiatrist Association Inc. v. La Cruz Azul De

---

[16] The complaint at issue in Clorox recited the results of a consumer survey which the lower court did not properly credit. Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d at 37 (reversing dismissal of section 43(a)(1)(B) claim).

[17] In order to constitute "commercial advertising or promotion" under section 43(a)(1)(B):

> a representation must (a) constitute commercial speech (b) made with the intent of influencing potential customers to purchase the speaker's goods or services (c) by a speaker who is a competitor of the plaintiff in some line of trade or commerce and (d) disseminated to the consuming public in such a way as to constitute "advertising" or "promotion."

Podiatrist Association Inc. v. La Cruz Azul De Puerto Rico, Inc., 332 F.3d at 19.

<u>Puerto Rico, Inc.</u>, 332 F.3d at 19. An Uber assignment of an Uber Taxi targets only one person, the particular individual that opened the Uber app and chose the Uber Taxi category of vehicles. An Uber assigned taxicab driver's use of his cellular telephone target the single Uber client. As such, the speech does not constitute commercial advertising or promotion. <u>See</u> <u>id.</u>

In addition, as to the use of cellular telephones, the complaint does not denote an advertisement or promotion that Uber Taxi drivers legally or lawfully use cellular telephones. In fact, the complaint does not identify any advertisement or promotion regarding the use of cellular telephones by Uber Taxi drivers let alone a false advertisement or promotion stating or implying that Uber Taxi drivers use cellular telephones legally. Instead, the complaint simply states that Uber Taxi drivers must use cellular telephones and that Rule 403 prohibits such use by taxicab drivers. (Docket Entry # 1-1, ¶ 42(B)). The fact that Uber Taxi drivers "must use cell phones to receive and accept Uber assignments" or that the Uber Taxi drivers must telephone the customer when the Uber Taxi nears the pickup point (Docket Entry # 1-1, ¶ 42) is not an advertisement or promotion. There is no literal or implicitly false representation to the viewer that the Uber assigned taxi driver's use of the cellular telephone is lawful. Use of the cellular telephone as a basis for the section 43(a)(1)(B) claim therefore fails. <u>See</u> <u>Mylan</u>

Laboratories, Inc. v. Matkari, 7 F.3d at 1139.

Further, to survive a motion to dismiss a section 43(a)(1)(B) false advertising claim even under the more permissive standard applicable prior to Twombly, 550 U.S. at 555, "a plaintiff at the very least must identify some medium or means through which the defendant disseminated information to a particular class of consumers." Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc., 332 F.3d at 20. Here again, the only means alleged is the use of the cellular telephone by the actual driver to the Uber customer, i.e., a particular individual as opposed to a targeted class or category of purchasers. See id. at 19.

The aforementioned discrimination "advertisement or promotion" similarly fails to support a section 43(a)(1)(B) claim for the same reasons. The complaint alleges that "Uber's assignment system permits a driver to discriminate for any . . . unlawful reasons" such as disability, age, gender and race. (Docket Entry # 1-1, ¶ 42(C)). The complaint fails to identify a purportedly false representation that Uber is operating lawfully by not discriminating. See Mylan Laboratories, Inc. v. Matkari, 7 F.3d at 1139. Likewise, it does not identify the means or the medium by which Uber communicates the false message that it is not discriminating. See Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc., 332 F.3d at 20. Failing to identify the

false or misleading statement made in Uber's advertising or promotion warrants dismissal of a section 43(a)(1)(B) claim based on Uber operating the assignment system lawfully relative to discrimination. See id.

As to the single option credit card payment, it is literally true that Uber assigned taxis provide only one option for payment which consists of charging the customer's credit card registered with Uber. Again, however, the complaint fails to identify an Uber advertisement or promotion with the explicit or implicit message or claim that Uber is operating legally by allowing only payments that charge the Uber registered credit card. See Mylan Laboratories, Inc. v. Matkari, 7 F.3d at 1139. The complaint does not denote the means or medium in which Uber made the false advertisement or communication relative to operating legally by allowing such payment. See Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc., 332 F.3d at 20. Moreover, there is no indication that Uber disseminated the information relative to payment "to the consuming public in such a way as to constitute 'advertising' or 'promotion.'" Id. at 19. Failing to identify the false or misleading statement made in Uber's advertising or promotion warrants dismissal of a section 43(a)(1)(B) claim based on Uber operating lawfully by allowing payment only by an Uber user's registered credit card. Id. at 20.

Turning to the gratuity and $1.00 fee representation,

insofar as plaintiffs seek to challenge a message that Uber is operating legally when, in fact, it is operating illegally, the gratuity statement does not convey explicitly or by necessary implication that Uber is operating lawfully. With respect to whether the message misleads the viewing public who access the website, the statement does not imply that the gratuity is lawful. There is no reference to any legal or illegal activity or any other ordinance or statute. The statement does not suggest that Uber Taxis are operating lawfully by charging the gratuity. There is also no reference to Rule 403 let alone a reference to the limits placed on maximum metered and flat rate fares. Thus, to the extent plaintiffs seek to raise a section 43(a)(1)(B) claim based on an advertisement or promotion that literally or implicitly conveys that Uber is operating lawfully by charging the gratuity or fee, it does not survive the motion to dismiss. See, e.g., Mylan Laboratories, Inc. v. Matkari, 7 F.3d at 1139.

Drawing reasonable inferences in plaintiffs' favor, however, the statement that, "'[W]e'll automatically add 20% gratuity for the driver . . . so there's no need to hand any payment to the driver'" may imply or convey a message to the viewing public that the Uber Taxi driver, including Boston Cab drivers who partner with Uber, approve the gratuity charges. (Docket Entry # 1-1, ¶¶ 37, 49, 50 & 60). Hence, with respect to the gratuity statement,

the complaint sets out a section 43(a)(1)(B) claim that the
website communication falsely conveys a message that Boston Cab
drivers who partner with Uber approve the gratuity.  (Docket
Entry # 1-1, ¶¶ 37, 49, 50, 59 & 60).  The message explicitly
refers to the gratuity for the driver of the Uber Taxi and
necessarily implies that the driver knows the customer will not
hand him any payment and therefore approves the payment method
and the gratuity.  The size of the "20% gratuity for the driver"
also implies the driver's approval.  Viewing the message in its
entirety, a viewer could recognize the claim that the driver
approves the gratuity as if stated explicitly.  See <u>Cashmere &</u>
<u>Camel Hair Mfrs. Institute v. Saks Fifth Ave.</u>, 284 F.3d at 315
("'claim is conveyed by necessary implication when, considering
the advertisement in its entirety, the audience would recognize
the claim as readily as if it had been explicitly stated'").  The
gratuity representation is also false because it conveys a
message that the driver receives the full 20% gratuity ("'we'll
automatically add 20% gratuity for the driver'") when in fact the
"drivers only get half of the 20% charge."  (Docket Entry # 1-1,
¶¶ 38, 42).  In short, at the motion to dismiss stage, the
complaint adequately sets out a viable claim that Uber
represents, falsely and Boston Cab drivers who partner with Uber
approve the 20% gratuity and that they receive the 20% gratuity.

Uber raises the additional argument that plaintiffs fail to

show any resulting competitive injury traceable to the false statement. (Docket Entry # 6, § I(B)(3)). As noted above, causation is a required element of a section 43(a)(1)(B) claim. Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Ave., 284 F.3d at 311. A plaintiff must establish he has been or is "likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." Id. An injury to the plaintiff's reputation may also suffice. See Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8, 15 (1st Cir. 2004) (noting injury in the form of "'loss of control over reputation'");[18] see, e.g., MMM Healthcare, Inc. v. MCS Health Management Options, 818 F.Supp.2d 439, 451 (D.P.R. 2011) (plaintiff adequately pled "financial and reputation damages as a result of" defendants' false advertising). Simply stated, a plaintiff must show "that the false advertisement actually harmed its business." Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Ave., 284 F.3d at 318.

Here, the complaint generically states that, "Uber's misrepresentations have caused harm to the plaintiffs." (Docket Entry # 1-1, ¶ 64). Such conclusory allegations are ignored in conducting a Rule 12(b)(6) review. Manning v. Boston Medical

---

[18] Although Beacon addressed a Lanham Act section 43(a)(1)(A) claim, the statutory language ("he or she is likely to be damaged by such act") prefaces both subparagraphs (a)(1)(A) and (a)(1)(B).

<u>Center Corp.</u>, 725 F.3d 34, 43 (1st Cir. 2013) ("conclusory allegations that merely parrot the relevant legal standard are disregarded").  Taking the remaining factual allegations in the complaint as true, the complaint fails to show a plausible entitlement to relief under section 43(a)(1)(B).  Nowhere does the complaint set out factual allegations or permit a reasonable inference from such allegations that Uber's false advertisement that it "'automatically add[s] 20% gratuity for the driver'" caused plaintiffs' harm to their businesses.  There is no reference to any diversion of sales, any lost customers or any lessening of goodwill or harm to plaintiffs' reputation as a result of this misrepresentation.[19]  Plaintiffs' attempt to cure this defect with statements in their opposition brief is impermissible because such statements are outside the scope of the record when evaluating a Rule 12(b)(6) motion.  <u>See</u> <u>Fonte v. Board of Managers of Continental Towers Condominium</u>, 848 F.2d 24, 25 (2nd Cir. 1988) ("[f]actual allegations contained in legal briefs or memoranda are also treated as matters outside the pleading for purposes of Rule 12(b)").  The false gratuity representations therefore fail to provide a viable section 43(a)(1)(B) claim.

In sum, as previously explained, plaintiffs waived relying on false advertisements or promotions to set out a section

---

[19]  The alleged diversion of fares and revenue in the complaint is not made in reference to the 20% gratuity.

43(a)(1)(A) claim outside the parameters of the foregoing representations.[20]  Because these identified representations fail to set out a viable section 43(a)(1)(B) claim due to the absence of a false commercial advertisement or promotion and the absence of harm as a result of any such misrepresentation, it is not necessary to address Uber's _Dial A Car_ argument as it pertains to the Lanham Act claim in Count I.

B.  Section 43(a)(1)(A)  (Count II)

Uber moves to dismiss the section 43(a)(1)(A) claim due to the absence of any *use* by Uber of any *designation* belonging to plaintiffs in *interstate commerce*.  Pointing out that it does not own any vehicles, Uber submits that the complaint fails to allege any wrongful use of a protected designation in connection with plaintiffs' goods or services.  Uber additionally seeks dismissal due to the absence of consumer confusion and causally related damages.

Plaintiffs submit that the transmission of the false claims of a partnership over the internet satisfies the interstate commerce requirement and that the complaint adequately sets out consumer confusion.  Plaintiffs also point out that they are not making an "'infringement/false designation'" Lanham Act claim. (Docket Entry # 14).  Rather, according to plaintiffs, they are asserting "false claims of partnership" or "'false claims of an

_____
[20]   See footnote 12.

38

association.'"  (Docket Entry # 14) (quoting complaint).
Plaintiffs further argue that the diversion of business from EJT
as well as Boston Cab as a result of the false affiliation avoids
dismissal on the basis of Uber's causally related damages
argument.

Before addressing Uber's arguments, it is helpful to examine
the nature of the claim in the context of section 43(a)(1)(A).
Section 43(a)(1) "'proscribes the unauthorized use of a service
mark when the particular usage causes a likelihood of confusion
with respect to the identity of the service provider.'"  Oriental
Financial Group, Inc. v. Cooperativa de Ahorro y Credito
Oriental, 698 F.3d 9, 16 (1st Cir. 2012).  In pertinent part, the
statute states that:

> Any person who, on or in connection with any goods or
> services, or any container for goods, uses in commerce any
> word, term, name, symbol, or device, or any combination
> thereof, or any false designation of origin, false or
> misleading description of fact, or false or misleading
> representation of fact, which–
>
> > (A) is likely to cause confusion, or to cause mistake .
> > . . as to the affiliation, connection or association of
> > such person with another person, or as to the origin,
> > sponsorship, or approval of his or her goods, services,
> > or commercial activities by another person, . . .
>
> shall be liable in a civil action by any person who believes
> that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

In setting out the claim, which is captioned as a
"misrepresentation of connection, association, sponsorship and

approval," the complaint alleges that:

> By fabricating a nonexistent "partnership" with Boston taxi owners and misrepresenting its legal authority to operate a dispatch service, as alleged above, Uber has used false descriptions and representations of fact to cause confusion and mistake in consumers, who are likely to believe that Uber is affiliated with, connected with, associated with, sponsored by, and approved by Boston medallion owners, including plaintiff EJT Management, Inc. and lawful Radio Associations, including plaintiff Boston Cab Dispatch, Inc., in violation of 15 U.S.C. § l125(a)(l)(A).

(Docket Entry # 1-1, ¶ 63). Count II is therefore based on Uber's false descriptions and representations of its affiliation, sponsorship or association as a partner with Boston Cab and EJT. See Swarovski Aktiengesellschaft v. Building No. 19, Inc., 704 F.3d 44, 49 (1st Cir. 2013); Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 639 (1st Cir. 1992) (section 43(a)(1)(A)'s "prohibition against false designation of origin encompasses more than deceptions as to geographic origin; it extends, as well, to origin of source, *sponsorship or affiliation*") (emphasis added); see also 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:8 (2013) (confusion is "not only as to source, but also as to affiliation, connection or sponsorship").

By its terms, section 43(a)(1) refers not only to a "false designation of origin" but also to a "false or misleading description of fact, or . . . representation of fact." 25 U.S.C. § 1125(a)(1). Likewise, section 43(a)(1)(A) refers not only to a likelihood of confusion "as to the origin" of a plaintiff's

"goods, services or commercial activities" but also to the
"sponsorship, or approval" of such "goods, services or commercial
activities" and "to the affiliation, connection, or association of
such person with another person."  15 U.S.C. § 1125(a)(1)(A).
Section 43(a)(1)(A) therefore "prohibits a false representation
which is likely to cause confusion . . . as to the affiliation,
connection, or association of" the defendant with the plaintiff
"or as to the sponsorship or approval of the defendant's goods,
services, or commercial activities" by plaintiff.  5 J. Thomas
McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 28:15
(2013) (discussing false endorsement claims).  Boston Cab, which
dispatches the taxicabs carrying its recognizable color scheme,
design and logo, is the exclusive licensee of the trademarks,
trade names and trade dress associated with its taxi services.
(Docket Entry # 1-1, ¶ 4).  Count II therefore differs from the
typical scenario of an infringer passing off another's mark as his
own in a manner likely to cause confusion as to the source of the
goods or services.  <u>See</u> <u>Swarovski Aktiengesellschaft v. Building</u>
<u>No. 19, Inc.</u>, 704 F.3d at 48-49; <u>Century 21 Real Estate Corp. v.</u>
<u>LendingTree, Inc.</u>, 425 F.3d 211, 217 (3rd Cir. 2005).  Rather, Uber
is purportedly using Boston Cab's mark to refer to Uber's own Uber
Taxi services.  <u>See</u> <u>Century 21 Real Estate Corp. v. LendingTree,</u>
<u>Inc.</u>, 425 F.3d at 217.

    Uber initially argues that plaintiffs do not identify a

"'designation' allegedly misappropriated by Uber." (Docket Entry
# 6) (quoting <u>Brown v. Armstrong</u>, 957 F.Supp. 1293, 1300 (D.Mass.
1997)). Uber further submits that plaintiffs fail to identify
that Uber uses the designation. Assuming arguendo that plaintiffs
must show designation and use to avoid dismissal of a false
affiliation or sponsorship claim, the complaint adequately sets
out both elements. As reasonably inferred from facts in the
complaint, Boston Cab is an exclusive licensee of a recognizable
mark. Its recognizable logo, design and color scheme appear on
each of the hackney carriages driven by the 500 medallion owners
or lessees who belong to Boston Cab. Uber signs up or partners
with members of Boston Cab and thereby uses taxicabs with Boston
Cab's color scheme, design and label as Uber Taxis. Dismissal on
the basis of a failure to specify designation and use is not
appropriate.

Similar reasons avoid dismissal of the claim on the basis of
Uber's argument that the complaint fails to allege that Uber's use
"'was in connection with goods or services.'" (Docket Entry # 6)
(quoting <u>Brown v. Armstrong</u>, 957 F.Supp. at 1300). By its terms,
section 43(a)(1) applies to "uses in commerce . . . in connection
with any goods or services." 15 U.S.C. § 1125(a)(1); <u>see</u> <u>Island</u>
<u>Insteel Systems, Inc. v. Waters</u>, 296 F.3d 200, 213 (3rd Cir. 2002)
(quoting 15 U.S.C. § 1125(a)).

As alleged in the complaint, Uber's use of Boston taxicab

drivers, including members of Boston Cab who use the Boston Cab
unique colors, design and logo on their hackney carriages, creates
a false affiliation, sponsorship, partnership or connection
between Uber and plaintiffs.  Uber partners with Boston taxicab
drivers including a number of the 500 medallion owners or lessees
who belong to Boston Cab and drive vehicles with the radio
association's identifying color scheme, design and logo.  (Docket
Entry # 1-1, ¶¶ 4, 42 & 63).  Uber's attempt to distance itself
from its use of these services by noting that it does not own any
vehicles (Docket Entry # 1-1, ¶ 14) and therefore does not use the
Boston Cab logo when it connects an Uber client to an Uber Taxi is
misguided for purposes of a motion to dismiss.  When an Uber
client opens the Uber app and chooses an Uber Taxi, Uber's
computer system connects that customer to an Uber Taxi including,
at times, Boston Cab vehicles bearing Boston Cab's mark.  Section
43(a)(1) addresses use "in connection with any goods and services"
as opposed to ownership or title.

Uber next maintains that the complaint fails to evidence or
support the use of any designation in interstate commerce.  The
relevant statutory language proscribes the conduct of any person
who, "in connection with any goods or services . . . *uses in
commerce* any word, term, name symbol, or device, or any
combination thereof," i.e., a mark,[21] "or any false designation of

---

[21] See 15 U.S.C. § 1127 (defining "mark" as including any
trademark, service mark, collective mark, or certification

origin" or "false or misleading representation of fact."  15

U.S.C. § 1125(a)(1) (emphasis added); see Purolator, Inc. v. EFRA

Distributors, Inc., 687 F.2d 554, 558 (1st Cir. 1982) (citing 15

U.S.C. §§ 1125 and 1127).  The term "commerce" refers to "all

commerce which may lawfully be regulated by Congress."  15 U.S.C.

§ 1127.  The statute defines "in commerce" as the "use of a mark

in the ordinary course of trade."  15 U.S.C. § 1127.  A mark on

services is used "in commerce" inter alia when it is "used or

displayed in the sale or advertising of services and the services

are rendered in commerce."  15 U.S.C. § 1127; see also Patsy's

Italian Restaurant, Inc. v. Banas, 658 F.3d 254, 268 (2nd Cir.

2011) (noting that "'use in commerce' is defined differently for

trademarks and service marks" under 15 U.S.C. § 1127).

    The language of section 43(a)(1), as amended in 1989,

"requires that the defendant's accused use be 'in commerce,' it

does not require that the plaintiff's mark have been used in

commerce."  5 J. Thomas McCarthy, McCarthy on Trademarks and

Unfair Competition § 27:47 (2013); see generally Cashmere & Camel

Hair Mfrs. Institute v. Saks Fifth Ave., 284 F.3d at 311 (false

advertising claim requires proof that "the defendant placed the

false or misleading statement in interstate commerce").[22]  Uber

---

mark").

[22] Case law nevertheless deems the "in commerce" requirement
satisfied when "the *plaintiff* used its mark in interstate
commerce and the defendant's infringement damages plaintiff's
interstate reputation."  5 J. Thomas McCarthy, McCarthy on

removed this action on the basis of diversity of citizenship, 28 U.S.C. § 1332, (Docket Entry # 1) such that subject matter jurisdiction exists.

Focusing on the conduct of Uber and its use of the mark in commerce, as indicated by the statutory language, the complaint states that Uber used "the internet to transmit fraudulent misrepresentations to Boston consumers about fares in Uber Taxis and false claims of association between Uber and Boston Cab." (Docket Entry # 1-1, ¶ 80). Moreover, Uber transmitted the false representations to Boston users of Uber "thousands of times over a period in excess of five months." (Docket Entry # 1-1, ¶ 80). The complaint also describes the "thousands of violations" as being "with Boston Uber customers."[23] (Docket Entry # 1-1, ¶ 81).

Drawing reasonable inferences in plaintiffs' favor, Uber uses

_____

Trademarks and Unfair Competition § 27:47 (2013) (emphasis in original) (citing Johnson v. Jones, 149 F.3d 494, 502 (6th Cir. 1998), in footnote). Thus, as stated in a 2003 First Circuit case in finding that the plaintiff made only "meager showings of commerce and harm," there was "no evidence in the record that Danielson even operated outside Massachusetts at this time, in order to establish the necessary interstate commerce nexus for the market in which business was allegedly lost." John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., 322 F.3d 26, 46 (1st Cir. 2003) (citing Johnson v. Jones, 149 F.3d at 502).

[23] Plaintiffs identify these statements (Docket Entry # 1-1, ¶¶ 80-81) as satisfying the "in commerce" requirement. (Docket Entry # 14). Although Count II (Docket Entry # 1-1, ¶¶ 1-61) does not expressly incorporate these statements (Docket Entry # 1-1, ¶¶ 80-81), Uber had the opportunity to object to their consideration in the reply brief and failed to address the issue. See O'Connell v. Marrero-Recio, 724 F.3d at 124; Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d at 260.

false statements of fact regarding its association with Boston Cab over the internet and therefore outside the Commonwealth.[24] The false affiliation or sponsorship arises when a customer chooses an Uber Taxi and/or a taxicab driven by a Boston Cab member with its identifiable color scheme, design and logo and the member accepts the assignment from the Uber computer system and arrives at the pickup location. The transmissions by Uber of such false statements of association thousands of times over the internet outside the Commonwealth satisfies, barely, the "in commerce" requirement under the relatively forgiving Rule 12(b)(6) standard of review. See NTP Marble, Inc. v. AAA Hellenic Marble, Inc., 799 F.Supp.2d 446, 451 (E.D.Pa. 2011) ("press release was accessible through the Internet" thus causing "it to appear outside of Pennsylvania, where it might also have an impact on parties outside the state" deemed sufficient to satisfy "Lanham Act's interstate commerce requirement"); Futuristic Fences, Inc. v. Illusion Fence Corp., 558 F.Supp.2d 1270, 1277 (S.D.Fla. 2008) ("[a]dvertising that affects interstate commerce and solicitation of sales across state lines is commerce within the meaning of Lanham Act") (internal ellipses omitted); Nike, Inc. v. Rubber Mfrs. Ass'n, Inc., 509 F.Supp. 919, 924 (D.C.N.Y. 1981) ("mere solicitation of sales is 'commerce' within the meaning of Section

_____

[24] Although the complaint does not expressly state that Uber's internet transmissions include those made outside Massachusetts, a reasonable inference of such use arises by use of the internet.

43(a)"); see also Purolator, Inc. v. EFRA Distributors, Inc., 687 F.2d at 559 ("'jurisdiction exists to grant relief under the Lanham Act if a defendant's activities although wholly intrastate tend to have a damaging effect on plaintiff's federally protected interstate business'").

Uber next submits that the section 43(a)(1)(A) claim falters because of the lack of confusion.  Uber presents the argument as confusion regarding a false designation of origin as opposed to the pled claim of false representations of an affiliation, partnership or sponsorship between Uber and EJT as well as Boston Cab.[25]  (Docket Entry # 1-1, ¶ 63).  Accordingly, before addressing the confusion, it is worth distinguishing the parameters of an origin of service claim and a false affiliation claim vis-à-vis a likelihood of confusion.

Historically, trademark law guards against confusion about "the source of the good or service to which the mark is attached." Swarovski Aktiengesellschaft v. Building No. 19, Inc., 704 F.3d at 49 (addressing "a nominative use case" and liability under section 43(a)(1)(A)).  A "'typical situation . . . involves the

_____

[25]  Uber does not distinguish between EJT and Boston Cab.  It simply asserts that "plaintiffs" fail to cite evidence of consumer confusion.  (Docket Entry ## 6 & 19).  Uber also seeks to dismiss the entire claim as opposed to the claim with respect to EJT or Boston Cab.  Uber's failure to distinguish between EJT and Boston Cab regarding the arguments waives the argument that the claims against EJT as opposed to Boston Cab is subject to dismissal.  See O'Connell v. Marrero-Recio, 724 F.3d at 124; Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d at 260.

defendant's having passed off another's mark as its own or having used a similar name, confusing the public as to precisely whose goods are being sold." Id. (quoting Century 21 Real Estate Corp. v. LendingTree, Inc., 425 F.3d at 217); International Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing Center, 103 F.3d 196, 202 (1st Cir. 1996) ("[i]n the typical commercial setting, confusion as to the source of goods or services occurs when . . . a buyer may purchase one product or service in the mistaken belief that she is buying a different product or service"). Thus, when a defendant designates or passes off the plaintiff's mark as its own, liability attaches where there is a likelihood of confusion as to the source or origin of the goods.

Here, the facts in the complaint give rise to a nominative use case. See generally id. Indeed, plaintiffs disclaim bringing an "'infringement/false designation'" case and, instead, describe their section 43(a)(1)(A) claims as "false claims of an association" or partnership. (Docket Entry # 14); see, e.g., Century 21 Real Estate Corp. v. Lendingtree, Inc., 425 F.3d at 217 (defendant "is using plaintiff's mark in order to refer to defendant's own goods or to the goods of the trademark owner in a way that might confuse the public as to the relationship between the two").

Nominative use may arise where the alleged infringer uses the

48

plaintiff's mark to describe the plaintiff's product even if the ultimate goal is to describe its own product.  See 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:11 (2013) (quoting Cairns v. Franklin Mint Co., 292 F.3d 1139, 1151 (9th Cir. 2002)).  It may also arise in a fair use case wherein the defendant uses plaintiff's mark only to describe his own product or service.  See Swarovski Aktiengesellschaft v. Building No. 19, Inc., 704 F.3d at 49 n.3; Century 21 Real Estate Corp. v. LendingTree, Inc., 425 F.3d at 218; 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:11 (2013).

In a nominative use case, the confusion "is not one of source . . . but rather of *endorsement or affiliation*."  Swarovski Aktiengesellschaft v. Building No. 19, Inc., 704 F.3d at 49 (emphasis in original).  Here too, plaintiffs are claiming that Uber's use of Boston taxicab drivers, including the 500 members of Boston Cab who use the Boston Cab unique and identifiable colors, design and logo on their hackney carriages, creates a false affiliation, sponsorship or partnership between Uber and plaintiffs.  (Docket Entry # 1-1, ¶¶ 3, 4, 14, 42 & 63).  Plaintiffs are not claiming that Uber falsely designated the source of its services as Boston Cab or EJT.  As explained in greater detail in Swarovski, a case in which Building 19 acquired a number of Swarovski crystal figurines and advertised them using the Swarovski mark along with the Building 19 name:

> The potential for confusion in a nominative use case is not one of source—here, the crystal really was manufactured by Swarovski—but rather one of endorsement or affiliation.  The fear is that *a consumer* glancing at Building # 19's proposed advertisement *might mistakenly believe that Swarovski had some official association with the sale*; perhaps that Swarovski sponsored the sale and so stood behind the goods as a direct seller, *or that it had partnered with Building # 19 in a way that might detract from its luxury status*.

Id. (emphasis added).  Plaintiffs' section 43(a)(1)(A) claim involves a false endorsement or affiliation leading to a likelihood of confusion as opposed to a false designation of the source or origin of Boston Cab's services.

Having articulated the nature of the claim, Uber is correct that a likelihood of confusion is a required element of any section 43(a)(1) claim.  See id. (absent a likelihood of confusion "showing, no trademark infringement has occurred and so the trademark holder has no cause of action"); Venture Tape Corp. v. McGills Glass Warehouse, 540 F.3d 56, 60 (1st Cir. 2008) (plaintiff must show that defendant's "use of the Venture mark likely confused" consumers thereby causing harm); Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008) ("plaintiff must establish . . . that the allegedly infringing use is likely to cause consumer confusion"); Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 116 (1st Cir. 2006) (plaintiff must "demonstrate . . . that the allegedly infringing use is likely to result in consumer confusion").  In addition, "the likelihood of confusion inquiry is not limited to actual or

potential purchasers, but also includes others whose confusion

threatens the trademark owner's commercial interest in its mark."

Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d at 16.

Ordinarily, in deciphering whether a likelihood of confusion

exists, the First Circuit examines the following eight factors:

> "(1) the similarity of the marks; (2) the similarity of the
> goods (or, in a service mark case, the services); (3) the
> relationship between the parties' channels of trade; (4) the
> juxtaposition of their advertising; (5) the classes of
> prospective purchasers; (6) the evidence of actual confusion;
> (7) the defendant's intent in adopting its allegedly
> infringing mark; and (8) the strength of the plaintiff's
> mark."

Dorpan, S.L. v. Hotel Melia, Inc., 728 F.3d 55, 65 (1st Cir. 2013)

(quoting Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v.

Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir. 1996));

Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d

482 (1st Cir. 1981). The issue of whether to apply all or some of

those factors to a nominative use case and/or include other

factors, such as whether Uber "accurately portrayed the

relationship between itself" and plaintiffs, is an issue of first

impression in this circuit. See Swarovski Aktiengesellschaft v.

Building No. 19, Inc., 704 F.3d at 50 & 53. For present purposes,

it is not necessary to resolve the issue because the Pignons

factors permit a likelihood of confusion finding and the addition

or substitution of factors used in the Ninth and Third Circuit

cases cited in <u>Swarovski</u>, 704 F.3d at 50,[26] yields the same conclusion.

Overall, each member vehicle of Boston Cab carries a Boston Cab color scheme, design and logo. (Docket Entry # 1-1). Five hundred of the 1,825 medallion owners in Boston are members of Boston Cab. Such a proportionally large number of taxicabs in Boston bearing Boston Cab's mark gives rise to a finding that Boston Cab is a well known and recognizable taxi dispatch service in Boston. Facts in the complaint also reasonably infer that the color scheme, design and logo serve the function of identifying the vehicles as driven by Boston Cab members and dispatched by Boston Cab. Consumers seeking transportation for hire thereby associate Boston Cab's mark on taxicabs as identifying a taxicab emanating from and dispatched by Boston Cab.

When a consumer seeking transportation for hire opens the Uber app, he sees the option of an Uber Taxi with a map of the various "taxis in the neighborhood" from which he can choose the Uber Taxi category. (Docket Entry # 1-1, ¶ 13). Associating Boston Cab with taxicabs in Boston, the consumer may falsely draw the conclusion that Uber is affiliated with or sponsored by taxis in Boston, including taxicabs that carry Boston Cab's mark. When a Boston Cab member appears as the Uber assigned taxi in response

_____
[26] <u>Toyota Motor Sales, U.S.A., Inc. v. Tabari</u>, 610 F.3d 1171, 1175–76 (9th Cir. 2010); <u>Century 21 Real Estate Corp. v. LendingTree, Inc.</u>, 425 F.3d at 222.

to an Uber customer's choice of an Uber Taxi, the customer sees and uses a hackney carriage with Boston Cab colors and logo thereby further cementing the false affiliation in the minds of these Uber clients that Uber partners with Boston Cab.  See Swarovski Aktiengesellschaft v. Building No. 19, Inc., 704 F.3d at 52 (use of the word "Swarovski" "in Building # 19's proposed advertisement might, in theory, have created confusion" by "suggest[ing] some official affiliation between Swarovski and Building # 19").

In short, at *both* the time the customer chooses an Uber Taxi and at the time the Uber Taxi appears at the pickup location, the consumer may believe there is an association, partnership or endorsement between Boston Cab's taxi services and Uber's transportation services.  See generally id. at 49.  Uber's argument that there is no likelihood of confusion because the Uber customer does not see the Boston Cab until it arrives at the pickup location is therefore misplaced.  Uber's reliance on the disclaimer of association with third party transportation services in the legal terms and conditions is also not determinative particularly in the context of a motion to dismiss.  See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d at 639 ("use of a mark may be deceptive and, thus, violative of section 43(a), in light of the overall appearance of the package, despite the existence of fine print identifying the true origin").

Turning to the _Pignons_ factors with greater specificity, Uber uses Boston Cab's identifying color scheme, design and logo each time a Uber customer opens the app, chooses the Uber Taxi category and a taxi with Boston Cab's color scheme, design and logo arrives at the pickup location. Uber and its Uber Taxis use Boston Cab's mark as its own. See generally Venture Tape Corp. v. McGills Glass Warehouse, 540 F.3d at 61 ("McGills' website incorporated Venture's exact marks"). The first two _Pignons_ factors, similarity of the marks and the goods or services, support a likelihood of confusion.

Both Uber and Boston Cab also offer transportation services for hire in Boston. (Docket Entry # 1-1, ¶ 5) ("Uber operates a transportation-for-hire service" in Boston). Although Uber's sign up sheet and its terms and condition indicate a distance between Uber and its member drivers who provide the transportation service, the complaint and the Rule 12(b)(6) record as a whole present a closer relationship between Uber and its member drivers. For purposes of the motion to dismiss, the relationship between Uber's and Boston Cab's channels of trade closely overlap. Uber and Boston Cab both use apps that allow a customer seeking transportation for hire in Boston to use a smart phone to summon a vehicle for hire such as a taxicab. (Docket Entry # 1-1, ¶¶ 12-15). The fourth _Pignons_ factor thereby supports a likelihood of confusion. There is also a significant overlap in the classes of

purchasers. Uber and Boston Cab compete for the same class of prospective purchasers, i.e., individuals seeking transportation for hire in Boston.

It is true that the Rule 12(b)(6) record fails to show actual confusion or a strong showing on the strength of Boston Cab's mark as well as Uber's intent. Taking these factors into account, the complaint and other documents that comprise the Rule 12(b)(6) record still permit a sufficient showing that Uber's use of Boston Cab's color scheme, design and logo is likely to confuse consumers that Uber is affiliated or associated with Boston Cab and/or EJT and that plaintiffs sponsor or partner with Uber. See Swarovski Aktiengesellschaft v. Building No. 19, Inc., 704 F.3d at 49 & 52.

The three additional factors noted in Swarovski, 704 F.3d at 50 (citing Third and Ninth Circuit cases),[27] standing alone or in combination with the eight Pignons factors do not alter this finding. It is difficult to distinguish between an Uber Taxi and a Boston Cab vehicle with its color scheme, design and logo that accepts an assignment and arrives at the pickup location. Although the terms and conditions portray differences between Uber and Boston Cab or EJT, the Uber computer system nevertheless dispatches drivers with vehicles bearing Boston Cab's color scheme, design and logo thereby inaccurately portraying a close association and affiliation with Boston Cab. There is little

_____

[27] See the previous footnote.

indication that Uber uses more of Boston Cab's mark than is necessary given the lack of allegations regarding Uber advertising a direct affiliation with Boston Cab or EJT on its website or elsewhere. On balance, however, there is an adequate showing of a likelihood of confusion to avoid a Rule 12(b)(6) dismissal.

Uber next asserts there is no showing of "causally-related damages" or competitive harm. (Docket Entry ## 6 & 19). Uber also points to plaintiffs' statement in their brief that, "'The predicate acts of lying to customers about fare and affiliation do not, standing alone, cause the plaintiffs appreciable harm.'"[28] (Docket Entry # 19) (brackets omitted). Plaintiffs argue that Uber misappropriates their good will by claiming a partnership. In their brief, plaintiffs also contend that Uber diverts business from EJT which "has experienced a drop in demand for its cabs." (Docket Entry 3 14).

Turning to the facts in the Rule 12(b)(6) record, Boston Cab dispatches only drivers that pass background checks and accept all forms of payment, including coupons. They drive vehicles equipped

---

[28] Plaintiffs made this statement to address Uber's RICO argument that they do not allege harm from the investment of funds derived from the wire fraud. A RICO injury, see George v. National Water Main Cleaning Co., 2011 WL 841226, at *13 (D.Mass. March 23, 2011), differs from a Lanham Act injury, which may include a lessening of goodwill or an injury to the plaintiffs' reputation. See Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d at 15; Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Ave., 284 F.3d at 311. Because of the context in which plaintiffs made the statement and the differing legal principles, Uber's reliance on the statement is unsound.

with a panic button, protective partitions and a GPS that gives the Boston Police "real time" internet access. Uber Black Cars and Uber SUVs and their drivers lack such protective safety features. Competitive harm may take the form of associating Boston Cab and its mark with Uber in a manner that detracts from the safety, reliability and assurances offered when a customer hails a taxicab through Boston Cab, see generally id. at 49 (consumer might mistakenly believe that Swarovski "had partnered with Building # 19 in a way to detract from its luxury status"), and thereby negatively impact Boston Cab's reputation and good will. In addition, Boston Cab drivers do not use cellular telephones. Uber Taxis, including drivers that use the Boston Cab color scheme, design and logo, use cellular telephones which puts customers at risk. (Docket Entry # 1-1).

The fact that Boston Cab receives weekly fees from its members does not eviscerate the harm caused by the damage to its good will and reputation resulting from the affiliation. Although the harm to plaintiffs' goodwill and reputation is sufficient to avoid dismissal, Uber also "divert[s] taxi revenues" by replacing taxis with Uber Black Cars and Uber SUVs. (Docket Entry # 1-1, ¶ 55). Dismissal on the basis of the absence of facts to support the presence of causally related damages is not appropriate.

C. Dial A Car

As an additional basis to dismiss Count II, Uber argues that

plaintiffs cannot premise a Lanham Act claim based on violations of Rule 403, chapters 386 or 392 or ordinance 16-15.05 because they do not create a private right of action. Uber maintains that chapters 386 and 392 as well as ordinance 16-15.05 delegate the exclusive authority to make rules and to enforce Rule 403 to the Commissioner. According to Uber, plaintiffs seek to bypass the administrative process in Rule 403 by bringing claims under the Lanham Act premised on Uber's violations of Rule 403 and/or the foregoing statutes and ordinance. Uber submits that, "Claimed violations of local ordinances are, in this instance, for the designated local municipal authority to determine." (Docket Entry # 6). It also points out that the municipal authority has not held Uber subject to or in violation of Rule 403 or had the opportunity to address the issue.

In presenting the argument, Uber relies exclusively on <u>Dial A Car, Inc. v. Transportation, Inc.</u>, 82 F.3d 484 (D.C.Cir. 1996). In <u>Dial A Car</u>, the plaintiff, a transportation service licensed to operate a "point-to-point" corporate account service known as "'Blue Car' service" in the District of Columbia ("D.C."), filed suit against two taxicab companies licensed in Virginia and Maryland but not in D.C. <u>Id.</u> at 485. For taxicabs licensed in another jurisdiction, the D.C. Code required a reciprocal agreement to operate taxicabs in D.C. <u>Id.</u> Promulgated by the D.C. Taxicab Commission, the reciprocal agreement at issue allowed

the defendants' taxicabs to drop off and pick up passengers in
D.C. as long as the pick up or drop off location was outside D.C.
and in the county of licensure.  Id.  Although licensed to provide
Blue Car service in D.C., the defendants used their taxicabs, as
opposed to their other vehicles, to render Blue Car service in
D.C.  According to the plaintiff, the use of taxicabs to perform
Blue Car service violated the reciprocal agreement.  The plaintiff
therefore brought a false advertising claim under section
43(a)(1)(B) based on the defendants' false representation "in
their promotional brochure that they lawfully may perform
corporate account services in the District."  Id.

        The court did not resolve the issue of whether the defendants
violated the reciprocal agreement because it deemed the matter
"within the jurisdiction of the D.C. Taxicab Commission" and "the
Commission [had] not addressed" the issue.  Id. at 488.  Noting
that the plaintiff was "simply using the Lanham Act to try to
enforce its preferred interpretation of [the reciprocal agreement]
instead of adjudicating the issue before the Commission," the
court found "no reason to reach out and apply federal law to [the]
quintessentially local dispute."  Id. at 488-489.  Uber highlights
and quotes the following language from the opinion:

        By entertaining appellant's claim, we would be transforming
        the Lanham Act into a handy device to reach and decide all
        sorts of local law questions.  Not surprisingly, although the
        Act has been interpreted in literally hundreds of appellate
        cases since its enactment in 1946, we cannot find a single
        case that purports to extend the Act to allow federal judges

to interpret and enforce municipal regulations, thereby
affording plaintiffs remedies over and above those provided
by local law.

Id. at 490.

A number of reasons counsel against dismissing Count II on
the basis of Uber's Dial A Car argument.  First, the First Circuit
has neither cited nor adopted Dial A Car's reasoning prohibiting a
Lanham Act claim when a matter involves an issue covered by a
municipal regulation not yet addressed by the regulatory body.[29]
Although not cited by Uber, a number of federal circuit courts,
however, use Dial A Car's reasoning to preclude false advertising
claims under the Lanham Act based on mislabeling prescription or
non-prescription drugs or hazardous products.  See PhotoMedex,
Inc. v. Irwin, 601 F.3d 919, 928 (9th Cir. 2010) (affirming summary
judgment on section 43(a)(1)(B) claim because "PhotoMedex is not
permitted to circumvent the FDA's exclusive enforcement authority
by seeking to prove that Defendants violated the FDCA, when the
FDA did not reach that conclusion"); Schering-Plough Healthcare
Products, Inc. v. Schwarz Pharma, Inc., 586 F.3d 500, 508-510 (7th
Cir. 2009) (agreeing with lower court that "Schering jumped the
gun by suing [under section 43(a)(1)(B)] before the FDA addressed

---

[29]  Two district court cases cite to Dial A Car only in relation
to the court's Sherman Act analysis.  See CCBN.Com, Inc. v.
Thomson Financial, Inc., 270 F.Supp.2d 146, 155 (D.Mass. 2003);
Wojcieszek v. New England Tel. and Tel. Co., 977 F.Supp. 527,
533-534 (D.Mass. 1997).

the misbranding issue");[30] IQ Products Co. v. Penzoil Products Co.,
305 F.3d 368, 374 (5th Cir. 2002) (affirming summary judgment on
section 43(a)(1)(B) claim because Federal Hazardous Substances Act
"does not create a private cause of action" and "vests the CPSC
with the authority to enforce federal labeling requirements");
Sandoz Pharmaceuticals Corp. V. Richardson-Vicks, 902 F.2d 222,
231 (3rd Cir. 1990) ("[n]either of these agencies' constituent
statutes creates an express or implied private right of action and
what the FD&C Act and the FTC Act do not create directly, the
Lanham Act does not create indirectly").

Here, it is doubtful that the First Circuit would defer to
the Commissioner before deciding the false affiliation claim.  The
section 43(a)(1)(A) claim does not require the Commissioner's
determination that Uber is operating as a taxi service or a radio
association or that Uber is in charge of hackney carriages driven
by unlicensed drivers.  Rather, it involves an assessment of
Uber's use of Boston taxicab drivers, specifically members of
Boston Cab with its logo, color scheme and design, as creating a
false affiliation or sponsorship with Boston Cab.  In particular,
the likelihood of confusion determination entails an adjudication
of Uber's use of Boston Cab's mark as creating a likelihood of
consumer confusion of a false affiliation or endorsement between

---

[30] The Schering-Plough court articulates the nature of the
argument as based on the principle of primary jurisdiction.
Schering-Plough Healthcare Products, Inc. v. Schwarz Pharma,
Inc., 586 F.3d at 507.

61

Boston Cab or EJT and Uber.  See generally Swarovski, 704 F.3d at
49-50.  No decision by the Commissioner is required or usurped by
proceeding with the section 43(a)(1)(A) false endorsement claim.

In addition, Uber's argument that plaintiffs should proceed
before the Commissioner under Rule 403 and that the rule includes
a "mandatory administrative process for adjudicating alleged rules
violations" (Docket Entry # 19) is misguided.  Uber overstates the
reach of the available administrative procedures in Rule 403.
Those procedures allow administrative challenges to a denial of a
hackney carriage license application followed by court review.
Rule 403 also sets out procedures for medallion owners when
another person files a hackney complaint or a police officer files
a hackney carriage violation culminating in court review.[31]  Rule
403 additionally includes an express procedure for complaints
against an approved radio association for violating the radio
association standards in Rule 403.  (Docket Entry # 6-3, § 7).
Rule 403 does not attempt to proscribe unfair competition based on
a false affiliation between an existing approved radio association
and an unapproved taxi or dispatch service.  Whether Uber is
operating as a radio association without approval from the
Inspector of Carriages under Rule 403 or is in charge of
unlicensed drivers of hackney carriages in violation of chapter
392 or 386 is not the focus of the Lanham Act false affiliation

---

[31]  Decisions by the Inspector of Carriages with respect to
hackney carriage violations for vehicle deficiencies are final.

claim.  Likewise, whether Boston Cab members who partner with Uber are violating Rule 403 is not the focus of the Lanham Act claim. Accordingly and contrary to Uber's position (Docket Entry # 6, p. 9), plaintiffs are also not "using the Lanham Act to try to enforce [their] preferred interpretation of [Rule 403] instead of adjudicating the issue before the Commission."  <u>Dial A Car</u>, 82 F.3d at 488.  Unlike the false advertising section 43(a)(1)(B) claim and the facts in <u>Dial A Car</u> well as the above FDA cases, there is little that the Commissioner or the Inspector of Carriages would adjudicate regarding the false affiliation claim and the likelihood of confusion as between Boston Cab's mark and Uber's false endorsement or sponsorship.  The issues regarding the section 43(a)(1)(B) claim are therefore not within the exclusive purview of the Commissioner, Rule 403 or the regulations therein.

Similarly, the absence of a private right of action to enforce Rule 403 or the foregoing state statutes with respect to an approved radio association seeking to sue a competitor does not warrant dismissing the section 43(a)(1)(A) claim.  First, the claim does not require a decision by the Commissioner that Uber is violating a particular provision of Rule 403.  The claim also does not invade the Commissioner's "exclusive authority to make rules and orders" regulating hackney carriages under chapter 392. (Docket Entry # 6-3).  It involves a subject matter relatively distinct from regulating and licensing Boston taxicabs, their

drivers and their dispatch services.

Second, the Lanham Act provides a private right of action for false endorsement or affiliation claims and "'federal courts have a "virtually unflagging obligation to exercise the jurisdiction given them."'" Chico Service Station, Inc. v. Sol Puerto Rico Ltd., 633 F.3d 20, 29 (1st Cir. 2011) (internal ellipses omitted). The doctrine of primary jurisdiction, cited by one of the above cases that relies on Dial A Car's reasoning, also does not apply because the section 43(a)(1)(A) claim does not require the special competence of the Commissioner to decide the issues. See Chico Service Station, Inc. v. Sol Puerto Rico Ltd., 633 F.3d 20, 30 n.13 (1st Cir. 2011) ("primary jurisdiction doctrine counsels abstention 'whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body'"); see also Arroyo-Melecio v. Puerto Rican American Ins. Co., 398 F.3d 56, 73 -74 (1st Cir. 2005) ("doctrine's application depends on . . . whether the agency determination lay at the heart of the task assigned" agency by legislature; "whether agency expertise was required to unravel intricate, technical facts;" and whether agency's "determination would materially aid the court").[32] The

_____

[32] Uber does not raise or seek dismissal based on Burford v. Sun Oil Co., 319 U.S. 315 (1943). See O'Connell v. Marrero-Recio, 724 F.3d at 124; Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d at 260. Uber does not cite to Burford or to any of its progeny and Uber discusses only Dial A Car, a case that did not cite or mention abstention on the basis of Burford.

section 43(a)(1)(B) claim primarily concerns the false partnership or association in the use of Boston Cab's mark which does not require the Commissioner's expertise as to whether Uber is operating in violation of a particular provision in Rule 403.

Uber's argument based on <u>Dial A Car</u> therefore does not require dismissal of the section 43(a)(1)(A) claim. Uber also seeks to extend the reasoning to the state law claims.[33] The <u>Dial A Car</u> argument with respect to the state law claims is addressed separately, if necessary, with respect to each of the state law claims.

D. <u>Chapter 93A</u>

Uber seeks to dismiss the unfair or deceptive acts chapter 93A claim alleged in Count III and the unfair competition chapter 93A claim in Count IV based on a number of arguments. First, Uber submits that plaintiffs fail to allege an independent basis for chapter 93A liability. Thus, because the Lanham Act claims fail, the chapter 93A claims therefore fail. (Docket Entry # 6, p. 13). Inasmuch as the Lanham Act claim in Count II survives dismissal, this brevis argument does not merit a dismissal of the chapter 93A claims.

Second, the reply brief asserts that plaintiffs "have no evidence" to show "actual consumer deception" with respect to the false affiliation alleged in Count III. (Docket Entry # 1-1, ¶

_____

[33] Uber did not present an argument based on federal preemption of the state law claims.

65

66(a)).  Count III includes the allegation that Uber engages in
unfair and deceptive acts and practices by "[f]alsely claiming an
affiliation with medallion owner and radio associations."  (Docket
Entry # 1-1, ¶ 66(a)).[34]  Uber points out that it disclaims any
affiliation with Uber assigned drivers in the terms and conditions
and on the initial sign up page.

    "[A]ctual consumer deception, as posited by Uber, is not the
standard for deception in a section 11 (or section nine) action
under chapter 93A.  "Whether conduct is deceptive is initially a
question of fact, to be answered on an *objective* basis and not by
the subjective measure argued by the defendants."  Aspinall v.
Philip Morris Companies, Inc., 813 N.E.2d 476, 486 (Mass. 2004)
(emphasis added).  Uber's argument based on actual as opposed to
objective deceptive conduct is therefore incorrect.  See id.  The
correct standard is whether the act or practice "has the 'capacity
or tendency' to deceive."  In re Pharmaceutical Industry Average
Wholesale Price Litigation, 582 F.3d at 185.  A practice is
"deceptive" when "'it "could reasonably be found to have caused a
person to act differently from the way he [or she] otherwise would
have acted."'"[35]  Aspinall v. Philip Morris Companies, Inc., 813

---

[34]  The complaint identifies three other allegations specific to
Count III.  (Docket Entry # 1-1, ¶ 66(b)-66(d)); see fn. 39.

[35]  The "crucial factors" to determine whether an act or practice
is "unfair" are "the nature of challenged conduct" as well as the
"purpose and effect of that conduct."  Massachusetts Employers
Ins. Exchange v. Propac-Mass, Inc., 648 N.E.2d 435, 438 (Mass.
1995) (also noting as "uninstructive" the language "'level of

N.E.2d 476, 486 (Mass. 2004). Because Uber seeks dismissal based on an incorrect standard, a dismissal of the section 11 false affiliation claim in Count III is not appropriate. In any event, applying the correct standard does not lead to a dismissal of the claim.

Third, Uber maintains that plaintiffs lack a private right of action under Rule 403 and, therefore a cause of action under chapter 93A with respect to both counts III and IV. Citing and relying exclusively on <u>Katz v. Pershing, LLC</u>, 806 F.Supp.2d 452, 458 & 461 (D.Mass. 2011), and <u>Dial A Car</u>, Uber argues that because Rule 403 "confers exclusive jurisdiction in the Police Department" and "does not confer a private right of action on Plaintiffs," they cannot maintain a chapter 93A claims. (Docket Entry ## 6 & 19). Uber submits that "Rule 403 and its authorizing statutes occupy the field of Boston taxicab regulations and include a mandatory process for adjudicating alleged rules violations." (Docket Entry # 19).

The plaintiff in <u>Katz</u> sued a brokerage clearing house on the basis that it failed to safeguard customers' non-public personal

---

rascality'" and "'rancid flavor of unfairness'"). Examining the circumstances, "An act or practice is 'unfair' if it is 'within at least the penumbra of some common-law, statutory or other established concept of unfairness,' is 'immoral, unethical, oppressive, or unscrupulous,' and 'causes substantial injury to consumers (or competitors or other businessmen).'" <u>In re Pharmaceutical Industry Average Wholesale Price Litigation</u>, 582 F.3d at 184; <u>Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc.</u>, 648 N.E.2d at 69.

information ("NPPI") on its proprietary software platform.[36]  Id.
at 457.  She nevertheless failed to allege that her NPPI was
misappropriated or any instances of actual data loss or
unauthorized access to customers' NPPI.  The district court
therefore dismissed the chapter 93A claim for lack of
constitutional and statutory standing.[37]  Katz v. Pershing, LLC,
806 F.Supp.2d at 457-459 & 461.

     The statutory standing decision in Katz relied on the
reasoning that Uber seeks to apply to the case at bar.  The
plaintiff in Katz based her chapter 93A claim solely on the
violation of a state statute[38] that imposed an obligation on
businesses to notify customers of a known breach of security
regarding their stored personal and financial information.  Katz

---

[36]  The plaintiff also sought class action status.  Id. at 457-
458.

[37]  On appeal, the First Circuit explained the distinction between
constitutional and statutory standing.  Katz v. Pershing, LLC,
672 F.3d 64, 75 (1st Cir. 2012).  The latter turns upon whether
"the statute gives that plaintiff authority to sue."  Id.; see
Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 92
(1998) (implying that "whether EPCRA authorizes this plaintiff to
sue" presents issue of statutory standing); In re American River
Transp. Co., 728 F.3d 839, 846 (8th Cir. 2013) (statutory
standing asks "'whether this plaintiff has a cause of action
under the statute'"); see also Northwest Airlines, Inc. v. County
of Kent, Mich., 510 U.S. 355, 365 (1994) (whether federal statute
creates private right of action "is not jurisdictional").
"[S]tatutory standing goes to the merits of the claim" whereas
constitutional "standing presents a question of justiciability;
if it is lacking, a federal court has no subject matter
jurisdiction over the claim."  Katz v. Pershing, LLC, 672 F.3d at
75; see Steel Co., 523 U.S. at 97 n.2.

[38]  Massachusetts General Laws chapter 93H ("chapter 93H").

v. Pershing, LLC, 806 F.Supp.2d at 458.  As noted by the district court, chapter 93H limited the enforcement of that statute to the Massachusetts Attorney General and it did "not incorporate or authorize a private right of action."  Id.  The relevant language quoted and relied on by Uber states that, "Because Katz cannot maintain an action under Chapter 93A based on an alleged violation of Chapter 93H, she cannot look to the state consumer protection statute to establish standing."  Id.  On appeal, the First Circuit did *not* address the issue of the enforcement scheme in chapter 93H as precluding a chapter 93A claim based upon the former statute. See Katz v. Pershing, LLC, 672 F.3d at 75-76.

In response to Uber's private right of action argument, plaintiffs maintain that three of the four unfair or deceptive acts or practices in Count III (Docket Entry # 1-1, ¶ 66(a), 66(b) & 66(d)) do not depend upon interpreting Rule 403.[39]  Plaintiff is correct with respect to paragraphs 66(a) and 66(b).  Deception in the form of a false affiliation between Uber and Boston Cab or EJT

---

[39] The four allegedly unfair or deceptive acts or practices identified in the paragraph specific to Count III are:

> (a) Falsely claiming an affiliation with medallion owners and radio associations;
> (b) Falsely claiming that it only collects a $ 1 fee and pays the full 20% "gratuity" to taxi drivers;
> (c) Falsely claiming that its taxi service is lawful under Boston Taxi Rules;
> (d) Falsely claiming that its Black Cars, SUVs and UberX vehicles do not need to be licensed and regulated as taxis in Boston.

(Docket Entry # 1-1, ¶ 66).

does not require an adjudication of a Rule 403 violation as a material part of the claim or otherwise usurp the authority of the Commissioner.[40]  The unfair or deceptive act or practice concerns the false affiliation between Uber and plaintiffs.  Similar to the Lanham Act claim in Count II, the deceptive act or practice of creating a false affiliation between Uber and plaintiffs exists irrespective of Uber's violations, if any, of Rule 403 and irrespective of Uber being in charge of unlicensed hackney carriage drivers under chapters 392 and 382.  Likewise, whether Uber is falsely claiming that it pays the full 20% gratuity to its drivers and only receives a $1.00 fee does not depend upon interpreting or enforcing Rule 403.  The claim turns upon the existence of these purportedly false and fraudulent statements as opposed to whether Uber is operating as a de facto and unapproved radio association and using licensed hackney carriage drivers that charge in excess of the metered or flat rate fares set by the Commissioner.

Katz is therefore distinguishable because the plaintiff based her chapter 93A claim exclusively on a violation of chapter 93H.  See Katz v. Pershing, LLC, 806 F.Supp.2d at 458.  Here, neither the false affiliation nor the gratuity allegations in Count III depend upon an interpretation of Rule 403 or usurp the authority of the Commissioner to regulate taxicabs in Boston and enforce

---

[40]  This court is not making the converse finding that if a showing was required, it would preclude the chapter 93A claim.

Rule 403.  The absence of a private right of action therefore does not foreclose the chapter 93A claims based on a false affiliation or gratuity.[41]

Count III also includes the allegations that Uber's "taxi service is lawful" and that Uber Black Cars, Uber SUVs and UberX vehicles do not require hackney carriage licences.  (Docket Entry # 1-1, ¶ 66(c) & 66(d)).  In contrast to paragraphs 66(a) and 66(b), these allegations more closely implicate Rule 403 and the foregoing statutes.  By their terms, chapters 386 and 392 uniformly proscribe any person from having charge of a vehicle used to convey persons for hire within Boston unless the driver is licensed to drive the hackney carriage.  Chapter 386 also explicitly prohibits a person from being in charge if a taxicab that is not licensed as a hackney carriage.  Count IV includes the

---

[41]  Uber raises a new argument in the reply brief seeking to dismiss Count III because plaintiffs offer no cognizable theory of harm regarding the chapter 93A claim based on the gratuity. (Docket Entry # 19).  Uber presents the argument in a single sentence bereft of any developed argument.  The argument is therefore waived with respect to the present motion.  See U.S. v. Caparotta, 676 F.3d at 218 ("argument consist[ing] of just two sentences and two cursory citations in his brief . . . is therefore waived"); U.S. v. Pizarro-Berrios, 448 F.3d 1, 5-6 (1st Cir. 2006) ("[w]e have consistently held that, except in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived"); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d at 260 ("district court is free to disregard arguments that are not adequately developed"); see also CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 97 F.3d 1504, 1526 (1st Cir. 1996) (courts are "entitled to expect represented parties to incorporate all relevant arguments in the papers that directly address a pending motion").

allegation that Uber competes unfairly because it evades the expense of complying with obtaining hackney carriage licenses for the drivers of Uber Black Cars and Uber SUVs.[42]

As noted above with respect to the foregoing allegations in Count III and the foregoing allegation in Count IV, Uber maintains that Rule 403 and the statutes and ordinance occupy the field and that neither Rule 403 nor its authorizing statutes confer a private right of action to plaintiffs.[43]  (Docket Entry ## 6 & 19). Where the Massachusetts legislature enacts a comprehensive regulatory scheme with a specific statute geared towards remedying the misconduct at issue, the more specific statute with its limited remedies may preclude the broader remedies in chapter 93A. See Cabot Corp. v. Baddour, 477 N.E.2d 399, 402 (Mass. 1985) (state securities statute enacted four days after chapter 93A precluded chapter 93A relief because it was "comprehensive regulatory scheme" that included criminal enforcement mechanism and private right of action for defrauded purchaser without recovery of punitive or multiple damages); Reiter Oldsmobile, Inc. v. General Motors Corp., 393 N.E.2d 376, 378 (Mass. 1979)

---

[42]  The above allegation is one of the two identified means by which Uber competes unfairly in Count IV.  The other allegation (diverting credit card processing fees) fails for lack of injury under section 11.  Accordingly, the allegation is not addressed with respect to Uber's argument that Rule 403 and chapters 392 and 386 occupy the field thereby precluding a chapter 93A claim.

[43]  Somewhat different concerns apply to this argument when it seeks to preclude the state law cause of action as opposed to the federal law cause of action.

(automotive industry); see also Darviris v. Petros, 812 N.E.2d
1188, 1195 (Mass. 2004) (Attorney General's chapter 93A rule
making power continues to exist unless legislature "covered the
field in a way which precludes further remediation by regulation
under [chapter 93A]").  The statutes implicated in Cabot and
Reiter, each enacted after chapter 93A, covered the same
misconduct at issue as did chapter 93A yet limited the remedies.
See Cabot Corp. v. Baddour, 477 N.E.2d at 401-402; Reiter
Oldsmobile, Inc. v. General Motors Corp., 393 N.E.2d at 377
(Massachusetts General Laws chapter 93B "declares unlawful
'(u)nfair methods of competition and unfair or deceptive acts or
practices' occurring in the automotive industry").  In each case,
the more specific, subsequently enacted statute prevailed over the
broader and more general chapter 93A statute.

    In other circumstances, a specific and more general
regulatory scheme can coexist without conflict.  See Dodd v.
Commercial Union Ins. Co., 365 N.E.2d 802, 805 (Mass. 1977).[44]
"The mere existence of one regulatory statute does not affect the
applicability of a broader, nonconflicting statute, particularly
when both statutes provide for concurrent coverage of their common
subject matter."  Id. (also noting that Massachusetts General Laws

_____

[44]  A statutory amendment to chapter 93A after the Dodd decision
overrode the decision's "restrictive interpretation" of the
plaintiffs "who could bring private causes of action for unfair
insurance claim settlement practices."  Hopkins v. Liberty Mut.
Ins. Co., 750 N.E.2d 943, 950 n.12 (Mass. 2001) (discussing
Dodd).

chapters 176D and 93A "overlap but do not conflict").  For
example, the regulation of rental car companies under
Massachusetts General Laws chapter 90 and a rental car company's
collision damage waiver agreement's violation of section 32E½ of
chapter 90 did not preclude a chapter 93A claim against the rental
car company.  Hershenow v. Enterprise Rent-A-Car Company Of
Boston, Inc., 840 N.E.2d 526, 529 (Mass. 2006).  The Hershenow
court rejected the rental car company's argument that chapter 90
barred a chapter 93A claim because section 32E½ only provided for
civil fines and a public enforcement action brought by the
Commonwealth without a private cause of action.  Id.

     In addition, "Statutes addressing the same subject matter"
are "construed harmoniously so as to give full effect to all of
their provisions and give rise to a consistent body of law."
Ciardi v. F. Hoffmann-La Roche, Ltd., 762 N.E.2d 303, 311 (Mass.
2002) (state antitrust law did not preclude chapter 93A claim).
It is also presumed that the legislature was aware of chapters 392
and 386 at the time it enacted section 11 of chapter 93A.  See
Hadley v. Amherst, 360 N.E.2d 623, 626 (Mass. 1977); see also
Cabot Corp. v. Baddour, 477 N.E.2d at 402 (paraphrasing Hadley,
360 N.E.2d at 626, in parenthetical).

     Overall, chapters 392 and 386 as well as ordinance 16-15.05
and Rule 403 are not as pervasive or comprehensive with respect to
the regulated subject area as the regulatory schemes and statutes

which the Massachusetts Supreme Judicial Court ("SJC") interpreted as precluding a chapter 93A claim because the former occupied the field.  See <u>Cabot Corp. v. Baddour</u>, 477 N.E.2d at 401 (state securities law); <u>Fleming v. National Union Fire Ins. Co.</u>, 837 N.E.2d 1113, 1117-1118 (Mass. 2005) (workers compensation benefits for injured employees); <u>Reiter Oldsmobile, Inc. v. General Motors Corp.</u>, 393 N.E.2d at 378 (automotive industry).  Neither chapter 392 nor chapter 386, which imposes a statutory fine of $50.00, provide a civil private right of action thereby indicating a lack of pervasive regulation.  See <u>Hershenow v. Enterprise Rent-A-Car Company Of Boston, Inc.</u>, 840 N.E.2d at 532;[45] <u>Cabot Corp. v. Baddour</u>, 477 N.E.2d at 401.[46]  In addition, the statute at issue in

_____

[45]  The SJC in <u>Hershenow</u> contrasted the <u>Cabot</u> and <u>Reiter</u> decisions, which found preclusion, with <u>Dodd</u>, which allowed the chapter 93A claim, in a manner indicative of finding that a statute is more likely to occupy the field when it allows a private right of action and embodies limited remedies.  The relevant citations to <u>Cabot</u>, <u>Reiter</u> and <u>Dodd</u> are as follows:

> <u>Contrast</u> <u>Cabot Corp. v. Baddour</u>, 394 Mass. 720, 722-723, 725, 477 N.E.2d 399 (1985) (Uniform Securities Act intended to provide comprehensive regulation of securities field, and distinguishing <u>Dodd v. Commercial Union Ins. Co.</u>, supra, where absence of private actions established that insurance field not comprehensively regulated); <u>Reiter Oldsmobile, Inc. v. General Motors Corp.</u>, 378 Mass. 707, 711, 393 N.E.2d 376 (1979) (G.L. c. 93B, which addresses unfairness in dealings in the automotive industry, provided specific private remedies for violation, so no relief available under G.L. c. 93A).

<u>Hershenow v. Enterprise Rent-A-Car Company Of Boston, Inc.</u>, 840 N.E.2d at 532.

[46]  Likewise the SJC in <u>Cabot</u> contrasted the decisions in <u>Reiter</u> and <u>Dodd</u> to note that an absence of private right of action

Reiter[47] expressly referred to chapter 93A and included and excluded certain remedies of chapter 93A thereby evidencing the legislature's intention to exclude the broader chapter 93A remedy. See Reiter Oldsmobile, Inc. v. General Motors Corp., 393 N.E.2d at 377 ("Legislature was aware of the private injunctive relief available under c. 93A, s 9, but made explicit reference in c. 93B, s 12, only to the damage remedy set forth in s 9, excluding by implication injunctive relief").

Here, chapter 93A, the later enacted statute, does not expressly preclude a cause of action based on chapters 392 and 386. Chapter 93A does not mention either chapter 392 or chapter 386. Like the subsequently enacted statute in Hershenow, chapter 93A is devoid of any "clearly expressed legislative intent" to bar a private civil cause of action that implicates misconduct encompassed by chapters 392 and 386. See Hershenow v. Enterprise Rent-A-Car Company Of Boston, Inc., 840 N.E.2d at 531 ("[w]e do not perceive a conflict between the two statutory schemes, nor do

_____

indicates a lack of comprehensive regulation:

> We distinguished the result in Reiter from that reached in Dodd v. Commercial Union Ins. Co., 373 Mass. 72, 76-78, 365 N.E.2d 802 (1977), reasoning that "[u]nlike c. 93B, c. 176D made no provision for private actions," and therefore the latter did not comprehensively regulate unfair or deceptive insurance practices. Reiter, supra 378 Mass. at 711, 393 N.E.2d 376.

Cabot Corp. v. Baddour, 477 N.E.2d at 401.

[47] Massachusetts General Laws chapter 93B ("chapter 93B").

we perceive any clearly expressed legislative intent that G.L. c. 90, § 32E½, displace entirely any existing private remedies for deceptive practices"). Presumably, the Massachusetts legislature was aware of these statutes and the regulatory scheme when it enacted section 11 of chapter 93A. Recognizing a cause of action under chapter 93A for misconduct that may also fall within the scope of chapters 392 and 382[48] is consistent with the legislative purpose of section 11 "to 'encourage more equitable behavior in the marketplace and impose liability on persons seeking to profit from unfair practices.'" In re Pharmaceutical Industry Average Wholesale Price Litigation, 582 F.3d at 194 (quoting Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998)); see generally Kattar v. Demoulas, 739 N.E.2d 246, 257 (Mass. 2000) (chapter 93A "'creates new substantive rights,'" "'provides new procedural devices for the enforcement of those rights'" and "'makes conduct unlawful which was not unlawful under the common law or any prior statute'") (internal brackets omitted). In addition, allowing the private cause of action under chapter 93A

_____

[48] One example of the overlapping misconduct is "falsely claiming that its black cars, SUVs and UberX vehicles do not need to be licensed and regulated as taxis in Boston." (Docket Entry # 1-1, ¶ 66(d)). Establishing this premise as a violation of section 11 entails determining if Uber is a person in "charge of a hackney carriage" driven by an unlicensed hackney carriage driver under chapters 392 and/or 386. As previously indicated, the statutory grant of authority to the Commissioner in chapter 392, section four, to grant hackney carriage licences impliedly encompasses the authority to determine if Uber qualifies as an approved radio association.

does not render chapters 392 or 382 surplusage because these statutes impose statutory fines as opposed to civil damages.  See Cabot Corp. v. Baddour, 477 N.E.2d at 402 (recognizing chapter 93A cause of action would render the limitations upon private remedies in the more specific statute "surplusage").  In short, there is no conflict between chapters 392 and 386 and section 11 of chapter 93A.

The overall regulatory framework of Boston taxicabs and, in particular, the operation of an unapproved dispatch service, as discussed at length in the factual background, is not as detailed as the frameworks at issue in Cabot, Fleming and Reiter.  The limited express remedy imposing a statutory fine against Uber under chapter 386[49] and the absence of an express administrative process in Rule 403 to resolve a complaint against an unapproved dispatch service[50] allows the chapter 93A cause of action to easily coexist without a conflict.[51]  Accordingly, the Commissioner's regulation of licensed hackney carriages, medallion owners and,

_____

[49]  For purposes of resolving the motion to dismiss, the facts in the complaint construed in plaintiffs' favor permit a finding that Uber is a person in charge of vehicles for hire operated by drivers who do not have hackney carriage licenses.

[50]  With respect to radio associations, the rule expressly sets out only the penalty of a removal of a radio association from "the list of approved radio associations."  (Docket Entry # 6-3, § 7).

[51]  It is therefore not necessary to decide dubiánte that a regulation enacted after a statute can impliedly override the express cause of action in the prior statute.

primarily, approved as opposed to unapproved radio associations under Rule 403[52] does not conflict with the recognition of a private cause of action under chapter 93A against an entity such as Uber.  See generally Hershenow v. Enterprise Rent-A-Car Company Of Boston, Inc., 840 N.E.2d at 531 ("[w]e do not perceive a conflict between the two statutory schemes, nor do we perceive any clearly expressed legislative intent that G.L. c. 90, § 32E½, displace entirely any existing private remedies" under chapter 93A).  Allowing a chapter 93A cause of action, whether for unfair or deceptive practices in Count III or unfair competition in Count IV, is not barred by the regulatory scheme in Rule 403 or chapters 392 and 386.  The statutes' failure to refer to chapter 93A coupled with the principle that statutes addressing the same subject matter are construed harmoniously lend support for allowing the chapter 93A causes of action.  Legislative intent to bar the chapter 93A claims is absent.  Contrary to Uber's position, the chapter 93A claims are not an attempt to bypass the administrative enforcement procedures under Rule 403.

As an aside, Massachusetts case law allows an aggrieved individual or entity to file suit in equity and obtain injunctive relief against a competitor for unlawful competition that causes harm to a plaintiff notwithstanding the existence of a regulatory

---

[52] Rule 403 does proscribe that only approved radio associations may accept licensed hackney carriage medallion owners as members.

scheme similar to the Commissioner's regulation and authority over Boston taxicabs. See A. B. & C. Motor Transp. Co. v. Department of Public Utilities, 100 N.E.2d 560 (Mass. 1951) (allowing suit in equity against competitor to preclude transfers of competitor's licenses authorizing carriage of property for hire). Equity may therefore provide relief to "restrain competition by an unlicensed carrier." Id. at 561 (collecting cases); see Boston & M. R. R. v. Hart, 150 N.E. 212, 213 (Mass. 1926) (allowing suit in equity against defendant, which operated "line of motor busses . . . for the carriage of passengers for hire over public ways by regular routes" and "had no licenses at any time for carrying on his business in any of the cities or towns through which his busses run, such as were and are required by G. L. c. 159, § 45"); Boston & M.R.R. v. Cate, 150 N.E. 210, 211 (Mass. 1926) (allowing suit in equity against defendant which was "operating his motor vehicles . . . for the carriage of passengers for hire . . . similar to that afforded by a railway company" without license from city council, in violation of city ordinances and without certificates from department of public utilities); see also New York, N.H. & H.R. Co. v. Deister, 148 N.E. 590, 591 (Mass. 1925) (allowing suit by railroad operator because "agreed facts disclose irreparable injury to the plaintiff in the loss of revenue derived from patronage diverted by the defendant through his illegal conduct in operating buses without the licenses required by law"). In fact,

the Massachusetts Appeals Court in Lynch rejected an argument that a court order requiring the Commissioner to notify applicants for hackney carriage licenses about the rejection of their applications as stale and the need to file new applications was "an impermissible infringement upon his discretion." Lynch v. Police Commissioner of Boston, 681 N.E.2d at 311.

In sum, the Commissioner's delegated authority, the regulatory scheme and/or the absence of a private right of action do not require dismissal of Counts III or IV. Uber's arguments based on Dial A Car and Katz fail to warrant dismissing the chapter 93A claims.

Uber next asserts that Count IV fails for two reasons, each specific to the two allegations in Count IV. Count IV incorporates the previous paragraphs in the complaint and then alleges the following:

> 69. By unlawfully operating its taxi, Black Car, SUV and UberX transportation services without incurring the expense of compliance with Massachusetts and Boston laws, as alleged above, Uber unfairly competes with plaintiffs, in violation of M.G.L. c. 93A, § 11.

> 70. By diverting revenues for credit card processing that the plaintiffs are contractually obligated to pay to CMT, Uber unfairly competes with the plaintiffs.

(Docket Entry # 1-1). With respect to paragraph 69, Uber asserts that the allegation fails because Uber does not own any vehicles. Liberally reading the facts in the complaint, it allows for a finding that Uber is in charge of unlicensed vehicles for hire in

Boston.

Uber's challenge to paragraph 70 is that plaintiffs do not suffer any harm as a result of the uncollected credit card processing fees.  Uber points out that it is CMT that does not receive the processing fees and that plaintiffs fail to plead an interest in CMT that would result in harm.

Section 11 provides a cause of action for any person engaged in "any trade or commerce and who suffers any loss of money or property" due to "an unfair method of competition or an unfair or deceptive act or practice" of "another person who engages in any trade or commerce."  Mass. Gen. Laws ch. 93A, § 11; RTR Technologies, Inc. v. Helming, 707 F.3d 84, 92 (1st Cir. 2013). Notably, the plaintiff must allege the "loss of money or property . . . *as a result of* the use or employment by another person . . . of an unfair method of competition or an unfair or deceptive act or practice."  Mass. Gen. Laws ch. 93A, § 11 (emphasis added); Arthur D. Little, Inc. v. Dooyang Corporation, 147 F.3d 47, 56 (1st Cir. 1998) (loss of money or property must stem from the chapter 93A misconduct).  "In the absence of a causal connection between the alleged unfair acts and the claimed loss, there can be no [chapter 93A] recovery."  Farm Bureau Federation v. Blue Cross, 532 N.E.2d 660, 665 (Mass. 1989).  "Money means money, not time, and property means the kind of property that is purchased or leased, not such intangibles as a right to a sense of security, to

82

peace of mind, or to personal liberty." <u>Arthur D. Little, Inc. v.</u>
<u>Dooyang Corp.</u>, 147 F.3d at 56 (internal quotation marks, ellipses
and brackets omitted).

Here, the loss of credit card processing fees experienced by
CMT does not equate to a loss of money to Boston Cab or EJT. It
is true that Boston Cab has a contract with CMT, an approved
taxicab credit card processing company. In return for CMT
installing equipment in taxicabs owned or leased by members of
Boston Cab, CMT receives "credit card processing fees for fares"
and "advertising revenue" from approved video screens in licensed
taxicabs. (Docket Entry # 1-1, ¶ 52). Payments by Uber clients
bypass "the credit card system installed in Boston Cabs" and
deprive "*CMT* of the processing fees that" Boston Cab "is
contractually obligated to give CMT." (Docket Entry # 1-1, ¶ 53)
(emphasis added). It is CMT, not plaintiffs, which suffers the
loss of money in the form of credit card processing fees.
Although Count IV survives dismissal with respect to paragraph 69
and the complaint as a whole, the allegation in paragraph 70 is
insufficient to support a loss of money or property and, as a
result, a basis for the unfair competition claim in Count IV.

E.  <u>Common Law Claims</u>

Counts V and VI respectively set out common law claims for
unfair competition and interference with contractual
relationships. Uber seeks to dismiss Count V because it is

derivative of the Lanham Act and chapter 93A claims and therefore subject to dismissal to the same extent. (Docket Entry # 6).

A common law unfair competition claim encompasses a claim against a defendant "'palming off his goods as those of the plaintiff to the injury of the latter.'" <u>Planned Parenthood Federation of America, Inc. v. Problem Pregnancy of Worcester, Inc.</u>, 498 N.E.2d 1044, 1047 (Mass. 1986); <u>see</u> <u>Datacomm Interface, Inc. v. Computerworld, Inc.</u>, 489 N.E.2d 185, 191 (Mass. 1986); <u>see also</u> <u>Open Software Foundation, Inc. v. U.S. Fidelity and Guar. Co.</u>, 307 F.3d 11, 17 (1st Cir. 2002). The common law unfair competition claim in Count V is therefore similar to the Lanham Act false affiliation or sponsorship claim in Count II. Because Count II survives dismissal, Count V is not subject to dismissal as derivative of the Lanham Act claim in Count II. Similarly, because the chapter 93A claim in Count III is also not subject to dismissal, Count V is likewise not subject to dismissal based on Uber's argument.

Uber next summarily states that, "Because Count IV fails, so does Count V." (Docket Entry # 19). Count IV survived dismissal except to the extent that it depended upon the allegation in paragraph 70. Paragraph 70 did not support the chapter 93A claim because of the complaint's failure to set out any facts regarding a "loss of money or property." No such statutory requirement applies to the common law unfair competition claim. Uber's brevis

84

argument therefore does not provide a basis to dismiss Count V. Uber's <u>Dial A Car</u> argument fails for a number of the reasons addressed with respect to the chapter 93A claims.

Turning to Count VI, Uber moves to dismiss the claim because the complaint fails to satisfy the requirements that: (1) plaintiffs "had an advantageous relationship with a third party"; (2) Uber "knowingly induced a breaking of that relationship"; (3) Uber's interference was "improper in motive and means"; and (4) the interference harmed plaintiffs.[53] (Docket Entry # 6) (citing <u>Blackstone v. Cashman</u>, 860 N.E.2d 7, 12-13 (Mass. 2007)). Plaintiffs submit that the complaint adequately sets out a plausible claim of intentional interference with contractual relationships with facts to support each element.

Count VI and the complaint as a whole include two contractual relations or contracts. First, Uber purportedly induced drivers of taxicabs managed by EJT to breach the terms of their lease agreements. (Docket Entry # 1-1, ¶¶ 2-3, 14, 29, 33, 42, 51-53, 58 & 76-78). In particular, the lease agreements between a driver and EJT require the driver/lessee to comply with Rule 403. Among other requirements, Rule 403 requires drivers to accept coupons, vouchers and credit card payments and not use a cellular

---

[53] Uber incorrectly sets out elements of an intentional interference with an advantageous business relationship claim as opposed to the related tort of an intentional interference with a contract or contractual relations. Uber also misstates the motive or means requirement as requiring "motive and means." (Docket Entry # 6).

telephone. The rule also dictates that taxicabs, including those driven by Boston Cab members and lessees, must have a functioning credit card reader in the vehicle. Hence, medallion owners and drivers with taxicabs managed by EJT who partner with Uber may violate Rule 403 and therefore their lease agreements with EJT.

Second, Count VI alleges that Uber intentionally interferes with Boston Cab's contract with CMT. (Docket Entry # 1-1, ¶¶ 2, 3, 14, 33, 42, 51-54 & 76-78). Specifically, Uber mandates that drivers of Uber Taxis, including drivers who belong to Boston Cab, use Uber's computerized billing system that charges the customer's Uber registered credit card in lieu of the credit card reader in the taxicab. Under Boston Cab's contract with CMT, the latter collects the credit card processing fee when the customer uses the credit card reader. The benefit to Boston Cab under the contract is that CMT pays for and installs the required credit card equipment or reader. (Docket Entry # 1-1, ¶¶ 2, 3, 14, 33, 42, 51-54 & 76-78). Uber's diversion of the credit card processing fees from CMT purportedly interferes with Boston Cab's contract with CMT.

In order to establish a claim for intentional interference with contractual relations or relationships, the plaintiff must show that "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being

intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 571 N.E.2d 1363, 1369 (Mass. 1991); Pierce v. Cotuit Fire Dist., 2014 WL 291946, at *8 (1st Cir. Jan. 28, 2014); United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20 (Mass. 1990); Melo-Tone Vending, Inc. v. Sherry, Inc., 656 N.E.2d 312, 314-315 (Mass.App.Ct. 1995) (citing Restatement (Second) of Torts § 768(1)(d) cmt. g. (1986)).[54] As noted above, Uber seeks to dismiss the claim due to the absence of all four elements.

As to the required element of harm, there must be a showing "that the plaintiff suffer[ed] damages as a consequence of the defendant's conduct, and those damages cannot be speculative or conjectural losses." Chemawa Country Golf, Inc. v. Wnuk, 402 N.E.2d 1069, 1072-1073 (Mass.App.Ct. 1980) (no disruption of the contract and no evidence that golf club lost members or green fees due to defendant's interference); G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 571 N.E.2d at 1371 (plaintiff must sustain "damages due to [third party's] breaking off of its contract with" plaintiff and such damages cannot be "speculative" or "conjectural") (citations omitted); see Sharratt v. Housing Innovations, Inc., 310 N.E.2d 343, 348 (Mass. 1974) (dicta that,

---

[54] Massachusetts cases look to the Restatement (Second) of Torts §§ 766-766B (1979), for guidance in this area. See Blackstone v. Cashman, 860 N.E.2d 7, 12 (Mass. 2007).

for intentional interference of contractual relations claim, "it is the actual and not the assumed damage which provides the basis for recovery, and which accordingly *must be alleged*") (emphasis added); see also Tech Plus, Inc. v. Ansel, 793 N.E.2d 1256, 1263 (Mass.App.Ct. 2003) (insufficient harm alleged because, although "plaintiffs were removed as sales representatives" from transactions, they received all of the commissions). The court in Chemawa reversed a denial of a motion for judgment notwithstanding a verdict that found the defendant liable for intentional interference with business or contractual relations because there was no evidence "that Chemawa was damaged by Wnuk's conduct." Chemawa Country Golf, Inc. v. Wnuk, 402 N.E.2d at 1073. Thus, a recovery of emotional distress damages "is not allowed unless *the elements* of the tort are made out[,] i.e., actual damage to an economic relationship or prospective relationship." Ratner v. Noble, 617 N.E.2d 649, 650 (Mass.App.Ct. 1993).

In the case at bar, the complaint sets out a conclusory allegation of harm (Docket Entry # 1-1, ¶ 78) (Uber's interference with contractual relationships between "plaintiffs and Boston cab drivers has caused the plaintiffs harm"); see generally Hill v. Gozani, 638 F.3d 40, 55 (1st Cir. 2011); Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008). The complaint fails to show any facts that plaintiffs experienced harm as a result of Uber's interference with the contract between Boston Cab and CMT to pay

for and install credit card equipment in return for credit card processing fees. It is true that one who interferes "with the performance of a contract . . . between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him." Restatement (Second) of Torts § 766B (1979); Shafir v. Steele, 727 N.E.2d 1140, 1144 (Mass. 2000). The complaint however does not indicate that CMT will not continue the relationship or plans to terminate the contract as a result of reduced credit card processing fees due to Uber's interference thereby causing Boston Cab pecuniary harm. See generally Restatement (Second) of Torts § 766B & cmt. c (1979). The complaint also fails to show any facts that Uber's interference is making it more expensive or burdensome for Boston Cab to perform the contract with CMT under which Boston Cab provides CMT with the credit card processing fees when customers pay with credit or debit cards. (Docket Entry # 1-1, ¶ 53). Boston Cab is contractually obligated to provide CMT these processing fees but there is no indication that Boston Cab experiences a greater burden to perform the contract due to the reduction in credit card processing use.

With respect to the allegation that Uber induces Boston Cab members subject to a lease agreement with EJT to violate the terms of the lease agreement by not complying with Rule 403, there is no

indication that Boston Cab or EJT experience harm as a result of Uber's interference.  There is no indication that Boston Cab is subject to being removed as an approved radio association resulting in a loss of income as a result of Uber's interference. There are also no facts or reasonable inferences that EJT's income is reduced because of Uber's interference with the lease agreements that causes the drivers to violate Rule 403.

Uber's request to dismiss Count VI without leave to amend is nevertheless unwarranted.  Under certain circumstances, a court may allow a plaintiff an opportunity to amend in lieu of a dismissal of a claim with prejudice.  See Eastern Food Services, Inc. v. Pontifical Catholic University Services Ass'n, Inc., 357 F.3d 1, 8 (1st Cir. 2004) (leave to amend often allowed "for failure to state a claim where court thinks that the case has some promise"); see, e.g., Rodi v. Southern New England School of Law, 389 F.3d 5, 20 (1st Cir. 2004) (directing district court to afford the plaintiff opportunity to amend and replead chapter 93A claim). The terms of the contract between CMT and Boston Cab may set a baseline number of credit card processing transactions that, if not met, require Boston Cab to reimburse CMT or include other conditions such that Uber's interference caused Boston Cab harm. EJT may be experiencing a drop in revenue because Boston Cab members and former or existing lessees are no longer leasing their

vehicles because of Uber's interference.[55]  Given the preference to
decide cases on their merits, a dismissal of Count VI with
prejudice is not appropriate.  <u>See</u> <u>generally</u> <u>Rodi v. Southern New</u>
<u>England School of Law</u>, 389 F.3d at 20 (noting that "'the purpose
of pleading is to facilitate a proper decision on the merits'").
Plaintiffs may therefore seek leave to amend the complaint to set
out facts to support a plausible entitlement to relief under Count
VI within the time frame of any case management deadline.[56]

F.  <u>RICO Claims</u>

     Uber moves to dismiss the RICO claims under Rule 9(b).  The
predicate RICO acts alleged in the complaint consist of wire fraud
in violation of 18 U.S.C. § 1343.

     Where, as here, the predicate acts are wire fraud, Rule 9(b)
requires the pleader "'to go beyond a showing of fraud and state
the time, place and content of the alleged . . . wire
communications perpetrating that fraud.'"  <u>Cordero-Hernandez v.</u>

_____

[55]  Plaintiffs' brief, which is not part of the Rule 12(b)(6)
factual record, alleges that Uber's diversion of business has
caused a diminution in the number of cabs leased and therefore
economic harm.  (Docket Entry # 14).  The complaint does not
state that EJT experienced harm in the form of reduced lease
agreements as a result of Uber's interference in the lease
agreements.

[56]  The recommendation to dismiss Count VI without prejudice due
to the absence of harm makes it unnecessary to address Uber's
other arguments.  Uber can raise these arguments in the event
plaintiffs seek leave to amend the complaint.  At present, it is
premature to address the arguments because a proposed amended
complaint might include additional facts that place the arguments
in a different light.

<u>Hernandez-Ballesteros</u>, 449 F.3d 240, 244 (1st Cir. 2006) (quoting

<u>N. Bridge Associates, Inc. v. Boldt</u>, 274 F.3d 38, 43 (1st Cir.

2001)).  Wire fraud requires:  "(1) a scheme to defraud based on

false pretenses; (2) the defendant's knowing and willing

participation in the scheme with the specific intent to defraud;

and (3) the use of interstate . . . wire communications in

furtherance of the scheme."  <u>Sanchez v. Triple-S Management,</u>

<u>Corp.</u>, 492 F.3d 1, 9-10 (1st Cir. 2007); <u>United States v. Cassiere</u>,

4 F.3d 1006, 1011 (1st Cir. 1993) (stating elements of wire fraud).

Uber maintains that the complaint does not comply with Rule 9(b)

with respect to all three requirements.  (Docket Entry ## 6 & 19).

The schemes to defraud based on false pretenses arise from

the false representations about the fare or gratuity with respect

to Uber Taxis (Docket Entry # 1-1, ¶¶ 3, 4, 20, 35-38, 42, 49-50,

79-80, 86 & 91) and the false representations that Uber, through

Uber Taxi, partners or associates itself with Boston Cab and EJT

(Docket Entry # 1-1, ¶¶ 3, 4, 14, 42, 50, 63, 66, 79, 80, 86 &

91).  The facts in the complaint set forth in these paragraphs

adequately particularize a scheme to defraud under Rule 9(b).

They also adequately plead an intent to deceive under Rule 9(b).

Uber uses these schemes to deceive Uber clients that it is paying

a 20% gratuity to the driver and that it associates with Boston

taxicabs, in particular, those driven by Boston Cab members or

lessees.  <u>See</u> <u>Sanchez v. Triple-S Management, Corp.</u>, 492 F.3d 1,

12 (1st Cir. 2007) ("scheme must be intended to deceive another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct"); <u>McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.</u>, 904 F.2d 786, 791 (1st Cir. 1990).

Turning to the use of interstate wire communications, Uber customers use their Uber app to view a map of nearby Uber affiliated vehicles including Uber Taxis. Based on the fact that Boston Cab has 500 medallion owner members out of the 1,825 "city-issued medallions" (Docket Entry # 1-1, ¶¶ 2, 4 & 11), taxicabs driven by Boston Cab members have a strong and recognized presence in Boston. When a taxicab driven by a Boston Cab member with the Boston Cab logo and color scheme accepts the assignment and picks up the Uber client, the client falsely associates Uber and Uber Taxi with Boston Cab. As to the misrepresentation regarding fares, Uber's website states that, "'we'll automatically add 20% gratuity for the driver" when, in fact, the driver only gets "half of the 20% charge." (Docket Entry # 1-1, ¶¶ 37-38).

Aside from content, the specificity regarding the time and place of the use of interstate wire communications is absent. As explained in <u>Cordero-Hernandez</u>, the plaintiffs "did not make the requisite allegations identifying specific interstate phone calls by time, place, and content." <u>Cordero-Hernandez v. Hernandez-Ballesteros</u>, 449 F.3d at 244. To the extent the complaint particularizes the time and place of the interstate wire

93

communications, it does so in paragraph 80.  The paragraph reads
as follows:

> 80.  By using the internet to transmit fraudulent
> misrepresentations to Boston consumers about fares in Uber
> taxis and false claims of an association between Uber and
> Boston Cab Dispatch, Uber violates the federal Wire Fraud
> statute, 18 U.S.C. § 1343.  These fraudulent representations
> have been transmitted to Boston users of the Uber taxi
> transportation system thousands of times over a period in
> excess of five months.

(Docket Entry # 1-1, ¶ 80).  Using the internet to transmit the

misrepresentations "thousands of times" for "a period in excess of

five months" does not particularize the time and place of the use

of interstate wire communications.  The information is not within

the exclusive control of Uber to warrant additional discovery.

See N. Bridge Associates, Inc. v. Boldt, 274 F.3d at 43-44.

Plaintiffs have access to Uber clients who choose Uber Taxi in the

event a Boston Cab member accepts the assignment and transports

the Uber client.  Plaintiffs also do not request additional

discovery to ascertain the time, place and content of the

interstate wire communications.

The issue therefore reduces to whether leave to amend to

particularize the time and place of interstate wire communications

is appropriate.  Plaintiff has not filed previous complaints

deficient under Rule 9(b) and the outline of the complaint

provides Uber adequate notice of wire fraud to frame a response.

There is also a preference to decide cases on their merits.

Plaintiffs do not however request an opportunity to amend the RICO

claims if deemed deficient under Rule 9(b).  On balance, the

circumstances support allowing an opportunity to amend the

complaint.  See Juarez v. Select Portfolio Servicing, Inc., 708

F.3d 269, 281 (1st Cir. 2013) (district court abused its discretion

in denying amendment after Rule 9(b) dismissal because "totality

of the circumstances" warranted allowing plaintiff to re-plead

fraud at "this first procedural stage"); North American Catholic

Educational Programming Foundation, Inc. v. Cardinale, 567 F.3d 8,

16 (1st Cir. 2009) (for Rule 9(b) deficiencies, "leave to amend is

often given, at least for plausible claims").  In light of the

potential damage to Uber's reputation resulting from the RICO

claims, a time limit of 30 days is appropriate to allow a motion

for leave to amend the complaint to particularize the RICO claims

in counts VII to IX.

                          CONCLUSION

     In accordance with the foregoing discussion, this court

**RECOMMENDS**[57] that the motion to dismiss (Docket Entry # 5) be

**ALLOWED** to the extent that Count I is dismissed with prejudice and

counts VI and VII to IX are dismissed without prejudice.

Plaintiffs shall have 30 days to file a motion for leave to amend

---

[57] Any objections to this Report and Recommendation must be filed
with the Clerk of Court within 14 days of receipt of the Report
and Recommendation to which objection is made and the basis for
such objection.  See Rule 72(b), Fed. R. Civ. P.  Any party may
respond to another party's objections within 14 days after
service of the objections.  Failure to file objections within the
specified time waives the right to appeal the order.

the RICO claims.  This court **RECOMMENDS**[58] that the motion otherwise

be **DENIED.**

                                                 /s/ Marianne B. Bowler
                                                **MARIANNE B. BOWLER**
                                                United States Magistrate Judge

---

[58]  See the previous footnote.