| | |
|---|---|
| ) | |
| BOSTON CAB DISPATCH, INC, ) | |
| ) | |
| and ) | |
| ) | |
| EJT MANAGEMENT, INC, ) | |
| ) | |
| Plaintiffs, ) | C.A. No. 13-cv-10769-NMG |
| ) | |
| v. ) | |
| ) | |
| UBER TECHNOLOGIES, INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |

## AMENDED COMPLAINT

Plaintiffs Boston Cab Dispatch ("Boston Cab") and EJT Management ("EJT") (collectively referred to as "plaintiffs") complain against defendant Uber Technologies, Inc. ("Uber") as follows:

## INTRODUCTION

1. The plaintiffs provide taxi dispatch services and manage leased taxi cabs in the City of Boston, and have invested substantial capital in complying with City rules and state laws, developed over the last eighty years, that protect consumers, ensure public safety, and provide non-discriminatory service. Uber has created an illegal transportation service that violates state laws and Boston ordinances and deceives consumers about the fares they must pay, the safety of the cars and drivers transporting them, the insurance coverage available, and the legality of Uber's service.

## **PARTIES AND JURISDICTION**

2. Plaintiff Boston Cab is a Massachusetts corporation with principal offices at 72 Kilmarnock Street, Boston, Massachusetts. Boston Cab is an approved taxi dispatch service ("radio association") under Boston Police Department Rule 403, "Hackney Carriage Rules and Flat Rate Handbook" ("Rule 403" or "Taxi Rules"). The owners of 500 Boston Taxi Licenses ("medallions") pay weekly membership fees to the Boston Cab Dispatch Radio Association in exchange for dispatching and related services.

3. Plaintiff EJT Management, Inc. ("EJT") is a Massachusetts corporation with principal offices at 60 Kilmarnock Street, Boston, Massachusetts. EJT has contracted with the owners of 370 Boston medallions to manage all aspects of the ownership, licensing and leasing of the owners' medallions and the taxis bearing these medallions. EJT's management agreements with Boston medallion and taxi owners give it authority to seek legal protection of 370 medallion and taxi owners' rights against all forms of unfair competition and trademark infringement.

4. Plaintiff Boston Cab owns and is the exclusive licensee of all trademarks, trade names, trade dress and goodwill associated with Boston Cab operations in the City of Boston. Boston Cab has strong, distinctive, and recognizable trademarks, trade dress and trade names associated with its taxi services. Every Boston Cab Dispatch member cab is painted with distinctive "Boston Cab" logos and color schemes approved by the City of Boston.

5. Defendant Uber is a Delaware corporation with principal offices at 800 Market Street, San Francisco, California. The Superior Court has personal jurisdiction over Uber, as

Uber operates a transportation-for-hire service in the City of Boston and other Massachusetts communities, consisting of Uber black cars, SUVs, taxis, and unlicensed personal vehicles owned by individual drivers and offered through a cut-rate service advertised by Uber as "UberX."

6. Jurisdiction is proper pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), as Uber is a foreign corporation doing business in Massachusetts, and Counts VII-IX arise under the laws of the United States, thus conferring federal jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction over pendant state claims). Venue is proper pursuant to 28 U.S.C. § 1391.

## FACTS

### *Regulation of Taxis in Boston*

7. The Boston taxi industry is highly regulated by state statutes, city rules and ordinances, and multiple agreements that specify how medallion owners, radio associations, drivers and credit card processers must operate together. These legal controls are designed to protect consumers and ensure that taxi services in Boston will operate both safely and reliably.

8. The Massachusetts legislature has given the City of Boston authority to regulate all vehicles "used or designed to be used for the conveyance of persons for hire from place to place within the city of Boston." (See M.G.L. c. 40, § 22 and M.G.L. c. 159, Massachusetts Session Laws of 1930, Chapter 392 and the Session Laws of 1963, Chapter 386.)

9. The City, pursuant to the powers vested in it by the Massachusetts legislature, granted authority to the Police Commissioner ("Commissioner") of the Boston Police

Department ("BPD") to enact Rule 403, known as the Hackney Carriage Rules and Flat Rate Handbook, which applies to all vehicles "used or designed to be used for the conveyance of persons for hire from place to place within the city of Boston." ("Hackney Carriage Rules and Flat Rate Handbook," Boston Police Department Rule 403.1.I.a.) The Taxi Rules explicitly state that they are intended to be a "comprehensive and definitive listing of all regulations affecting the Hackney Carriage industry in the City of Boston . . ." (Taxi Rules, Section 1(II)(c).)

10. The current version of Rule 403 is the product of decades of revisions, designed to protect consumers, ensure public safety, safeguard competition, and provide non-discriminatory taxi services to all areas of the city and to the elderly and disabled. The plaintiffs and all medallion owners operating in Boston have invested significant capital and resources to develop systems and infrastructure that meet Rule 403's broad-ranging requirements.

11. Boston's taxi regulations use three fundamental methods of ensuring that Boston taxi service is safe, reliable, and non-discriminatory: First, the city issues a limited number of taxi licenses, called taxi medallions. A taxicab cannot operate legally in Boston without one of the 1825 city-issued taxi medallions, and medallion owners must have cabs that meet strict requirements concerning vehicle age, condition, and installed equipment (for example, computerized dispatch machines, taximeters and approved credit card machines). Second, every cab must be a member of an approved "radio association," such as plaintiff Boston Cab. There are currently seven approved radio associations, including plaintiff Boston Cab. Each approved Association must: a) operate a single, GPS-enhanced radio dispatch service for members of that

association; b) create and require members to adopt the same distinctive city-approved cab colors and trade names for all cabs in that Association; and c) operate from a Boston business address, with a registered telephone number and registered agent for the radio association. <u>Third</u>, every taxi driver in Boston must have a Hackney Carriage Driver's License and comply with extensive rules of conduct promulgated by the City of Boston (for example, requirements for dealing with handicapped passengers, allowed fares and charges, anti-discrimination requirements, and prohibitions on cell phone use).

### *Uber*

12. Uber is a transportation service that owns no taxis or livery cars and pays none of the substantial capital costs and ongoing expenses required to operate legal taxi and livery car businesses. Uber offers four types of conveyance-for-hire vehicles to Boston travelers—Uber Black Cars, Uber SUVs, Uber Taxis and UberX, a cut-rate, unlicensed taxi service.

13. Uber's transportation system communicates with customers through a free smart phone application ("app"). The Uber app gives Boston consumers the choice of every form of private transportation. It can be used to summon an "SUV" that seats up to six passengers; a "black car" that seats four; a conventional Boston-licensed taxi that seats three-four; or an UberX car, that seats 3-4. The user opens the Uber application, which displays a map of the user's location (or designated pickup point), displays the available black cars, SUVs, taxis and UberX cars in the neighborhood, and states how long the user will have to wait for each type of car. Depending on how much the user wants to spend and how many cars in each price range are nearby, the user then

chooses the type of car they want. Uber's out-of-state computer system then selects
an Uber-affiliated car, displays the driver's name and photograph on the user's smart
phone, and sends a text message to the user with the driver's projected arrival time
and cell phone number.

### *Uber's Unlawful Approach to Competition*

14. Uber's business plan cuts corners illegally and undermines critical safety provisions
of Boston taxi laws. Uber's transportation system only succeeds because, unlike
lawful competing taxi apps, it preys parasitically on established taxi services without
paying for them and without obeying laws designed to protect taxi customers. Uber
owns no cars, no medallions, no radio associations, and employs no drivers—
preferring to pay nothing for infrastructure and profit from the investment of
medallion owners and radio associations. It induces its taxi drivers ("partners") to
illegally substitute Uber's computerized dispatching and credit card billing system for
the seven legal dispatching systems and three legal billing systems in Boston--
knowing full well that in so doing, the taxi drivers who sign up with Uber are
violating the Taxi Rules of the City of Boston and their contracts with taxi owners.

15. Uber adopts illegal methods because it can only operate profitably by
misappropriating the infrastructure of existing taxi services. There are dozens of
smart phone taxi dispatching apps, any one of which could—if they also chose to
operate illegally—beat Uber at is own game. Plaintiff Boston Cab Dispatch has
already developed its own lawful competing app, "Boston Cab," available, like
Uber's, from online app stores. In order to stay ahead of its competition (and attract
investors), Uber is violating nearly all substantive Boston taxi laws, lying to its

customers, forcing taxi drivers who sign up with Uber to violate licensing laws and contracts with taxi owners, and discriminating unlawfully against handicapped, elderly and less wealthy users of public transportation.

16. Uber does not simply want to take control of revenue generated by licensed cabs. It also wants to undermine the existing Boston taxi market by having unregulated UberX cars, black cars and SUVs function as cabs. The City of Boston requires that all "conveyance[s] of persons for hire" that are dispatched, hailed, or available at taxi stands must have taxi licenses, and the City has only issued 1825 license "medallions." Uber simply ignores this legal limit—and public safety—by signing up an unregulated and unaccountable legion of UberX vehicles, black cars and SUVs and linking them to customers in direct competition with taxis and in direct violation of Boston's Taxi Rules.

17. Uber's full-tilt campaign to woo taxi and livery drivers is not a public-spirited attempt to modernize the taxi industry. It is, to the contrary, a carefully crafted plan to insert itself, at no cost and without legal authority, into the taxi infrastructure that has existed in Boston since 1930. Uber then profits by simultaneously flouting and taking parasitic advantage of a transportation system in which all other players must comply with safety rules and consumer protections established by state and city laws.

18. Eighty years of regulation in Boston has produced a set of rules designed to meet the needs and protect the rights of individuals who need a car and driver on short notice—i.e., a taxi. Technological advances have made taxi dispatching more efficient over the years; however, Uber's approach ignores virtually all taxi

regulations designed to protect consumers who suffer from disabilities, who live in less secure neighborhoods, or who simply cannot afford a limousine.

### *Uber's Illegal Operation of UberX Vehicles, Black Cars and SUVs*

19. Uber's business strategy is aimed directly at undermining the existing legal protections consumers receive under the Boston Taxi Rules. When it began operation in Boston in 2011, Uber urged its customers to use Uber-affiliated black cars and SUVs, rather than its taxis:

> Our classic black car option is the default. Choose this and either a high-end sedan or SUV will be curbside in minutes.
>
> (https://www.uber.com/cities/boston.)

20. By early 2013, Uber was promoting UberX, "the Low Cost Uber," as the economical substitute for all other Uber vehicles.

21. UberX is a cut-rate version of Uber Black Cars and SUVs. Uber's promotional material in early 2013 told every owner of a Prius, Camry, Altima, Taurus or Fusion (2006 or later) with a Massachusetts driver's license and a commercial insurance policy that they can become an Uber vehicle simply by demonstrating "city knowledge and professionalism" and completing a one-hour "on-boarding session." Car owners could be corporations, LLCs, or even a DBA (an individual "Doing Business As" any company name they choose). Equipment did not need to meet any of standards set forth in the Taxi Rules. Drivers did not need to pass any of the criminal record and driving record standards for Boston taxi drivers, and did not need to comply with the Taxi Rules that protect riders and neighborhoods against discrimination. UberX-affiliated cars are assigned by a set of computers with no real-

time connection to the Boston Police Department and no ability to respond to public safety emergencies.

22. By shirking all regulation, UberX can charge lower rates than medallioned cabs. Uber's goal is supplant taxis in the wealthiest and most heavily traveled areas of Boston, leaving licensed cabs to serve less lucrative segments of the market.

23. Uber's marketing approach in 2014 is designed to convince consumers to see Uber's "black" cars (SUVs and limousine-style cars have been combined into this category) as down-market limousines, and to see UberX vehicles as the inexpensive alternative to Uber's black cars and Uber Taxis. But in the ways that matter for public safety Uber's fleet of black cars and UberX vehicles are unlicensed—and dangerous—taxis. They are taxis because all Uber-affiliated cars—UberX, black cars, SUVs and taxis—are hailed by smart phone app, assigned to customers through the same Uber computer system, and have fares determined by Uber's metering device. Uber-affiliated black cars and UberX cars now function as roving conveyances for hire in Boston, and are assigned in response to an "electronic hail" just as quickly as a taxi. Uber itself agrees that its affiliated autos function as taxis, claiming to New York taxi regulators that the Uber system is a "virtual hail" equivalent to standing on a street corner and flagging a cab.

24. All Uber-affiliated vehicles must, therefore, be considered "hackney carriages" under Boston's regulations, and cannot operate legally without a medallion and hackney-licensed driver. The Boston Ordinance is clear:

> In the City of Boston, no person, firm, or corporation driving or having charge of a taxicab or other private vehicle shall offer the vehicle for hire for the purpose of

transporting, soliciting and/or picking up a passenger or passengers unless said person is licensed as a hackney driver and said vehicle is licensed as a hackney carriage by the Police Commissioner.

(City of Boston Code 16-15.05: Vehicle for Hire Ordinance) (Appendix I to Taxi Rules).

25. Every UberX or black car or SUV hailed electronically by an Uber customer in the City of Boston must, under the provisions of the Vehicle for Hire Ordinance quoted above, have a medallion. None of them do, and all Uber black car, SUV and UberX services in Boston are, therefore, operating illegally. This massive illegal operation puts the public and consumers at risk in many ways.

### Risks of Uber's Illegal Operation of UberX, Black Cars and SUVs

26. The Taxi Rules protect the public from dangerous vehicles by requiring that all taxis be inspected to ensure they meet specific Taxi Rules standards for age, condition, equipment, lack of damage and cleanliness. (Taxi Rules, Section III.) Uber ducks these requirements entirely (and illegally) with its affiliated UberX cars, black cars and SUVs. Uber tells its customers that it inspects all of its fleet, but the plaintiffs are informed and believe that while Uber superficially inspects these vehicles and checks registration and insurance information when the owner first signs up, Uber does not have a regular program of rechecking vehicle condition, licensing or insurance.

27. The Taxi rules protect the public from dangerous cab drivers by requiring hackney license applicants to meet seventeen criteria before they can even <u>apply</u> for a license, including:

1. be twenty-one (21) years of age or older;

2. pass a standard examination demonstrating the ability to speak, read, write and understand the English Language;

3. participate in Hackney Carriage testing and training as determined by the Inspector of Carriages;

4. have an original **Birth Certificate, Alien Card, Asylum Document, US Passport or Naturalization Papers**;

5. **not have a Hackney Carriage Driver's License that is revoked or suspended in any jurisdiction**;

6. have a valid Massachusetts Driver's License;

7. have had a Driver's license in the United States for at least two (2) years;

8. **not have been adjudged a Habitual Traffic Offender**, as defined by Massachusetts General Law Chapter 90 section 22F, or the equivalent in any jurisdiction, within the past five (5) years;

9. **not have any outstanding or unresolved driving infractions which could result in the applicants Driver's license being suspended or revoked in any jurisdiction**;

10. **not have had his or her Driver's License suspended for five (5) or more Surchargeable Incidents**, as defined by Chapter 211 of the Code of Massachusetts Regulations section 134, or the equivalent in any jurisdiction, within the past five (5) years;

11. **not have more than four violations of the Traffic Laws and/or At-Fault Accidents** as defined by Chapter 211 of the Code of Massachusetts Regulations section 134 or an equivalent department in the last three (3) years (violations and accidents occurring on the same date will count as only one) in any jurisdiction;

12. **not have any Operating Under the Influence of drugs or alcohol convictions** or dispositions under Massachusetts General Law Chapter 90 section 24D **within the past five (5) years** or the equivalent in any jurisdiction;

13. **not have any felony convictions within the last five (5) years** in any jurisdiction;

14. **not have any drug convictions in the last five (5) years** in any jurisdiction;

15. **not have any dispositions for a criminal offense, in any jurisdiction, that would result in the denial of a license,** including admissions to sufficient facts or continues of an offense without resolution, unless the circumstances of such incident are reviewed by the Inspector of Carriages as to the specific facts and circumstances and the applicant is thus approved by the Inspector of Carriages;

16. **not be required to register as a sex offender** in any jurisdiction; and

17. **not have any outstanding or unresolved criminal court cases in any jurisdiction which could result in the license being denied** if the Applicant was convicted of the alleged offense.

(Hackney Carriage Driver Standards, Taxi Rules Appendix I) (emphasis added).

28. Uber violates the Taxi Rules by signing up UberX, black car and SUV drivers who have not met the Hackney License requirements, and Uber does not even bother to assure its customers that these drivers could meet any of the Hackney Carriage Driver Standards. According to Uber, anyone can drive an Uber-affiliated UberX car, black car or SUV in Boston as long as they have a conventional driver's license and insurance. Here is Uber's complete description of the standards it applies in selecting drivers:

We carefully select the fleet partners we work with and ensure that they have proper licensing and insurance.

(http://support.uber.com/entries/22346733-how-does-uber-select-drivers.)

29. Uber then attempts to reassure customers that, despite Uber's relaxed standard for selecting partners, it takes steps to weed out unsuitable drivers:

We've also implemented a customer generated rating system for drivers. If a driver's rating goes beneath a certain level, we will no longer do business with them. We're careful to maintain a standard of only doing business with quality, licensed drivers.

(http://support.uber.com/entries/22346733-how-does-uber-select-drivers.)

30. But Uber's alleged method of ensuring it has "quality" drivers consists of a five-star "rating system" by which Uber riders can choose to rate their driver immediately after the ride. Uber claims that if a driver dips below a certain star rating, Uber will "no longer do business with" him. But Uber does not tell its customers that every driver receives a five star rating just for signing up with Uber. The plaintiffs are informed, and believe, that a driver only drops below a "Five Star" rating if dissatisfied customers take the time to post negative reviews, and that Uber continues to use drivers even after they have received multiple negative reviews.

31. Uber's true stance on driver safety is revealed in the waiver it forces every customer to execute when they first register as an Uber user. This waiver demonstrates that Uber pretends to run a safe operation, but in reality refuses to screen its drivers or take responsibility for anything "dangerous, offensive, harmful to minors, unsafe or otherwise objectionable" its "quality" drivers do:

> The company may introduce you to third party transportation providers for the purposes of providing transportation. **We will not assess the suitability, legality, or ability of any third party transportation providers** and you expressly waive and release the company from any and all liability, claims, or damages arising from or in any way related to the third party transportation provider. **The company will not be a party to disputes, negotiations of disputes, between you and such third party providers.** We cannot and will not play any role in managing payments between you and the third party providers. Responsibility for the decisions you make regarding the services offered via the application or service (with all its implications) rest solely with you. **We will not assess the sustainability, legality or ability of any such third parties** and you expressly waive and release the company from any and all liability, claims, causes of action, or damages arising from your use of the application or service, or in any way related to the third parties introduced to you by the application or service. You expressly waive and release any and all rights or benefits under Section 1542 of the Civil Code of the State of California (or any analogous law of any state), which reads as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the

release, which, if known by him, must have materially affected his settlement with the debtor."

**The quality of the transportation services scheduled through the use of the service or application is entirely the responsibility of the third party provider who ultimately provides such transportation services to you. You understand, therefore, that by using the application and the service, you may be exposed to transportation that is potentially dangerous, offensive, harmful to minors, unsafe, or otherwise objectionable, and that you use the application and the service at your own risk.**

(https://www.uber.com/legal/terms#)(emphasis added).

### *Uber Discriminates Against Disabled, Elderly and Less Wealthy Riders*

32. Boston's Taxi Rules require every medallion-holder to be part of a Radio Association, and Associations must ensure that members comply with the Rules. The Taxi Rules include multiple provisions that protect poor, disabled and elderly riders against discrimination.

33. Customers in wheelchairs are protected by Taxi Rules requiring every association to have Wheelchair Accessible Vehicles (WAVs) in their fleet (Taxi Rules Section 7.I.d), with WAV-Certified drivers who must "respond to each call for a WAV taxi." Other Hackney Licensed drivers in conventional cabs must offer service to wheelchair users, and must notify their dispatcher immediately if the customer asks for a WAV taxi. Uber illegally flouts each of these obligations. The Uber app does not allow a customer to request a WAV taxi, and Uber takes no steps to provide WAVs, to provide WAV-certified drivers, or to have drivers working for Uber assist customers who need a WAV taxi.

34. The Taxi Rules Anti-Discrimination Clause states that:

A Hackney Carriage Driver may not refuse any passenger on the basis of race, sex, religion, disability, sexual orientation, national origin, or location of the passenger's pick-up or destination in any circumstance.

(Taxi Rules, Section 5.2.)

35. Uber-affiliated drivers can unlawfully ignore this requirement without any adverse consequences, forcing customers in less secure neighborhoods to use conventional taxis, and forcing conventional taxis to bear the full burden of complying with the Anti-Discrimination Clause.

36. Boston taxi drivers are required to accept multiple forms of payment, including cash, credit cards, vouchers and Boston Taxi Industry Elderly Program (BTIEP) coupons, which allow customers who are elderly, handicapped, disabled or suffer from cancer to pay discounted rates. (Taxi Rules, Section 9.II.b; Taxi Rules, Section 7.l.) Uber drivers cannot accept cash, coupons or vouchers. All payments—even tips—are charged automatically to the customer's preauthorized credit card. Uber's credit-card-only payment system discriminates against lower-income individuals without credit cards, and discriminates unlawfully against elderly, handicapped, disabled and cancer patients who, who have the legal right to use BTIEP coupons to pay for taxi trips.

### *Uber Charges Illegal Fares and Lies to Customers*

37. Boston taxi rules protect consumers—and less wealthy customers—by establishing uniform fares. Charges for trips within Boston and to nearby suburbs ("Meter Rate Communities") must be displayed on a city-inspected and sealed Taximeter that calculates the fare based on time and distance. Trips to more distant towns are set by the Flat Rate Handbook. (Taxi Rules, Section 5.II.k, Section 10.II.c.)

38. For UberX, black cars and SUV's, Uber makes no pretense of obeying these fare limits, charging a flat rate plus additional charges per-mile or per-minute, depending

on the car's speed. This illegal variation in rates violates the City of Boston's policy in favor of uniform, non-discriminatory charges for taxi service.

39. When a customer chooses an Uber-affiliated Boston taxi, rather than an UberX car, black car or SUV, the fare is calculated differently. In a nod to the Taxi Rules, Uber's fares for taxis with Boston medallions begin with the Taximeter fare or Flat Rate. But Uber then "mandates" an illegal $1 "fee" and a 20% "gratuity" in addition to the maximum charges set by the Taxi Rules.

40. From the time it began operation of Uber Taxi in Massachusetts in September, 2012 until this lawsuit was filed March 11, 2013, Uber's website automatically informed every one of its thousands of Massachusetts customers that Uber's fee was a mere $1 per taxi trip, and that drivers would receive the full 20% "gratuity:"

> With Uber TAXI we'll automatically add **20% gratuity for the driver**, and you'll see it reflected on your receipt. We charge your credit card directly, so there's no need to hand any payment to the driver.

(https://www.uber.com/cities/boston#)(emphasis added).

Among the thousands of Boston Uber customers who received this false information concerning gratuities from the Uber website were Amanda Tetrault, who signed up on May 27, 2012, and Michael McLaughlin, who signed up on December 29, 2012.

41. Uber's claim that it received only $1 and drivers received the 20% gratuity was an outright lie. The truth was that drivers only got half of the 20% charge and the rest goes to Uber. Uber's lie was clever marketing, designed to trick customers into believing that they are paying the standard taxi fare, paying a standard 20% tip to the driver, and giving Uber only $1 for its services.

42. Uber's illegal fares for UberX, black cars and SUVs become even more exploitative in times of high demand, when Uber imposes "surge pricing," a multiple of its base fare structure. Surge pricing is an additional, illegal method by which UberX, SUVs and black cars unfairly compete against medallioned taxis, which cannot charge more than the rates prescribed by the Taxi Rules.

### *Uber Operates an Illegal Dispatching Service*

43. To ensure that Boston taxis comply with the Taxi Rules, Rule 403 requires that every taxi join a Radio Association. Each Association must have a membership of at least forty cabs. Approved Radio Associations are legally required to provide a broad range of services to assist the police, protect consumers, and make taxis available to elderly and handicapped passengers. These services include:

    i. Twenty-Four (24) Hour Dispatch Capabilities;
    ii. Two-Way Radio and Dispatch Service [amended by ix, below];
    iii. Wheelchair Accessible Vehicle (WAV) Availability;
    iv. Elderly Discount Re-imbursement Services;
    v. Call/Dispatch Record Keeping and Reporting;
    vi. Lost Or Found Property Reporting Procedures; and
    vii. Dispatch services shall include record keeping that specifies:
        (1) the total number of calls for service;
        (2) the time and location of each request;
        (3) the Medallion number of the cab dispatched; and
        (4) the time and location of WAV's dispatched.
    viii. Global Positioning System tracking devices are mandatory and all Hackney Carriages shall be equipped with a GPS system approved by the Inspector of Carriages which shall allow the Inspector of Carriages and Medallion Owner to ascertain the whereabouts, activities and fare data of each vehicle via the internet at all times. Said system shall store such information in a retrievable form for 365 days. The association must provide the Inspector of Carriages with the user name and password necessary to access said system. Such information shall be searchable for the following data.
        • Date, time, and location of passenger pick-up and drop-off
        • Trip duration measured in time and mileage
        • Trip number

- Itemized fare (tolls, surcharges, and tip amount for card payments)
- Payment type (Cash, Credit, Debit, Student ID, Voucher)
- Last four (4) digits of customer credit/debit, etc. account number
- Hackney Medallion number
- Hackney Drivers License number
- Status codes
- Date and time of taxicab dispatch
- "Breadcrumb trail" GPS-based location data. (real-time and historical)

   ix.   GPS enhanced dispatch services which enable the radio association to dispatch the Boston Licensed Taxi which can arrive at the location most quickly. Said system shall be equipped with a panic button utilized by the driver which will automatically notify the dispatcher of an emergency and the vehicle's location.

(Rule 403, Section 7.I.d.)

44. Only an approved radio association can dispatch taxis in Boston. (Taxi Rules, Section 7.) Uber is not, has never sought to be, and could not be an approved association, and it violates the law every time its computers send an UberX car, Boston taxi, black car or SUV to an Uber customer in Boston.

45. Uber's transportation system benefits financially by enlisting UberX car, black car and SUV owners who have no medallions and are not members of a Radio Association. By violating the medallion and Radio Association requirements, Uber unlawfully evades any investment in medallions, cars, Wheelchair Accessible Vehicles, registrations, insurance, dispatching equipment, protective partitions, taximeters, credit card machines, and other public safety and anti-discrimination requirements imposed by the Boston Taxi Rules. In circumventing the Taxi Rules with its affiliated black cars and SUVs, Uber puts the public at risk in a variety of ways.

A. *Quality of Drivers*: Taxi Rules require all drivers to hold a Hackney License, which is only granted to applicants who meet Rule 403's standards for testing, training, criminal record, driving record, drug use and sex offender status. Hackney License holders are held to an extensive set of rules, requiring them to (for example):

    i. not possess alcohol or permit open alcohol containers in their vehicle;
    ii. not talk on a cell phone;
    iii. not smoke or permit smoking; and
    iv. not discriminate against potential customers based on race, sex, religion, disability, sexual orientation, national origin, pickup location or destination or intoxication.

(Rule 403, Section 5.II.)

These rules are enforced by the Inspector of Carriages, who can conduct hearings on complaints and suspend or revoke a license. Uber, in contrast, does not require black car and SUV drivers in Boston to have anything more than a conventional driver's license. Uber's substitute for the rigorous Hackney License standards and disciplinary process is the Five-Star system described in ¶ 27, under which any driver with a license and insurance automatically gets Uber's highest rating.

B. *Quality of Owners*: Boston issues a limited number of medallions, and the Inspector of Carriages reviews each medallion applicant for suitability. (See Chapter 392 of the Acts of 1930; Taxi Rules, Section 2.II.b.i, b.ii.1-3, c.i, c.ii, c.iii and d.) Medallion owners must file annual reports of their financial condition, disclosing all liens, mortgages and judgments, can be required to provide tax returns, and must provide the Inspector with the names of every individual and organization with an ownership interest in the medallion.

Knowing who really owns and controls medallions allows the Inspector to prevent taxi licenses from falling into the wrong hands, and knowing the financial condition of medallion owners assists the Inspector in setting rates that are fair to owners and the public. Uber enlists as many black cars and SUVs as it can, often dealing with individuals or small companies with a single black car or SUV. Uber knows virtually nothing about the financial stability, citizenship, criminal background, litigation record, affiliations or true ownership and control of the black car and SUV owners it describes as its "partners."

C. *Quality of Cars*: Uber showcases the luxury of its black cars and SUVs, but these vehicles lack essential protections required by the Taxi Rules for all dispatched-on-demand transportation services in Boston. For example:

    i. *Protective Partitions*: The Taxi Rules require all Boston cabs to have a protective barrier of metal and lexan between the front and back seats. (Rule 403, Section 3.III.c.iii.) These barriers not only protect drivers from assault and theft; they also prevent drunk or drugged passengers from interfering with the driver and causing accidents. Uber's marketing plays up the six-person capacity of its SUVs, encouraging a party atmosphere and increasing the risk that boisterous passengers will distract the driver—or worse. Uber black cars and SUVs have no partitions, putting drivers at risk and undermining a critical public safety program of the City of Boston.

ii. *GPS Tracking and Panic Buttons*: Every Boston cab must be equipped with an Inspector-approved GPS system that gives the Boston Police internet access, both in real time and for a year after any trip, to the location of every cab, the pick-up and drop-off points, how the passenger paid, and the exact route followed. Every cab must also be equipped with a panic button that automatically sends the dispatcher an emergency signal and the location of the cab. Uber black cars and SUVs have no such approved equipment: Uber does not disclose what data it preserves on black car and SUV trips, and any such data is not accessible to the Boston Police. In an emergency, Uber black car and SUV drivers can't hit a panic button: they have to phone for help.

iii. *Taximeters and Flat Rates*: The fare for every Boston taxi trip is set by an inspected and sealed Taximeter or the Flat Rate Handbook, ensuring that every customer pays the same rate. Uber black cars and SUVs make no attempt to comply with these legally-mandated maximum rates. Fares are set by Uber's proprietary algorithm, which always charges more than the Boston taxi rate. Uber's user agreement also allows it to use "surge" pricing when demand becomes "intense." Uber took advantage of this contractually-permitted price gouging to hike prices 625% early on New Year's Day 2012.

(http://blog.uber.com/2012/01/01/take-a-walk-through-surge-pricing/.)

46. Uber's illegal transportation system is not limited to UberX, black cars and SUVs. As stated above, Uber also "partners" with Boston taxi cab drivers, who make an illegal

side deal with Uber to take its customers while simultaneously working a normal shift dispatched by a Boston Radio Association. A Boston cabbie who accepts work from the cab's approved radio association and from Uber is violating the Taxi Rules in many ways. Examples include:

A. _Illegal Fares_: By charging a 20% "gratuity" (half of which goes to Uber) and a $1 fee, the driver violates the maximum fare provisions of Rule 403.

B. _Illegal Cell Phone Use_: Uber drivers must use cell phones to receive and accept Uber assignments and to communicate with the Uber customer. Uber's computerized system typically requires drivers to respond to an "electronic hail" within a few seconds or lose the job, increasing stress, distraction, and the potential for accidents. Uber then compounds the risk by requiring drivers to call the customer when the cab is close to the pickup point. The Taxi Rules recognize that cabbies on cell phones are a risk, and prohibit such cell phone use. (Rule 403, Section 5.II.n.)

C. _Discrimination_: The Taxi Rules prohibit discrimination based on the passenger's personal characteristics (disability, age, gender, race, etc.). Uber's assignment system permits a driver to discriminate for any of these unlawful reasons.

D. _Refusal to Honor Payment Options_: The Taxi Rules ensure that customers without the means to use a credit card or smart phone can also pay by cash, voucher or discount coupon. Uber-affiliated taxis unlawfully limit these options, only allowing payment through the customer's smart phone, charging a credit card previously registered with Uber.

47. Uber tries to avoid regulation of its black cars and SUVs by claiming they are livery cars. True livery cars provide prearranged transportation and are not subject to the Taxi Rules. But Uber's computerized service allows spur-of-the-moment assignment and "virtual hails" of Uber-affiliated cars driving in a customer's neighborhood, putting Uber's black cars and SUVs in direct competition with taxis, whether dispatched, hailed, or parked at a taxi stand.

48. Uber does not claim that its UberX cars are livery vehicles. It simply takes the position that they are not subject to regulation in Boston.

49. Boston taxis must comply with regulations that protect the public from harm, prohibit discrimination against the disabled, the elderly and other victims of bigotry, and set maximum fares to protect the less wealthy. To comply with these regulations, Boston cabs must invest in equipment, training, licenses and insurance, charge only prescribed fares, and serve all areas, including the less profitable sections of the city. In contrast, UberX cars, black cars and SUVs defy the Taxi Rules, skimming customers who are wealthy and sophisticated enough to use a smart phone to summon a ride. UberX vehicles and Uber's black car and SUV "partners" are a fleet of upscale gypsy cabs recruited by Uber to compete unlawfully and unfairly against licensed Boston cabs by ignoring the Taxi Rules.

50. In addition to competing unfairly and unlawfully against Boston taxis, Uber's black cars and SUVs compete unfairly against true livery car services, which need not comply with the Taxi Rules if they convey passengers on prearranged trips for flat rates. Uber's black cars and SUVs ignore these restrictions, are dispatched as quickly

as Uber taxis, and thus have a substantial (and unfair) competitive advantage over livery cars services that comply with the Taxi Rules by refusing to participate in an on-demand dispatching system like Uber's.

51. The plaintiffs are informed, and believe, that many of Uber's black cars and SUVs also compete unfairly by unlawfully purchasing insurance that by law can only cover true livery cars. In Massachusetts, many livery cars and taxis are insured through the assigned-risk CAR program established by M.G.L. c. 175, § 113H. The CAR program insurance premiums for livery cars (called "car service" vehicles in the CAR regulations) are lower than the premiums for taxis. Under the CAR definitions, it is clear that Uber vehicles must pay the higher insurance rates charged to taxis, rather than car service cars. Taxis are defined as:

> a. *Taxicab or Similar Passenger Carrying Service*--a **metered** or unmetered motor vehicle with a seating capacity of eight or less that is **operated for hire** by or on behalf of the named insured or by an employee, but does not pick up, transport, or discharge passengers along a route.

(Commonwealth Automobile Reinsurers Commercial Automobile Insurance Manual, Section V—Public Transportation, § 73.D.2.a.)

Car service vehicles are defined as:

> c. *Car Service*--an unmarked for hire auto with a seating capacity of 8 or less which
> (1) is **hired on a prearranged basis**;
> (2) **does not pick up hail fares on the street**;
> (3) does not contain a rate meter, and **does not charge for services based upon miles traveled** if the trip is less than twenty-five miles;
> (4) operates on a scheduled business day, and **is returned to the vehicle's base of operation for a continuous period of at least four hours in each twenty-four hour period**;
> (5) is operated by the named insured, an employee, or an independent contractor of the named insured, in attendance as a chauffeur;

24

(6) operates from a base with two-way communication;
(7) primary payment method is by billing or credit card.

(Commonwealth Automobile Reinsurers Commercial Automobile Insurance Manual, Section V—Public Transportation, § 73.D.2.c.)

52. Uber-affiliated vehicles are not eligible for "car service rates" because Uber black cars and SUVs operate as taxis. They connect instantly with customers through Uber's computerized system, and thus "pick up hail fares on the street." The Uber GPS system calculates fares with "a rate meter," and fares are "charge[d] based upon miles traveled." These characteristics by definition require all Uber-affiliated vehicles to pay taxi insurance rates. Uber black cars and SUVs that pay car service rates thus compete unfairly by functioning as Boston taxis while paying substantially lower insurance rates than taxis. Uber and any affiliates who improperly obtain car service insurance are also putting customers at risk, as insurers may disclaim coverage for Uber-affiliated black cars and SUVs that have not paid taxi insurance rates.

53. Uber knows or should know that its affiliated black cars and SUVS are not paying proper insurance rates and are putting Uber customers in jeopardy. Uber nonetheless falsely assures customers that:

All our driver partners are fully licensed w/ commercial insurance. You're all safe here :).

(http://twitter.com/ryangraves/statuses/243081748131500032 (September 4, 2012).)

### *Uber Unfairly Competes By Deceiving Customers About UberX Insurance Coverage*

54. When Uber launched UberX in Boston in 2013, it represented to Boston consumers in postings on the Uber website that UberX vehicles would be covered by commercial insurance with $1 million limits, stipulated that UberX autos must meet strict model

and model year standards, and required that they be registered as commercial vehicles. After competition from "ridesharing" services such as Lyft and Sidecar threatened UberX's market share, Uber relaxed its standards. Presently, Uber advertises that anyone is eligible to drive for UberX who is "[a]t least 23 years old, with a personal license and personal auto insurance," if their personal vehicle is "[a]ny mid-size or full-size 4-door vehicle, in excellent condition."

(https://partners.uber.com/signup/boston/)

55. Uber currently informs its customers through a posting on its website dated March 14, 2014 that:

> From the time a driver accepts a trip request through our app until the completion of the ride, our partners have $1 million of coverage for driver liability. We were also the first ridesharing request service to include $1 million of coverage for uninsured/underinsured motorists, meaning that passengers and drivers are also covered for injuries when another party is at fault and lacks sufficient insurance. This $1 million coverage from trip acceptance to drop-off is consistent across cities. This coverage kicks in regardless of whether the driver's personal insurance applies to the trip.

> (http://blog.uber.com/uberXridesharinginsurance).

56. Uber's representation to Massachusetts's customers that it provides $1 million in liability coverage is deceptive in multiple ways.

57. The $1 million representation is deceptive, first, because the insurance policy Uber cites is, at best, excess coverage that only "kicks in" if the driver's coverage is inadequate or inapplicable (http://www.scribd.com/doc/214635531/Insurance-Policy).

58. Second, the $1 million representation is deceptive because Uber's $1 million policy appears to limit coverage to "the amount of insurance. . .required by the contract or agreement you have entered into with the additional insured. . . ." (http://www.scribd.com/doc/214635531/Insurance-Policy)(Endorsement JA5201US

09-12) Uber's agreements with UberX drivers in Massachusetts require the drivers to have Massachusetts Automobile Insurance policies. Under the Massachusetts Automobile Insurance policy, insured drivers are currently required to carry compulsory bodily injury insurance of $20,000 per person/$40,000 per accident, and compulsory property damage insurance of $5000 per accident. The policy cited by Uber appears to limit its coverage to the amount of the Massachusetts Automobile Insurance coverage UberX drivers in Massachusetts are required to carry under their agreements with Uber. The plaintiffs are informed, and believe, that the Uber contracts do not require UberX drivers to carry more than the compulsory limits. Endorsement JA5201US 09-12 appears, therefore, to set limits of coverage at an amount equal to the UberX driver's Massachusetts coverage, not the $1 million Uber claims.

59. Third, the $1 million representation is deceptive because it does not acknowledge that the insurers issuing personal insurance policies to Massachusetts UberX drivers can be expected to contest part or all of the bodily injury coverage in the event of a liability claim, either on the ground that the UberX driver misrepresented the use of the insured vehicle in obtaining coverage, or on the ground that optional coverage does not apply to use of the automobile as a "public or livery conveyance." Uber's representations that its policy "kicks in" regardless of the driver's insurance deceives UberX customers by downplaying the predictable delay, cost and inconvenience of determining whether the driver's personal insurance will apply.

### *Uber Unfairly Competes By Falsely Claiming To Be Affiliated With Boston Medallion Owners*

60. Each time Uber assigns a Boston cab in response to an electronic hail, Uber implicitly and falsely represents to its customers that it is legally authorized to do so, and that Uber is legally authorized to charge a fee and a 20% "gratuity" over and above the maximum lawful fare set by the Taxi Rules.

61. Uber falsely leads customers to believe that the owners and operators of Boston Cab taxis have approved these charges, and falsely implies that Uber and the radio associations, including Boston Cab, are "partners" in the Uber transportation system. Having invested nothing to acquire and equip vehicles, purchase licenses, create and equip radio associations, and pay carrying costs for insurance, inspection and regulatory compliance, Uber has unilaterally established a new system for linking customers to cabs and tricked the customers into believing that cab owners and radio associations, including Boston Cab, have granted Uber legal authority to sell taxi services in Boston and collect fares.

### *Uber Unfairly Competes By Interfering In Contractual Relations Between Licensed Taxis and Service Providers*

62. As stated above, the Taxi Rules require every medallion owner and Radio Association to install thousands of dollars of integrated equipment, including an approved, inspected and sealed Taximeter to measure fares; a GPS system that allows the Radio Association and the Boston police to track every taxi all the time; a panic button in case of emergencies; dispatching assignment equipment; and a credit card payment machine. When Uber convinces Boston cab drivers to sign on to Uber's service and get more fare-paying customers, Uber pays nothing for the capital cost of

this infrastructure. It simply diverts the fare, processing it through Uber's credit card processing facility, and taking a fee before paying the driver anything.

63. In order to afford the capital cost of required taxi equipment, Boston taxi owners and radio associations reach agreements with one of three credit card processing companies certified by the Inspector of Carriages as having appropriate technology and security for wireless credit card payments from cabs. These credit card companies pay for and install legally-required dispatching and fee processing equipment in exchange for the right to collect credit card processing fees for fares, and advertising revenue from city-approved video screens in licensed cabs.

64. Plaintiff Boston Cab Dispatch has an exclusive contractual agreement with Creative Mobile Technologies, LLC ("CMT"), one of the three city-approved taxi credit card processing companies. Under this contract, CMT purchases and installs thousands of dollars of equipment required by the Taxi Rules. In exchange, CMT receives transaction-processing revenues when passengers pay with credit or debit cards. Uber bypasses the credit card payment system installed in Boston cabs, depriving CMT of the processing fees that Boston Cab Dispatch is contractually obligated to give CMT in exchange for CMT's installation of legally-required taxi communications equipment. Uber's misappropriation of credit card fees unlawfully interferes with Boston Cab Dispatch's contract with CMT and violates the Taxi Rules.

65. The plaintiffs are informed, and believe, that Uber has agreements with drivers dispatched by all seven approved Boston radio associations, and that all seven associations have similar contracts, granting an approved credit card processor the right to receive processing fees when passengers pay fares by credit or debit card.

Uber's diversion of credit card payments and fees interferes with all seven radio associations' contracts with credit card processers by stealing revenue that is legally committed to paying for safety equipment required in all Boston taxis.

66. Uber's business plan is not difficult to understand. It intends to control the entire Boston private transportation system from limousines to taxis. If it is allowed to compete illegally and unfairly by ignoring the Taxi Rules, Uber will put Boston travelers at risk—forcing them to accept wildly fluctuating "surge pricing," uninspected cars, unqualified drivers and anonymous car owners. Uber aims to control an entire transportation system and take no responsibility for any feature of that system beyond collecting the fares. In place of all the protections Boston's Taxi Rules provide to travelers of all ages, physical abilities and financial means, Uber provides the following:

> **We will not assess the suitability, legality, or ability of any [driver or owner] and you expressly waive and release [Uber] from any and all liability**
>
> \*  \*  \*
>
> **[Uber] will not be a party to disputes, negotiations of disputes, between you and such [drivers or owners].**
>
> \*  \*  \*
>
> **We will not assess the sustainability, legality or ability of any such [drivers or owners].**
>
> \*  \*  \*
>
> **The quality of the transportation services scheduled through the use of [Uber] is entirely the responsibility of the [driver or owner] who ultimately provides such transportation services to you.**
>
> \*  \*  \*

**You understand, therefore, that by using [Uber], you may be exposed to transportation that is potentially dangerous, offensive, harmful to minors, unsafe, or otherwise objectionable, and that you use [Uber] at your own risk.**

(https://www.uber.com/legal/terms#.)

## COUNT I

### UNFAIR COMPETITION
### IN VIOLATION OF M.G.L. c. 93A, § 11

67. Plaintiffs incorporate the allegations of Paragraphs 1-66 of this Complaint here.

68. By unlawfully operating its taxi, black car, SUV and UberX transportation services without incurring the expense of compliance with Massachusetts and Boston laws, as alleged above, Uber unfairly competes with plaintiffs, in violation of M.G.L. c. 93A, § 11.

69. Uber's unlawful competition has caused harm to the plaintiffs by diverting revenues that would otherwise be paid to taxis and by reducing the value of taxi medallions.

## COUNT II

### COMMON LAW UNFAIR COMPETITION

70. Plaintiffs incorporate the allegations of Paragraphs 1-69 of this Complaint here.

71. By unlawfully operating its taxi, black car, SUV and UberX transportation services without incurring the expense of compliance with Massachusetts and Boston laws, as alleged above, Uber unfairly competes with the plaintiffs.

72. By diverting revenues for credit card processing that the plaintiffs are contractually obligated to pay to CMT, Uber unfairly competes with the plaintiffs.

73. Uber's unfair competition has caused harm to the plaintiffs by diverting revenues that would otherwise be paid to taxis and by reducing the value of taxi medallions.

# COUNT III

**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT "USE OR INVEST" PROHIBITION, 18 U.S.C. § 1962(a)**

74. Plaintiffs incorporate the allegations of Paragraphs 1-73 of this Complaint here.

75. As alleged in Paragraph 40, above, between mid-October, 2011 and March 13, 2013 or later, every one of thousands of Massachusetts residents who signed up for Uber service was falsely informed by the Uber website as part of the signup process that the automatically-charged 20% gratuity was paid to the driver. By using the internet over a period of over five months to transmit fraudulent misrepresentations to every one of thousands of Massachusetts Uber customers about fares in Uber taxis and false claims of an association between Uber and Boston Cab Dispatch, Uber violates the federal Wire Fraud statute, 18 U.S.C. § 1343.

76. Uber's thousands of violations of the federal Wire Fraud act over a period of over five months with Boston Uber customers are a continuous, related series of predicate acts that constitute a pattern of racketeering activity under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(5).

77. Uber derives income from its wire fraud violations by enlisting Boston Cab Dispatch drivers to drive Uber customers, diverting all credit card payments by Uber customers through Uber's collection system, and collecting illegal fees from those payments.

78. The plaintiffs are informed, and believe, that Uber uses some of the income illegally derived from diverted Boston taxi fares in its ongoing operation of the Uber transportation system. The Uber transportation system is engaged in and affects interstate commerce.

79. Uber's investment of the proceeds of its racketeering activity in Uber's ongoing operations causes injury to the plaintiffs by providing investment funds used to expand Uber's network of black cars, SUVs, and UberX vehicles. These taxi substitutes divert business from medallioned taxis that are managed by plaintiff EJT and that are members of the Boston Cab Dispatch Radio Association, causing economic injury to the plaintiffs.

80. Uber's conduct in using illegal profits from diverted Boston taxi fares to develop black car, SUV and UberX fleets that take business from licensed Boston taxis violates 18 U.S.C. § 1962(a), which makes it "unlawful for any person who has received any income derived. . .from a pattern of racketeering activity. . .to use or invest. . .any part of such income" in the "operation of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

### COUNT IV

**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT "INTEREST IN OR CONTROL OVER" PROHIBITION, 18 U.S.C. § 1962(b)**

81. Plaintiffs incorporate the allegations of Paragraphs 1-80 of this Complaint here.

82. Uber uses the fraudulent representations alleged above to expand its Boston customer base and increase the demand for Uber-affiliated taxis in Boston. This increased demand permits Uber to induce taxi drivers in Boston, including some drivers of taxis in the Boston Cab Dispatch Radio Association and some drivers of taxis managed by EJT, to enter into contracts with Uber.

83. The plaintiffs are informed, and believe, that the number of Uber-affiliated taxi drivers in Boston is expanding and that Uber is thereby increasing its control of the

seven radio associations that make up the Boston taxi transportation system, including control of dispatching, control of selection of the customers and neighborhoods that receive taxi service, and control of fares paid by taxi customers.

84. Uber's conduct violates 18 U.S.C. § 1962(b), which "prohibits any person from acquiring or maintaining. . .any. . .control over an enterprise through a pattern of racketeering activity."

85. By exercising an increasing level of control of the taxi operations of the seven Boston radio associations and their medallion-owning members, as alleged above, Uber causes economic harm to the plaintiffs by diverting revenues and reducing the value of taxi medallions.

**COUNT V**

**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT "CONDUCT OF ENTERPRISE" PROHIBITION, 18 U.S.C. § 1962(c)**

86. Plaintiffs incorporate the allegations of Paragraphs 1-85 of this Complaint here.

87. By unlawfully generating demand for its services in Boston, as alleged above, and entering into contracts with a growing number of Boston taxi drivers, Uber has insinuated itself into the operations of approved Boston Radio Associations and their medallion-owning members, including the plaintiffs, and has participated in the business of the Radio Associations and medallion owners by means of racketeering conduct.

88. Uber's conduct violates 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

89. Uber's participation in the conduct of the affairs of the Boston Radio Associations and Boston medallion owners has caused economic harm to the plaintiffs by diverting revenues and by reducing the value of taxi medallions.

WHEREFORE, the plaintiffs demand judgment in their favor on all counts, awarding them the defendant's profits from all fares collected by Uber-affiliated Boston taxis; damages caused to the plaintiffs by Uber's unlawful operation of black cars, SUVs, UberX vehicles and taxis in Boston; multiple and punitive damages for Uber's unlawful operation of black cars, SUVs, UberX vehicles and taxis in Boston; attorney's fees; interest; costs; and further relief found appropriate by the Court.

## DEMAND FOR JURY TRIAL

The Plaintiffs demand a trial by jury on all Counts.

> The Plaintiffs,
> By their attorneys,
> BRODY, HARDOON, PERKINS & KESTEN, LLP
>
>
> */s/ Samuel Perkins*
> Samuel Perkins  (BBO#542396)
> Richard E. Brody (BBO#058260)
> Michael Stefanilo (BBO# 684500)
> Brody, Hardoon, Perkins & Kesten, LLP
> One Exeter Plaza
> Boston, MA 02116
> (617) 880-7100
> sperkins@bhpklaw.com
> rbrody@bhpklaw.com
> mstefanilo@bhpklaw.com

Dated: July 8, 2014

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.

> */s/ Samuel Perkins*
> Samuel Perkins, BBO #542396

Dated: July 8, 2014