UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| BOSTON CAB DISPATCH, INC, ) | |
| ) | |
| and ) | |
| ) | |
| EJT MANAGEMENT, INC, ) | |
| ) | |
| Plaintiffs, ) | C.A. No. 13-cv-10769-NMG |
| ) | |
| v. ) | |
| ) | |
| UBER TECHNOLOGIES, INC., ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**PLAINTIFFS' CONSOLIDATED OPPOSITION AND MEMORANDUM IN
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED
COMPLAINT**

I.      INTRODUCTION

        Uber has moved to dismiss the Amended Complaint, arguing that the plaintiffs

have not pled causation adequately, that they have attempted to reassert dismissed claims,

and that this Court should decline to interpret and apply state law in ruling on its motions.

For the reasons stated below, Uber's motion should be denied.

I.      ARGUMENT

        A.      The Amended Complaint Counts Alleging Unfair Competition Plead
                Proximate Causation Adequately.

        Uber claims that the plaintiffs fail to plead causation adequately in alleging that

"Uber's unlawful competition has caused harm to the plaintiffs by diverting revenues that

would otherwise be paid to taxis and by reducing the value of taxi medallions." (Doc. 50,

¶ 69.) The defendant argues that since the plaintiffs only control 370 Boston taxi medallions out of a total of 1825, it is possible that some of the plaintiffs' lost revenues or diminished medallion value is attributable to competition from the remaining 1,455 medallions. (Doc. 55, at 9-10.) From this unfounded speculation about other causes, Uber argues that at the <u>pleading stage</u> the plaintiffs must negate all potential causes of loss other than Uber's activities in order to allege causation of damages. (Id.)

Uber's argument would convert pleading requirements into presentation of the proof required at trial. In explaining the current standard for pleading, the First Circuit "distill[ed] the following principles from Twombly and Iqbal" in *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 11 (1st Cir. 2011) and concluded:

> 1) "[A]n adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim."
> 2) The Court "should begin by identifying and disregarding statements in the complaint that merely offer " 'legal conclusion[s] couched as ... fact[ ]' " or "[t]hreadbare recitals of the elements of a cause of action." . . . "Non-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible."

*Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

In the Amended Complaint, the plaintiffs allege that Uber's unlicensed taxis have diverted revenue from medallion-holding taxis in Boston and reduced the value of medallions. (Doc. 50, ¶¶ 69, 73.) These are concrete allegations of specific forms of money damages, and the plaintiffs have pled in detail how these losses were caused by Uber's operations.

The defendant suggests that the plaintiffs must, in pleading causation and harm, negate all other potential causes of harm. (Doc. 55, at 9-10.) This requirement finds no support in the Federal Rules or precedent. Indeed, the only authority cited for this

proposition is a Massachusetts Superior Court decision that does not support Uber's argument. In that case, *IDT Telecom, Inc. v. Voice Distributors, Inc.*, No. 072465, 2008 WL 1800102 (Mass. Super. Apr. 11, 2008), the plaintiff alleged that misrepresentations by a competitor in the prepaid phone card market had misled consumers, and that the plaintiff lost market share because consumers chose the defendant's product over the plaintiff's. The defendant moved for summary judgment, arguing in part that the plaintiff could not prove that the defendant's alleged misrepresentations had caused the plaintiff to lose business. 2008 WL 1800102 at *1. Quoting *McCarthy on Trademark and Unfair Competition*, the Superior Court framed the causation problem at the summary judgment stage as: "How can one seller out of many who are selling the bona fide product prove that a certain customer of the falsely advertising defendant would have bought from the plaintiff but for the false advertising?" *IDT Telecom, Inc. v. Voice Distributors, Inc.*, 072465, 2008 WL 1800102, at *2 (Mass. Super. Apr. 11, 2008). The Superior Court agreed that it would be difficult, when there were numerous comparable vendors in the field, for the plaintiff to show that any particular customer would have chosen the plaintiff absent the defendant's misrepresentation, but acknowledged that this difficulty depended on the facts of each case. *Id.* Notably, the Superior Court pointed out that when the plaintiff could show that a competitor logically was likely to have diverted some portion of the plaintiff's business, the case could proceed. (*Id., citing Ricky Smith Pontiac, Inc. v. Subaru, Inc.,* 14 Mass.App.Ct. 396, 424 (1982) for the proposition that "a causal link between unfair competition and damages is inferable" where the defendant's unlawful competition logically can be expected to affect the plaintiff's sales.")

3

Here the plaintiffs allege that when unlicensed Uber Black Cars, SUVs and UberX vehicles drive customers in violation of state statutes, a Boston ordinance and the Taxi Rules, Uber diverts revenue from medallioned taxis. Contrary to Uber's suggestion (with no factual support) that the plaintiffs' lost business might have gone to other medallioned taxis, the plaintiffs will show that the supply of medallioned taxis and the plaintiffs' share of the market for taxi services had remained stable for years prior to Uber's expansion in Boston with what amounts to an explosively-expanding fleet of gypsy cabs. The plaintiffs will show that Uber's unlicensed vehicles have taken revenue from all the Boston medallioned taxis, the plaintiffs included. Unlike *IDT Telecom*, there is no logical basis for Uber's speculation that its campaign to flood the Boston market with unlicensed taxis might somehow lead the traveling public to abandon the plaintiffs' cabs and choose one of the other brands of taxi that have been operating in a stable, regulated market for Boston cabs for decades.

The First Circuit has addressed whether allegations of injury-in-fact that rely on economic probabilities comply with pleading standards, and stated:

> [B]asic economic theory quite consistently transcends utter randomness by positing elemental laws of cause and effect predicated on actual market experience and *probable* market behavior. Indeed, most "competitor standing" cases depend on such core economic postulates. *See United Transp. Union,* 891 F.2d at 913 (noting that in "garden variety competitor standing cases," courts routinely credit causal connections "firmly rooted in the basic laws of economics" or "basic economic logic[.]"

*Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993).[1]

---

[1] *Adams* addressed whether the plaintiffs' allegations of injury-in-fact were sufficient to establish standing, but the analysis is equally applicable to a Rule 12(b)(6) motion. *Katin v. Nat'l Real Estate Info. Servs., Inc.*, CIV. A. 07-10882DPW, 2009 WL 929554 (D. Mass. Mar. 31, 2009).

The *Adams* Court also dealt with the defendant's suggestion that the plaintiffs' pleadings do not establish that the plaintiffs, as opposed to other Boston taxi companies, have suffered injury as a result of Uber's unfair competition.  In *Adams*, out-of-state milk suppliers alleged that subsidies to Massachusetts producers would cut into the out-of-state suppliers' sales to Massachusetts milk dealers. Responding to the defendant's argument that the plaintiff could not show the subsidies would cause the plaintiff individualized harm, the Court stated:

> Even assuming that out-of-state producers, *as a class,* might be injured under appellants' forecasts, the Commissioner contends that these *individual* appellants failed to demonstrate either injury-in-fact or that West Lynn Creamery will buy less than 100% of their milk production in the event Massachusetts production is increased in the future. Once again, we cannot agree. Like other Massachusetts dealers with whom it must compete, West Lynn's self-interest (in lower transportation costs and reduced perishability) will be served by purchasing milk from nearby producers, which at least in many, perhaps most, cases will be producers located in Massachusetts. In that eventuality, the out-of-state producers' current 97% share of West Lynn's milk business would decline.

*Adams v. Watson*, 10 F.3d 915, 924 (1st Cir. 1993).

As in any damages analysis in which unlawful diversion of business causes harm to all existing authorized sellers in the market, expert testimony will be required to establish the plaintiffs' share of that loss. Uber's view of pleading standards would require the plaintiffs to calculate and allege that loss before any discovery has occurred. The First Circuit has affirmed that economic realities can be used to analyze injury-in-fact allegations at the pleading stage, and the plaintiffs have adequately pled that Uber's unlawful entry into the Boston taxi market has cost them business.

It is also important to note that the Superior Court precedent on which defendant's argument relies was a summary judgment decision, and resulted in an order allowing the parties to conduct further discovery to help resolve the causation issue. *IDT Telecom, Inc.*

*v. Voice Distributors, Inc.*, 072465, 2008 WL 1800102, at *4 (Mass. Super. Apr. 11, 2008). By holding that the case should proceed through discovery, *IDT Telecom* confirms that when causation is disputed, the issue should be resolved by summary judgment, following full discovery. *Id.*

B.  Uber Provides No Grounds For Precluding Allegations That Support
     Plaintiffs' Unfair Competition Claims.

Uber suggests that in dismissing the Lanham Act claims and the c. 93A unfair and deceptive practices claim (Counts I, II and III), the Court ruled that allegations that supported those claims were somehow disqualified as allegations supporting Counts IV and V, the c. 93A and common law unfair competition counts. Uber argues that continuing to use certain allegations in the original complaint to support the unfair competition claims (Amended Complaint, ¶¶ 60-65) is an attempt to circumvent the Court's dismissal of Counts I-III.  (Doc. 55, at 10-12.)

Uber's argument ignores the distinction between factual allegations and the legal claims they support.  The Court has dismissed the plaintiffs' original claims that Uber violated the Lanham Act by falsely claiming to be affiliated with the plaintiffs (Counts I and II), that Uber engaged in unfair and deceptive acts in violation of M.G.L. c. 93A (Count III), and that that Uber tortiously interfered with the plaintiffs' contracts with credit card processors (Count VI). As a result, the plaintiffs will not be able to assert claims for damages for the causes of action in Counts I-III and VI. But the Court did not rule that the acts now alleged in ¶¶ 60-65 of the Amended Complaint were irrelevant to the remaining unfair competition claims, or that they should be stricken from the pleadings. These allegations—which from the outset have supported the plaintiffs' claims that Uber competes unfairly because of the savings it achieves by ignoring state statutes,

a city ordinance, and the Taxi Rules—are (and always have been) appropriate support for the unfair competition claims. They are not, as Uber claims, attempts to insert the dismissed counts into the Amended Complaint.

A review of unfair-competition content of these allegations confirms that they provide examples of ways Uber economizes unlawfully, to the economic disadvantage of the plaintiffs—and are, therefore, appropriate allegations in support of the unfair competition claims:

> ¶ 60 alleges that Uber charges illegally high fares when it dispatches a legally license cab operated by an Uber-affiliated driver. As a result, Uber receives revenues the plaintiffs are legally prohibited from collecting, giving Uber an unfair advantage and additional revenue that allows it to fund UberX, Black Cars and SUVs, all of which deprive the plaintiffs of revenues and reduce the value of medallions.

> ¶¶61-62 alleges that Uber unfairly competes by unlawfully using the plaintiffs' cabs to generate fares without contributing anything to the substantial carrying costs of these licensed cabs. The plaintiffs pay the full carrying costs of this equipment; Uber pays nothing. This unlawful exploitation of the plaintiffs' equipment without paying the recurring costs gives Uber an economic advantage not available to the plaintiffs.

> ¶¶63-65 allege that under the Taxi Rules, every customer who pays a lawful fare by credit card uses an approved machine that is installed by a credit card processing company in every cab. The company that provides the credit card machine collects fees from these fares. Uber diverts all fares through its computers, allowing it to add to its revenues by avoiding the fees taxi customers pay to the credit card processing companies operating under the Taxi Rules. This savings, achieved by violating the credit card provisions of the Taxi Rules, reduce Uber's costs and put lawfully operating cabs at an economic disadvantage.

Uber argues that using these allegations to support the unlawful competition claims is a "repackaging" of claims that have been dismissed with prejudice, and should be rejected on this ground and on *res judicata* grounds.[2] The short answer to this

---

[2] Uber mistakenly argues that *res judicata* bars the amendment, overlooking the fact that—unlike the cases it cites—no final judgment has been entered, and the plaintiffs are not attempting to bring a second action on the same operative facts as claims that have proceeded to final judgment. As all

argument is that the Court dismissed the plaintiffs' attempts to recover damages pursuant to particular legal theories—the Lanham Act, intentional interference, unfair and deceptive conduct—but allowed the plaintiffs to proceed on unfair competition grounds. The allegations in ¶¶ 60-65 of the Amended Complaint have been part of the plaintiffs' unfair competition claims from the outset, and the Court has allowed those claims to proceed to the discovery phase. The plaintiffs are making no attempt to establish the elements of the dismissed causes of action, or to obtain remedies specific to those claims. The disputed allegations of the Amended Complaint all support and are relevant to the remaining unfair competition claims.

Uber also misses a second key distinction—i.e., the difference between allegations that Uber competes unfairly by violating applicable laws, and allegations that this unlawful behavior has caused the plantiffs to suffer economic loss. The plaintiffs have cited a multitude of specific violations that allow Uber to take business from the plaintiffs, to cut costs, and to boost revenues. While the plaintiffs must prove that Uber's unfair competition caused them economic loss, the plaintiffs are not required to show that every unlawful act by Uber is the proximate cause of a specific dollar loss. To the contrary, the plaintiffs will show that the overall economic advantage Uber achieves by flouting regulatory laws allows it to divert business from the plaintiffs and other lawful taxi operators. This economic advantage is achieved in many ways. Uber diverts business from licensed taxis by charging unlawfully low rates for its UberX cars. Uber saves costs

---

current orders are interlocutory, *res judicata* cannot apply; the applicable principle would, at best, be the discretionary doctrine of the law of the case. 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.). But that doctrine also does not apply, because, as argued above, the plaintiffs have always asserted the disputed paragraphs in support of the unfair competition claims, and are not attempting to smuggle dismissed theories of recovery back into the case.

(and thus unfairly boosts its ability to compete on price) in part by charging lower rates for its UberX vehicles than taxis must charge by law. Uber avoids the expenses regulated cabs must pay for equipment, again giving it an unfair advantage by allowing it to convert these savings into reduced fares for its vehicles and lost business for the plaintiffs. These violations include: charging unlawfully low rates for UberX (taking business from licensed taxis); charging unlawfully high fares for Black Cars and SUVs (boosting revenues by charging affluent customers more than taxis can); paying none of the equipment costs of licensed taxis (cutting costs); paying no credit card processing fees to the company that operates in-cab credit card machines (cutting costs); economizing on insurance and misrepresenting coverage (cutting costs); using drivers in UberX, Black Cars and SUVs who do not have hackney licenses (cutting costs); unlawfully failing to have UberX, Black Cars and SUVs join an approved radio association (cutting costs); not providing cabs for handicapped riders (cutting costs); and failing to have required protective partitions (cutting costs). Uber's strategy for displacing licensed taxis and taking over the private transportation market in Boston relies on many unlawful practices, as reviewed above. Allegations that Uber cuts its costs unlawfully (e.g., avoiding credit card processing fees) are as relevant as allegations that Uber has boosted its revenues illegally, as long as these unlawful practices were part of a deliberate pattern of unfair competitive behavior that deprived the plaintiffs of business.

In *Katin v. Nat'l Real Estate Info. Servs., Inc.*, CIV. A. 07-10882DPW, 2009 WL 929554 (D. Mass. Mar. 31, 2009), Judge Douglas Woodlock analyzed the sufficiency of unfair competition pleadings when Massachusetts real estate attorneys sued

conveyancing services that allegedly practiced law without a license by conducting

closings without attorneys.[3]

> I find that the process of analyzing probable market effects is equally applicable
> as a means of evaluating the likelihood and imminence of an alleged injury in a
> private complaint. For example, in *Bancard Services, Inc. v. E*Trade Access,
> Inc.,* 292 F.Supp.2d 1235 (D.Or.2003), the court held that companies engaged in
> servicing and maintaining ATMs had standing to sue a competitor company over
> allegedly invalid "perpetual" customer contracts. The court noted that the
> plaintiffs and the defendant were direct competitors within the same market and
> industry, and that the allegedly illegal contracts were likely to prevent the
> plaintiffs from effectively competing for customers. *Id.* at 1243. On that basis, the
> court concluded: "[P]laintiffs establish an imminent competitive injury sufficient
> to show 'injury in fact.' " *Id.*

*Katin v. Nat'l Real Estate Info. Servs., Inc.*, CIV. A. 07-10882DPW, 2009 WL 929554
(D. Mass. Mar. 31, 2009)(footnotes omitted).

Judge Woodlock explained in detail that the *Twombly* standards for pleading injury in

fact can be met by establishing the overall effect of the defendant's unlawful behavior on

the relevant market, and the likelihood of harm to the plaintiff:

> Although these allegations are undeniably underdeveloped in certain respects—
> e.g., the lack of any allegations of particular lost customers or sales—I find that
> they are sufficient under the *Twombly* standard to allege an "injury in fact" and
> "causation" adequately. The pertinent market in this case may be larger than the
> city-wide market in *Rental Housing Ass'n,* but it is very similar to the state-wide
> market for milk producers that was confronted by the First Circuit in *Adams.* Just
> as the First Circuit concluded with respect to the state subsidies in *Adams,* I find
> there is a high likelihood that the market for Massachusetts conveyancing services
> has been affected—and will continue to be affected—by the presence of
> defendants' allegedly unlawful business. I further find there is a high likelihood
> that these market effects have had an adverse economic impact on the plaintiffs,
> however small and uncertain it may be. On this basis, I conclude that plaintiffs
> have pled sufficient facts "to raise a reasonable expectation that discovery will
> reveal evidence of" their allegations of lost profits and revenue. *Twombly,* 550
> U.S. at 556. The fact that the alleged injuries are predicated to some extent on the

---

[3] Judge Woodlock initially analyzed the plaintiffs' standing, and then adopted that section of his opinion in
ruling on the sufficiency of the pleadings. *Katin v. Nat'l Real Estate Info. Servs., Inc.*, CIV. A. 07-
10882DPW, 2009 WL 929554 (D. Mass. Mar. 31, 2009)

independent decisions of third parties (i.e., customers) does not undermine
plaintiffs' allegation of causation. *See Adams,* 10 F.3d at 923.

*Katin v. Nat'l Real Estate Info. Servs., Inc.*, CIV. A. 07-10882DPW, 2009 WL 929554
(D. Mass. Mar. 31, 2009)(footnotes omitted).

The Amended Complaint concretely alleges that Uber is, through a pattern of

unlawful conduct, attempting to become the sole provider in the private transportation

market in Boston, and that the plaintiffs have suffered economic loss as a result. Uber

argues, in substance, that each unlawful act must be linked to specific damages to the

plaintiffs. (Doc. 55 at 7-8.) As *Katin* confirms, an unfair competition claim is sufficiently

pled if it describes, in economically plausible terms, how a competitor's unlawful

participation in the market has caused the plaintiff economic loss. Current pleading

standards do not require that each unlawful act in an overall anti-competitive strategy be

linked to a particular instance of economic loss. To the contrary, the "plaintiffs have pled

sufficient facts to allege that they are subject to ongoing economic harm of a potentially

indefinite nature from the adverse effect of defendants' presence in the market for [taxi

services]." *Katin v. Nat'l Real Estate Info. Servs., Inc.*, CIV. A. 07-10882DPW, 2009 WL

929554 (D. Mass. Mar. 31, 2009).

        C.    Uber's Misrepresentations Concerning Its Insurance Coverage Support
              The Plaintiffs' Unfair Competition Claims.

Uber argues that "Plaintiffs' new allegation that Uber allegedly misrepresents the

insurance coverage applicable to UberX trips cannot support Plaintiffs' unfair

competition claims. . .because Plaintiffs articulate no injury that is traceable to that

alleged conduct." (Doc. 55 at 14.) As in their previous arguments, Uber presumes that

each instance of unlawful unfair competition must, standing alone, proximately cause

specific damages to the plaintiffs.  To the contrary, the plaintiffs have alleged, and will

11

prove, that Uber has used its unlawful misrepresentation concerning its insurance to deceive, reassure and garner customers, depriving the defendants of business and causing actual economic loss. The plaintiffs also will show that Uber's unlawful cost-cutting approach to insurance, which violates the Taxi Rules, allows it to pay less for insurance than licensed taxis. These unlawfully gained savings allow Uber to undercut the prices charged by the plaintiffs' cabs, diverting passengers to Uber and causing economic loss. Uber's misrepresentations falsely reassure passengers concerning the insurance protection they are receiving, again giving Uber an unfair competitive advantage in attracting customers.

As argued in the preceding section of this brief, this unlawful behavior need not be the sole proximate cause of specific customer decisions to choose Uber over the plaintiffs' cabs. It is sufficient that the misrepresentations concerning insurance are part of a pattern of unlawful unfair competitive behavior that in combination affects customer decisions to choose Uber over a licensed taxi, depriving the plaintiffs' cabs of business and causing the plaintiffs economic loss.

D. <u>The Court Must Interpret And Apply State Law In Cases Within Its Jurisdiction.</u>

Uber makes the curious argument that this Court should shy away from any interpretation of Massachusetts law, and then, with no supporting logic, leaps to the conclusion that any claim involving state law should be dismissed. ("This Court should disregard the legal conclusion that uberX-, uberBLACK-, and uberSUV-requested vehicles are "hackney carriages" as defined by Boston regulations, and thus should disregard the allegations that are based on that premise as well. . . . Therefore, Plaintiffs' claims that rely solely on application of Boston taxicab regulation to uberX-,

uberBLACK-, and uberSUV-requested vehicles should be dismissed.")(Doc. 55, p. 16.)

Uber's argument begins with a false premise. As the plaintiffs have pointed out in previous filings, state law, not Boston municipal regulations, define Uber Black Cars, SUVs and UberX vehicles as "hackney carriages," which must be licensed by Boston Police Commissioner:

> Section 2 of Chapter 392 of the Acts of 1930 defines a "Hackney Carriage" as any "vehicle used or designed to be used for the conveyance of persons for hire from place to place within the city of Boston," other than trolleys and other unrelated forms of public transportation. Section 3 states, as a matter of state law—not a mere Hackney Division regulation—that:
>
>> [N]o person shall drive or have charge of a hackney carriage, nor shall any person, firm or corporation set up and use a hackney carriage, unless licensed thereto by the Police Commissioner of the City of Boston; nor shall any person having the care or ordering of such a vehicle in said city suffer or allow any other person other than a driver so licensed to drive such a vehicle.

(Doc. 14, p. 2.)

> Thirty-three years later, the Massachusetts legislature returned to the subject of Boston taxis, and enacted Chapter 386 of the Acts of 1963 (also set out in Appendix I of Exhibit C to the Defendants' Memorandum [Doc. 14]), which states in relevant part:
>
>> In the city of Boston, no person driving or having charge of a taxicab₁ shall solicit the carriage of a passenger or passengers for hire unless said person is licensed as a hackney carriage driver and said taxicab is licensed as a hackney carriage, by the police commissioner of said city.

(Doc. 14, p. 3.)

In short, Uber is violating statutes passed by the Massachusetts legislature, not simply regulations adopted by the Boston Police Commissioner. As with the application of state law in any case in federal court, this Court should interpret and apply Massachusetts law as written.

Uber is correct that its operation also runs afoul of the Taxi Rules adopted by the Police Commissioner, and much of the Amended Complaint details how the plaintiffs suffer competitive disadvantage when they must comply with rules Uber ignores. Earlier in this litigation, Uber attempted unsuccessfully to convince this Court that a single Lanham Act precedent from the D.C. Circuit that refused to interpret and apply an ambiguous municipal agreement should lead this Court to dismiss the unfair competition claims. (Doc. 41, at 67, 81, 84-85.) Uber attempts to re-argue this issue, and the Court should rule as it did previously. The plaintiffs also note that the D.C. Circuit chose to defer to municipal authorities in interpreting a municipal agreement because the agreement was ambiguous. *Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 488-89 (D.C. Cir. 1996). No such ambiguity exists in the regulations Uber has violated, and the Court should not hesitate to assess the remaining state law unfair competition claims in light of the clear provisions of Rule 403. Finally, even if the Court found certain regulations ambiguous, that finding would not require dismissal of the unfair competition claims. It would simply lead to a ruling—at the summary judgment or trial stage—that the Court was unable to determine that that particular violation had been proven.

### E. The Plaintiffs Have Pled Proximate Causation Sufficiently For A RICO Claim Pursuant to 18 U.S.C. § 1962(a).

Citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), Uber claims that its fraudulent skimming of 10% of every fare is "too tenuous[ly]" connected to Uber's unfair competitive success against the plaintiffs to support the plaintiffs' RICO claims. (Doc. 55 at 20.) What Uber fails to note is that the Supreme Court remanded *Anza*, following which the Second Circuit found that the plaintiff adequately pled a RICO violation by alleging that the defendant's fraudulently obtained tax savings had been used to establish

a steel outlet that took business from the plaintiff's operation. *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 320-326 (2d Cir. 2011). The defendant sought to reverse this holding, but the Supreme Court denied certiorari. *Anza v. Ideal Steel Supply Corp.*, 132 S. Ct. 1636, 182 L. Ed. 2d 246 (2012).

On remand from the Supreme Court in the first round of appeals, the Second Circuit examined the causation requirements of 18 U.S.C. § 1962(a). Plaintiff Ideal Steel Supply Corporation ("Ideal") alleged that its competitor in retail steel sales, National Steel Supply, Inc. ("National") had failed to pay sales taxes and had, as a result, been able to build and open a store near Ideal's and sell steel for substantially less, depriving Ideal of business. 652 F.3d *at* 314. The Second Circuit noted that for purposes of 18 U.S.C. § 1962(c), which prohibits conduct of an enterprise through a pattern of racketeering activity, the Supreme Court had found that the causal link was too attenuated between National's tax fraud (victimizing the state) and the lower prices it charged customers (causing harm to Ideal) for purposes of § 1962(c). However, the Supreme Court left the causation issue for § 1962(a) open on remand. The Second Circuit found that:

> Further, the numerous disjuncts in § 1962(a) create a broad prohibition. Assuming a pattern of racketeering activity and a commerce-affecting enterprise, both the funds derived "directly or indirectly" from such activity and the "proceeds of such income" are tainted: no part of the "income, or the proceeds of such income" may lawfully be "use[d] or invest [ed]," whether "directly or indirectly," in "the establishment or operation" of that enterprise. Thus, although the injury alleged to result from the violation of subsection (a)—as from the violation of any other subsection of § 1962—must be sufficiently directly related to the violation to meet the legal standard of proximate cause implied in § 1964(c), the many disjuncts in § 1962(a) mean that any of dozens of combinations or permutations will constitute a violation of that section.

*Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 322 (2d Cir. 2011).

The Court found that a § 1962(a) violation had been pled where National used the proceeds of its fraud (lower taxes and increased revenues) to compete unfairly with Ideal:

> With respect to the claim under § 1962(a), the proper referent in the proximate-cause analysis is defendants' "use or invest[ment]" of the funds, derived directly or indirectly from the alleged pattern of racketeering activity, to establish or operate the National facility in the Bronx.

652 F.3d at 323.

> The Complaint alleged that before National opened its Bronx facility, Ideal had a dominant market position there, with no serious competitors, as no other Bronx vendors offered as comprehensive an array of goods and services as Ideal (*see id.* ¶ 11); that National's Bronx facility, opened in the summer of 2000 a mere eight minutes' drive from Ideal's facility, began to offer an array of goods and services similar to those offered by Ideal (*see id.* ¶¶ 9–15); and that the opening of National's Bronx facility caused a substantial decrease in Ideal's sales, profits, and local market share (*see id.* ¶ 43). We see nothing implausible in the allegations that a plaintiff business entity that had once enjoyed a dominant market position, with no serious competition from other, more limited, entities, lost business when a large competitor comparable in size and offerings to the plaintiff opened nearby.

652 F.3d at 324.

After the Second Circuit upheld Ideal's §1962(a) pleading, National again petitioned the Supreme Court for certiorari—and was denied. Given the Supreme Court's focus on RICO pleading standards in *Anza*, denial of certiorari sends a meaningful message concerning the Second Circuit's analysis of causation. In this case, the plaintiffs have alleged that Uber diverted 10% of customer fares through a pattern of wire fraud misrepresentations. These increased revenues then supported Uber's expansion of its unlicensed cabs in Boston, in the form of subsequently introduced UberX vehicles that undercut taxis in prices and bore none of the considerable expense associated with taxi medallions and compliance with the Taxi Rules. The plaintiffs allege, as in *Anza*, that Uber's unlawfully obtained revenues were used and invested in this new expansion of Uber's operations, directly causing a loss in the plaintiffs' revenues and a decrease in the

value of taxi medallions. As the Second Circuit pointed out, these allegations meet the

applicable *Twombly* standards:

> The *Twombly* Court stated that "[a]sking for plausible grounds ... does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]." 550 U.S. at 556, 127 S.Ct. 1955.

652 F.3d at 324.

As noted above, the Supreme Court declined to review or revise this holding on

certiorari. For the reasons set out in the Second Circuit's decision, the motion to dismiss

Count III, alleging violation of 18 U.S.C. § 1962(a), should be denied.

F. The Plaintiffs' RICO Claims Do Not Constitute An Ordinary Business Dispute

Citing only concurring and dissenting opinions from the Supreme Court's *Anza*

decision, Uber argues that the RICO claims should be dismissed because there is no

allegation that Uber is connected to organized crime. (Doc. 55 at 20-21.) The Second

Circuit dealt with that assertion in *Anza*:

> The prohibitions set out in RICO are not limited to the activities of organized crime but rather extend to any person or entity engaging in a "pattern of racketeering activity" as that term is defined in 18 U.S.C. § 1961(5).

652 F.3d at 321.

> But "the capacious language" Congress used in defining such terms as pattern of racketeering activity is not limited to conduct by entities having a nexus with organized crime, and "the legislative history shows that Congress knew what it was doing when it adopted commodious language capable of extending beyond organized crime."

652 F.3d at 321(*quoting from H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 246 (1989)).

Finally, the Second Circuit pointed out that pleading standards advocated by the

defendants would effectively negate RICO's core purposes:

> [I]f defendants' investment of the proceeds of their alleged pattern of mail and wire frauds has not sufficiently directly harmed Ideal to meet the standard of proximate cause, we find it difficult to envision anyone who could show injury proximately caused by that investment—or to fathom to whom Congress meant to grant a private right of action under subsection (a).

652 F.3d at 326.

G.   The Plaintiffs Have Adequately Pled Predicate Acts

Uber argues that the plaintiffs' allegations concerning predicate acts of wire fraud are insufficient, as one of the identified customers had signed up with Uber before it began operation in Boston. (Doc. 55 at 18.) To begin with, the plaintiffs have alleged that all Uber Boston customers automatically received false information about gratuities through the Uber website, an allegation that is adequately specific because it covers all customers for all periods Uber operated in Boston. The allegations concerning the two specific customers included in the Amended Complaint, ¶ 40, do not allege that the false information concerning gratuities in Boston was transmitted to these two customers at the time they originally became Uber customers. To the contrary, it simply alleges that they "received" this information from Uber, not that they received it on the date they first signed up. These allegations sufficiently identify predicate acts for RICO purposes.

III.    <u>CONCLUSION</u>

For the reasons stated above, Uber's Motion to Dismiss should be denied. In the event the Court finds that any of the claims in the Amended Complaint fail to meet pleading standards, the plaintiffs request leave to further amend their pleadings to cure any deficiency.

> The Plaintiffs,
> By their attorneys,
> BRODY, HARDOON, PERKINS &
> KESTEN, LLP
>
> /s/ Samuel Perkins
> Samuel Perkins  (BBO#542396)
> Richard E. Brody (BBO#058260)
> Michael Stefanilo (BBO# 684500)
> Brody, Hardoon, Perkins & Kesten, LLP
> One Exeter Plaza
> Boston, MA 02116
> (617) 880-7100
> sperkins@bhpklaw.com
> rbrody@bhpklaw.com
> mstefanilo@bhpklaw.com

DATED: September 19, 2014

<b><u>CERTIFICATE OF SERVICE</u></b>

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.

> /s/Samuel Perkins
> Samuel Perkins, BBO #542396